## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

TEXAS ENVIRONMENTAL JUSTICE
ADVOCACY SERVICES
900 North Wayside Dr.
Houston, Texas 77023;

AIR ALLIANCE HOUSTON
2520 Caroline St.
Houston, Texas 77004;

CONCERNED CITIZENS OF ST. JOHN
389 E 26th St.
Reserve, Louisiana 70084;

ENVIRONMENTAL JUSTICE HEALTH
ALLIANCE FOR CHEMICAL POLICY
REFORM
28 Vernon Street, Suite 434
Brattleboro, Vermont 05301;

ENVIRONMENTAL DEFENSE FUND
257 Park Ave S,
New York, New York 10010;

ENVIRONMENTAL INTEGRITY PROJECT
888 17th St. NW, Suite 810
Washington, D.C. 20006;

LOUISIANA ENVIRONMENTAL ACTION
NETWORK
P.O. Box 66323
Baton Rouge, Louisiana 70896;

NATURAL RESOURCES DEFENSE
COUNCIL, INC.
40 West 20th Street, 11th Floor
New York, New York 10011;

RISE ST. JAMES LOUISIANA
8581 Hwy 18
St. James, Louisiana 70086; *and*

SIERRA CLUB

**Case No. 1:25-cv-3745**

2101 Webster St., Suite 1300
Oakland, California 94612;

               *Plaintiffs*,

               v.

DONALD TRUMP, President of the United
States, in his official capacity;

U.S. ENVIRONMENTAL PROTECTION
AGENCY; *and*

LEE ZELDIN, Administrator of the U.S.
Environmental Protection Agency, in his official
capacity;

               *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.       On July 17, 2025, President Donald Trump issued a proclamation purporting to exempt 50[1] chemical manufacturing plants from requirements to monitor and control emissions of hazardous air pollutants like ethylene oxide and chloroprene for two years. *Regulatory Relief for Certain Stationary Sources to Promote American Chemical Manufacturing Security*, 90 Fed. Reg. 34,587 (July 23, 2025) ("HON Proclamation") (Ex. 1). EPA had issued these requirements in its 2024 updates to its hazardous air pollutant standards for more than 200 facilities that manufacture synthetic organic chemicals and polymers and resins in a new rule (known as the "HON Rule").[2] By imposing more stringent requirements to prevent and control toxic air

---

[1] President Trump's Proclamation listed 52 facilities. Based on a review of EPA facility records, two of those appear to be duplicates.

[2] "HON" stands for "Hazardous Organics NESHAP." "NESHAP" stands for "national emissions standards for hazardous air pollutants," the hazardous air pollutant standards issued under 42 U.S.C. § 7412. The HON Rule covers the synthetic organic chemical manufacturing industry and two groups of polymers and resins manufacturers.

pollutant emissions, the updated HON Rule is estimated to reduce the number of people facing elevated cancer risk from HON emissions by 96 percent.

2.    President Trump's HON Proclamation, soon after a request from industry trade groups, unilaterally sweeps away those protections for nearly one-quarter of all HON Rule-regulated facilities, giving facilities in states from Louisiana to Michigan a free pass to continue to pollute and put communities at risk for an additional two years. By granting these exemptions, President Trump has allowed facilities to delay controls for toxic pollutants including ethylene oxide—a known carcinogen linked to lymphoma, leukemia, and breast cancer. He has allowed facilities to forgo leak monitoring and repair requirements that would help timely detect and stop toxic emissions from leaky pumps and vents. He has allowed facilities to postpone updating their operational practices to prevent and minimize toxic emissions during maintenance activities. And he has allowed facilities to forgo fenceline monitoring that would identify when toxic emissions escape a facility's boundaries and poison neighboring communities.



Image from https://www.edf.org/maps/epa-pollution-pass/ (last accessed Oct. 22, 2025)

3.      The President granted these sweeping exemptions by seizing on a narrow and, until this year, never-before-used provision of the Clean Air Act, 42 U.S.C. § 7412(i)(4). That provision allows the President to exempt a source from a hazardous air pollutant standard for up to two years only if "the technology to implement" the relevant standard is "not available" and if exempting the source "is in the national security interests of the United States." 42 U.S.C. § 7412(i)(4). Neither of those predicates are met here.

4.      In the fifty-five years since Congress enacted Section 7412(i)(4), no President had ever used that exemption authority. In just the first six months of his term, President Trump has done so five times for a total of 170 facilities. Besides the HON Proclamation, President Trump has issued proclamations exempting nearly one-third of U.S. coal-fired power plants from mercury and other air toxics standards, nearly half of commercial medical sterilizers from ethylene oxide standards, and the entire taconite iron-ore processing industry from mercury standards.

5.      President Trump's sweeping HON Proclamation grossly exceeds the bounds of the Section 7412(i)(4) exemption authority. The Proclamation exempts nearly one-quarter of HON-regulated facilities from complying with any part of the Rule without any standard- or facility-specific analysis to show that any of the 50 specific facilities meets the statutory standard. In fact, many of the 2024 HON Rule's requirements cannot be reasonably understood as turning on any "technological availability," as required to invoke the Section 7412(i)(4) exemption. Rather, they are operational practices and prohibitions that reduce dangerous emissions from existing equipment and processes. For other requirements, the air pollution control technology needed to comply with the standards is widely available in the industry—and indeed already in use by many of the facilities that received exemptions.

6.      The scope, content, and context of the Proclamation show it for what it really is: a pretext to relieve polluters from working to comply with the 2024 HON Rule while EPA works administratively to repeal those critical protections. Congress explicitly prohibited that sort of delay pending administrative reconsideration. 42 U.S.C. § 7607(d).

7.      The Proclamation violates the Clean Air Act and exceeds the President's lawful authority. Plaintiffs ask the Court to enter appropriate relief declaring the Proclamation unlawful and invalid and enjoining EPA and its Administrator from implementing or giving effect to it.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under laws of the United States, including the Clean Air Act.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because Plaintiff Environmental Integrity Project resides in this judicial district, because Defendants reside in this judicial district, and because a substantial part of the events giving rise to the claim occurred in this judicial district.

10.      The Court has authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

## PARTIES

### *The Plaintiffs*

11.      Plaintiff Louisiana Environmental Action Network ("LEAN") is a nonprofit organization based in Louisiana. LEAN is an environmental justice network of community members that advocate for environmental justice and protection from toxic pollution in

Louisiana. Through public education, advocacy, and community organizing, LEAN educates communities about the environmental impacts of industry and development, and empowers them to advocate for protecting human health and the environment.

12.    Plaintiff Environmental Justice Health Alliance for Chemical Policy Report ("EJHA") is a national network of grassroots environmental and economic justice organizations and advocates in communities that are disproportionately impacted by toxic chemicals from legacy contamination, ongoing exposure to polluting facilities, and health-harming chemicals in household products. EJHA has over a dozen member community-based environmental justice organizations in ten states. EJHA's member organizations represent communities in areas impacted by hazardous air pollutant emissions, including emissions from HON-regulated facilities. EJHA's mission is to support its affiliate member organizations to achieve a just transition to a pollution-free economy that leaves no community or worker behind.

13.    Plaintiff Air Alliance Houston ("AAH") is a nonprofit organization based in Texas. AAH works to reduce air pollution in the Houston region to protect public health and environmental integrity by conducting applied research on air pollution, educating the community about the sources and harms of air pollution, and advocating for improvements at the local, state, and national levels. AAH works closely with constituents to provide the training and technical assistance they need to address air pollution in their daily lives.

14.    Plaintiff Concerned Citizens of St. John ("CCSJ") is a nonprofit organization based in St. John the Baptist Parish, Louisiana. CCSJ advocates for community health and safety by working to reduce pollution and to protect the air, water, and soil in Louisiana. CCSJ also works to educate the residents of St. John Parish about environmental pollution and health risks.

15.     Plaintiff RISE St. James Louisiana is a nonprofit, grassroots, and faith-based organization based in Louisiana. RISE St. James advocates for racial and environmental justice in St. James Parish, Louisiana and in other river parishes impacted by toxic pollution.

16.     Plaintiff Texas Environmental Justice Advocacy Services ("t.e.j.a.s.") is a nonprofit organization with its headquarters in Houston, Texas. T.e.j.a.s. promotes environmental protection and environmental justice through education, policy development, community outreach, and legal action to ensure that everyone, regardless of race or income, is entitled to live in a clean environment.

17.     Plaintiff Environmental Defense Fund ("EDF") is a nonprofit environmental organization dedicated to finding practical solutions to critical environmental problems through the use of science, economics, policy, and law. EDF regularly collects and publishes data that highlights harm from petrochemical and industrial air pollution, including mapping reported air toxic emissions from petrochemical facilities alongside health risk levels, to provide information to communities and policymakers. *See, e.g.*, Petrochemical Air Pollution Map, https://www.clearcollab.org/pollutionmap/. EDF has offices throughout the United States, including in the District of Columbia. As a membership-based organization, EDF currently has more than 330,000 members, in all 50 states and the District of Columbia. These members have a strong interest in protecting human health and the environment from pollution.

18.     Plaintiff Environmental Integrity Project ("EIP") is a nonprofit, nonpartisan organization based in Washington, D.C. that empowers communities and protects public health and the environment by investigating polluters, holding them accountable under the law, and strengthening public policy on toxic air pollution and other environmental health issues. EIP works for more effective enforcement of environmental laws.

7

19.    Plaintiff Natural Resources Defense Council ("NRDC") is a national nonprofit environmental membership organization with hundreds of thousands of members nationwide. NRDC's purpose is to safeguard the Earth—its people, its plants and animals, and the natural systems on which all life depends. Part of NRDC's core mission is to improve air quality and safeguard public health by combating hazardous air pollutant emissions.

20.    Plaintiff Sierra Club is a nonprofit corporation with its headquarters located in Oakland, California. The Sierra Club is a national membership organization dedicated to the protection of public health and the environment and regularly advocates for policies that protect clean air. It has chapters in Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, North Carolina, Texas, and Virginia, and more than 600,000 members residing in all 50 states, the District of Columbia, and Puerto Rico.

*The Defendants*

21.    Defendant Donald Trump is the President of the United States. He resides and conducts his duties in Washington, D.C. He is sued in his official capacity.

22.    Defendant U.S. Environmental Protection Agency ("EPA") is a federal agency of the United States. EPA is headquartered in Washington, D.C.

23.    Defendant Lee Zeldin is the Administrator of the U.S. Environmental Protection Agency. He resides and conducts his duties in Washington, D.C. He is sued in his official capacity.

## LEGAL BACKGROUND

*The Clean Air Act's Program to Address Hazardous Air Pollution*

24.     Clean Air Act Section 112, 42 U.S.C. § 7412, establishes the framework for EPA's regulation of "hazardous air pollutants" from stationary sources, including industrial facilities.

25.     "Hazardous air pollutants" for Section 7412 purposes are a group of 188 air pollutants determined by Congress and EPA to be particularly harmful to human health. Ethylene oxide, benzene, 1,3-butadiene, ethylene dichloride, vinyl chloride, and chloroprene are hazardous air pollutants.

26.     Section 7412 requires EPA to regulate hazardous air pollutants by issuing emissions standards for categories and subcategories of stationary sources of such pollutants. Emissions standards must require the maximum degree of reduction that EPA deems "achievable," taking into consideration cost and any non-air quality health and environmental impacts and energy requirements. *Id.* § 7412(d)(2), (3)(A)-(B).

27.     After EPA establishes Section 7412 standards for a source category, the Clean Air Act requires EPA to perform recurring reviews to ensure that the standards adequately address risks to health and welfare from hazardous air emissions and that they reflect advancements in technology and practice that allow sources to achieve even greater emission reductions. These reviews are often done together and are known as the "residual risk and technology review."

28.     In a technology review, EPA must "review, and revise" the Section 7412 standards "as necessary (taking into account developments in practices, processes, and control technologies)." *Id.* § 7412(d)(6).

29.     In a risk review, EPA determines whether unacceptable risk to public health remains, or is likely to remain, from hazardous air pollutant emissions even after the application

of Section 7412 standards. If unacceptable risk remains, EPA must promulgate additional standards that eliminate the unacceptable risk, "provide an ample margin of safety to protect public health," and prevent "an adverse environmental effect." *Id.* § 7412(f)(2)(A).

30.     Congress also prescribed strict compliance schedules for Section 7412 standards. Residual risk-based emissions standards "shall become effective upon promulgation" for new sources, or 90 days after the effective date for existing sources. *Id.* § 7412(f)(3). EPA may waive compliance for up to two years only if it determines "such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." *Id.* § 7412(f)(4)(B).

31.     For standards revised as the result of a technology review, EPA must require existing sources to comply "as expeditiously as practicable," and no later than three years after the effective date. *Id.* § 7412(i)(3)(A). EPA may grant a source up to one additional year to comply only where "such additional period is necessary for the installation of controls." *Id.* § 7412(i)(3)(B).

*Clean Air Act Procedural Requirements*

32.     The Clean Air Act sets out rulemaking requirements that apply to "the promulgation or revision of any . . . emission standard or limitation under section 7412(d)." *Id.* § 7607(d)(1)(C). EPA must establish a rulemaking docket, publish a notice of proposed rulemaking in the Federal Register, and provide a statement of basis and purpose for the rule that includes the factual data on which the proposed rule is based, the methodology used in obtaining and analyzing the data, and the major legal interpretations and policy considerations underlying the proposed rule. *Id.* § 7607(d)(3). EPA must also provide, along with the proposal, any

comments by the Scientific Review Committee and the National Academy of Sciences and all data, information, and documents. *Id*.

33.     The Clean Air Act also requires EPA to allow any person to submit written comment, and to provide an opportunity for oral presentation of data, views, or arguments, on a proposed rule. *Id*. § 7607(d)(5); *see also id*. § 7607(h). In promulgating a final rule, EPA must provide a statement of basis and purpose as required at the proposal stage and must explain major changes from the proposed to final rule. *Id*. § 7607(d)(6)(A). EPA must also provide a response to each of the significant comments, criticisms, and new data submitted during the comment period. *Id*. § 7607(d)(6)(B). EPA may not base a promulgated rule on "any information or data which has not been placed in the docket as of the date of such promulgation." *Id*. § 7607(d)(6)(C).

34.     The Clean Air Act also provides procedures for reconsidering a promulgated rule. The EPA Administrator can "convene a proceeding for reconsideration of the rule" but must "provide the same procedural rights as would have been afforded" in the original proceeding. *Id*. § 7607(d)(7)(B). The Act states, however, that reconsideration "shall not postpone the effectiveness of the rule," except that the Administrator or a reviewing court may stay the effectiveness of the rule "for a period not to exceed three months." *Id*. Section 7607(d)(7)(B) is the sole authority EPA has to stay a rule after its effective date has passed. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

*Presidential Exemption Provision*

35.     Section 7412(i)(4) of the Clean Air Act authorizes the President, in narrowly prescribed circumstances, to "exempt any stationary source from compliance" with hazardous air pollutant standards promulgated under Section 7412, "for a period of not more than 2 years if the

President determines [1] that the technology to implement such standard is not available and [2] that it is in the national security interests of the United States to do so." 42 U.S.C. § 7412(i)(4).

36.    The President may extend the original exemption "for 1 or more additional periods, each period not to exceed 2 years." *Id*.

## FACTUAL AND PROCEDURAL BACKGROUND

*Synthetic Organic Chemical Manufacturing Industry NESHAP*

37.    In 1994, EPA promulgated the first hazardous air pollutant standards for synthetic organic chemical manufacturing industry ("SOCMI") processes at 40 C.F.R. part 63, subparts F, G, H, and I. 59 Fed. Reg. 19,402 (Apr. 22, 1994). EPA completed a residual risk and technology review for the HON Rule in 2006. 71 Fed. Reg. 76,603 (Dec. 21, 2006).

38.    The SOCMI source category comprises any facility engaged in manufacturing processes that produce synthetic organic chemicals. Those chemicals are primarily used to manufacture plastics, as well as rubbers, paints, adhesives, and pesticides. Demand for synthetic organic chemicals is driven by the growth of automotive and packaging sectors in emerging economies like India, Brazil, Vietnam, and Thailand.

39.    Emissions from SOCMI facilities are a major driver of cancer risk for millions of Americans. EPA estimated that emissions from the SOCMI source category alone is responsible for one excess cancer case every 6 months. EPA estimated that approximately 50,000,000 people live within 50 kilometers of SOCMI facilities, and that more than 7 million of those are estimated to have cancer risk above EPA's presumptively "unacceptable" rate of 100-in-1 million because of those facilities' emissions.

40.    EPA's estimates are based on modeled emissions from SOCMI facilities based on facilities' reported emissions. Studies have shown that actual hazardous emissions are often

higher. One study in Louisiana's "Cancer Alley," an 85-mile stretch along the Mississippi River between Baton Rouge and New Orleans that is home to more than 100 petrochemical manufacturers and refineries, found that pollution levels outside the property lines of ethylene oxide-emitting facilities were 10 times higher than EPA estimates.

*Polymers and Resins NESHAP*

41.     In 1995, EPA established the first standards for certain polymer and resins manufacturing processes at 40 C.F.R. part 63, subpart W, known as the Group II Polymers and Resins NESHAP ("P&R II NESHAP"). 60 Fed. Reg. 12,670 (Mar. 8, 1995). EPA completed a residual risk and technology review for the P&R II NESHAP in 2008. 73 Fed. Reg. 76,220, 76,223 (Dec. 16, 2008).

42.     In 1996, EPA established the first standards for various elastomer manufacturing processes at 40 C.F.R. part 63, subpart U, known as the Group I Polymers and Resins NESHAP ("P&R I NESHAP"). 61 Fed. Reg. 46,906 (Sep. 5, 1996). EPA completed a residual risk and technology review for those standards in 2008 and 2011. 73 Fed. Reg. at 76,223; 76 Fed. Reg. 22,566 (Apr. 21, 2011).

43.     EPA estimated that of the approximately 1,000,000 people live within 50 kilometers of the Denka facility, a neoprene manufacturer that emits chloroprene, 690,000 are estimated to have a cancer risk at or above 1-in-1 million from primarily the chloroprene emitted from Denka's source category emissions, with 2,000 people estimated to have a cancer risk above 100-in-1 million.

*The HON Risk & Technology Review*

44.     In 2010, EPA for the first time published a cancer potency for chloroprene, a pollutant emitted by the P&R I sources producing neoprene, in its Integrated Risk Information

System ("IRIS"). This cancer potency estimate was not available when EPA conducted its initial residual risk and technology review for P&R I source categories in 2008. 88 Fed. Reg. at 25,090. As a result, EPA's initial risk assessment and hazardous air pollutant standards treated chloroprene as presenting zero risk. Chloroprene is a likely human carcinogen that increases the risks of multiple cancers in addition to increasing the risk of non-cancer nervous system, immune system, and respiratory harms.

45.     In 2016, EPA updated its IRIS assessment for ethylene oxide, a pollutant emitted by the SOCMI source category. The updated IRIS assessment showed that ethylene oxide was a significantly more potent carcinogen than previously known. Exposure to even small amounts of ethylene oxide increases the risk of lymphoid cancer, such as non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia, as well as breast cancer. Ethylene oxide exposure is also linked to respiratory, nervous system, and hormone disruption. Children are more susceptible to health effects from ethylene oxide exposure.

46.     That change in EPA's understanding of health risks led the Agency to determine that it was necessary to conduct an updated residual risk review for the SOCMI and P&R I source categories, in addition to the technology review required under 42 U.S.C. § 7412(d)(6).

47.     In its final Residual Risk Assessment for SOCMI sources, EPA found the cancer risks in communities adjacent to HON facilities are "unacceptable," driven in large part by those facilities' ethylene oxide emissions.

48.     Without the requirements of the 2024 HON Rule, approximately 83,000 people living within 50 kilometers of SOCMI sources are exposed to "unacceptable" cancer risk above 100-in-1 million, and over 7 million people are exposed to excess cancer risk of 1-in-1 million.

The highest cancer risk from HON sources is 2,000-in-1 million—approximately 20 times higher than the level of risk that EPA considers presumptively "unacceptable."

49.     In addition to ethylene oxide and chloroprene, EPA identified at least eight additional hazardous air pollutants emitted by SOCMI sources contributing to risks above 1-in-1-million—which the Agency described as risk "drivers"—including acrylonitrile, ethylene dichloride, naphthalene, vinyl chloride, benzene, hydrazine, acrylamide, and nickel.

50.     Even after implementing the controls required by the 2024 Rule, EPA estimates that several pollutants other than ethylene oxide will cause roughly 40 percent of the remaining cancer risk from SOCMI sources. 89 Fed. Reg. 42,957 (May 16, 2024).

51.     In its final Residual Risk Assessment for P&R I neoprene production sources, EPA determined that the maximum individual lifetime cancer risk was 500-in-1-million before implementing the requirements of the 2024 Rule, and that 690,000 people living within 50 kilometers of the neoprene production source would be exposed to lifetime cancer risks greater than 1-in-1-million.

52.     EPA also conducted a technology review for the SOCMI and P&R source categories. EPA determined that developments in practices, processes, and control technologies warranted revisions to standards for heat exchange systems, storage vessels, and process vents in one or more of the SOCMI and both P&R source categories. EPA promulgated several new requirements to reflect those developments. 89 Fed. Reg. at 42,948-49.

*The 2024 HON Rule*

53.    EPA finalized the 2024 HON Rule in May 2024. 89 Fed. Reg. at 42,932. The 2024 HON Rule became effective on July 15, 2024.

54.    EPA found that the 2024 HON Rule would reduce hazardous air pollutant emissions by 6,230 tons per year, and reduce the number of local residents facing elevated cancer risks from HON emissions by 96 percent.

55.    Though EPA was not able to monetize the benefits from these reductions, EPA found the rule's reductions of volatile organic compound emissions and ozone would yield at least $77 to $690 million (using a 3 percent discount rate). 89 Fed. Reg. at 43,060.

56.    The 2024 HON Rule was projected to impose about $455 million in total capital costs across all regulated sources.

57.    The total annual cost of the rule is about $168 million.

58.    The annual cost represents less than 0.1 percent of the value of the U.S. synthetic organic chemical manufacturing industry, which was valued at $168 billion in 2022.

59.    The 2024 HON Rule established a variety of requirements applicable to different chemical manufacturing process units ("CMPUs"). Different HON facilities have different arrays of CMPUs, and thus are subject to different combinations of requirements from the 2024 HON Rule. For example, facilities that do not use or emit ethylene oxide would not be required to comply with ethylene oxide-specific requirements.

60.    Different HON facilities emit different arrays of hazardous organic air pollutants.

61.    For instance, the Formosa Plastics facility in Baton Rouge, Louisiana, is a plastics and resins manufacturer that emitted at least 21 hazardous air pollutants in 2024, including benzene, chloroprene, dioxins, and vinyl chloride.

62.     The Westlake Vinyls facility in Geismar, Louisiana, is a plastics and resins manufacturer that emitted at least 29 hazardous air pollutants in 2024, including benzene, chloroprene, dioxins, ethylene oxide, and vinyl chloride.

63.     The Citgo Petroleum Corporation Lemont Refinery is a petroleum refinery that emitted at least 34 hazardous air pollutants in 2024, including benzene and 1,3-butadiene.

64.     The 2024 HON Rule standards can be grouped and summarized as follows:

65.     *Ethylene oxide control requirements:* The 2024 HON Rule requires facilities that use, store, or emit ethylene oxide to reduce ethylene oxide emissions from process vents and storage vessels by either (1) venting the ethylene oxide to a control device that reduces ethylene oxide by a certain amount (for example, greater than or equal to 99.9 percent by weight), or (2) venting the ethylene oxide to a flare that meets preexisting performance, operation, and maintenance requirements. *See* 40 C.F.R. §§ 63.113(j) (process vents), 63.119(a)(5) (storage vessels). The Rule also sets new standards for wastewater containing ethylene oxide, including certain control measures and a prohibition on disposing of such wastewater through any heat exchange system. *Id*. § 63.104(k). The Rule prohibits bypassing air pollution controls for equipment that carries ethylene oxide and makes an atmospheric release from a pressure relief device a violation of the standard. *See* 89 Fed. Reg. at 42,957, 43,017; 40 C.F.R. § 63.165(e)(3)(v)(D). The compliance deadline for these provisions is July 15, 2026. 40 C.F.R. § 63.100(k)(11).

66.     *Fenceline monitoring and corrective action requirements:* The 2024 HON Rule requires facilities that use, store, or emit one or more of benzene, 1,3-butadiene, chloroprene, ethylene dichloride, ethylene oxide, and vinyl chloride to sample along the facility's property boundary (known as the "fenceline"). 40 C.F.R. § 63.184. The Rule provides standardized

sampling procedures for each of the pollutants. *See id.* § 63.184(b), (c). The Rule also creates an "action level": if the samples show concentrations of any of the six pollutants above a certain concentration, the facility's owner or operator must take specified actions to identify the root cause of the exceedance and take corrective action, including actions to prevent future exceedances. *Id.* § 63.184(d)(3), (e), (f). The compliance deadline for fenceline monitoring is July 15, 2026, and the compliance deadline for corrective action is July 15, 2027. *Id.* § 63.100(k)(12).

67.    *Leak detection and repair requirements:* The 2024 HON Rule requires facilities to implement new leak detection and repair requirements for certain equipment in ethylene oxide service to more quickly identify and correct leaks. These requirements include more frequent monitoring, with a lower leak concentration requiring repair, shorter deadlines to repair leaks, and limitations on any delay of repair. *See, e.g.,* 40 C.F.R. §§ 63.104(g)(6), 63.174(a)(3), (b)(3)(vi), (d) (g)(3), § 63.171(f). The compliance deadline for these requirements is July 15, 2026. *Id.* § 63.100(k)(11). The 2024 HON Rule also requires facilities to implement new leak detection and repair requirements for heat exchange systems generally, and the compliance deadline for those requirements is July 15, 2007, *id.* § 63.100(k)(10).

68.    *Work practice standards:* The 2024 HON Rule establishes work practice standards for pressure relief devices and maintenance activities designed to prevent or minimize hazardous air pollutant emissions during maintenance activities or upsets. For instance, the Rule requires facilities with pressure relief devices that vent to the atmosphere to implement three release prevention measures such as routine inspection and maintenance programs or operator training; to monitor pressure relief devices and take corrective action if there are emissions. 40 C.F.R. § 63.165(e)(3)(i)-(iii). The Rule also prescribes how and when operators can open process

equipment, including recordkeeping requirements and restrictions on the amount of ethylene

oxide released from maintenance vents, and standards for maintenance on storage vessels. *See id.*

§§ 63.113(k), 63.119(b)(7) (work practice standards during planned routine maintenance of a

fixed roof and an internal floating roof used for storage vessel compliance with total organic

HAP emission control requirements). The compliance deadline for these provisions is July 15,

2027. *Id.* § 63.100(k)(10).

69.     *Bypass prohibition:* The 2024 HON Rule prohibits owners and operators of HON

facilities from bypassing an air pollution control device at any time, and provides that in most

instances bypassing a control device is a violation of the applicable emission standard. 40 C.F.R.

§§ 63.114(d)(3) (process vents), 63.119(e)(7) (storage vessels), 63.127(d)(3) (transfer racks),

63.148(f)(4) (vapor collection systems and closed vent systems). The compliance deadline for

these provisions is July 15, 2027. *Id.* § 63.100(k)(10).

70.     *Operating and monitoring requirements for flares:* The Rule sets revised

operating and monitoring requirements for flares used as air pollution control devices. *See, e.g.*,

*id* §§ 63.108, 63.508. The Rule's requirements mirror and cross-reference the flare requirements

promulgated in EPA's 2015 hazardous air pollutant rules for refineries. These revisions include a

requirement that facilities operate at a minimum and monitor the net heating value of gases at the

flare combustion zone, taking into account any "assist" steam or air added to the stream. The

Rule also requires the use of certain methodologies to determine compliance. *See id.*

§§ 63.108(a), (c), 63.508(a).

71.     EPA determined that existing HON sources could comply with the requirements

of the HON Rule within the statutory timeframes of two years (for section 7412(f) ethylene

oxide requirements) and three years (for section 7412(d) technology-based requirements)—by

July 15, 2026, and July 15, 2027, respectively. 89 Fed. Reg. at 42,953-55. Each of these is the maximum compliance timeframe allowed under the statute. EPA also determined that HON sources could comply with fenceline monitoring requirements within two years, and fenceline monitoring root cause analysis and corrective action requirements within three years. *Id*. at 42,954.

72.     On January 31, 2025, the industry trade groups American Chemistry Council and the American Fuel and Petrochemical Manufacturers filed a petition for reconsideration of the HON Rule, requesting a broad rollback of the Rule's standards. The industry groups also requested that EPA "provide interim relief . . . while EPA takes regulatory action or addresses the more detailed issues" in the reconsideration petition. Among the options for interim relief suggested by the industry groups was that EPA "should request that the President provide national security exemptions under § 112(i)(4)."

73.     Less than two months later, on March 12, 2025, in a press event billed as "the greatest day of deregulation our nation has seen," EPA announced that it would "reconsider" the 2024 HON Rule and 31 other regulations protecting human health and the environment. EPA, News Release, *EPA Launches Biggest Deregulatory Action in U.S. History* (Mar. 12, 2025), https://perma.cc/EXL5-FAMQ (last visited Oct. 21, 2025).

74.     Along with its press release, EPA published a "fact sheet" about its planned reconsideration of the HON Rule and seven other recent hazardous air pollutant rules. That fact sheet included an invitation that "[a]ny source interested in a Presidential exemption" from any of the eight rules, "should provide their recommendations to EPA by March 31, 2025." EPA, *Oil and Gas Regulations: Powering the Great American Comeback Fact Sheet* 3, https://perma.cc/E8UM-RN3K (last visited Oct. 21, 2025). The Fact Sheet further explained,

"Sources need only provide why technology is unavailable and why it is in the national security interests of the United States to provide the exemption." *Id*.

75.     Following up on its invitation to request exemptions, on or about March 24, 2025, EPA posted a new webpage announcing it had established "an electronic mailbox"— airaction@epa.gov—"to allow the regulated community to request a Presidential Exemption under section 112(i)(4)." EPA, *Clean Air Section 112 Presidential Exemption Information* (last updated Apr. 14, 2025), https://perma.cc/WKL5-44FC (last visited Oct. 21, 2025). EPA asked that requests be submitted "by March 31, 2025," a week after the webpage was posted. *Id.*[3]

76.     EPA did not solicit any information from the public, or provide any opportunity for public comment.

77.     Facility owners and operators across multiple source categories sent exemption requests to that email inbox. Many requests urged the President to interpret the statutory considerations of technological availability and national security to encompass the cost of compliance and economic "security" and development. The industry trade groups American Chemistry Council and the American Fuel and Petrochemical Manufacturers also submitted a request for a blanket two-year exemption from the HON rule for all covered facilities.

*The HON Proclamation*

78.     On July 17, 2025, President Trump issued a proclamation exempting a list of HON-regulated facilities from "those aspects of the HON Rule that were promulgated under section 112 of the Clean Air Act, 42 U.S.C. 7412 for a period of 2 years beyond the HON Rule's relevant compliance dates." 90 Fed. Reg. at 34,587. The HON Proclamation cited "authority

---

[3] EPA has since removed much of the information in an April 14, 2025 update to the webpage. *See* EPA, *Clean Air Act Section 112 Presidential Exemption Information,* https://perma.cc/WKL5-44FC (last visited Oct. 21, 2025).

vested in [the President] by the Constitution and the laws of the United States, including section 112(i)(4) of the Clean Air Act, 42 U.S.C. 7412(i)(4)." *Id.* The HON Proclamation stated that it "applies to all compliance deadlines established under the HON Rule applicable to the stationary sources listed in Annex I, with each such deadline extended by 2 years from the date originally required for such deadline." *Id.*

79.     The Exemption Proclamation included what it referred to as two "determinations."

80.     First, the Exemption Proclamation purported to "determine" that "[t]he technology to implement the HON Rule is not available," stating that "[s]uch technology does not exist in a commercially viable form sufficient to allow implementation of and compliance with the HON Rule by the compliance dates in the HON Rule." *Id.* at 34,588.

81.     Second, the Exemption Proclamation purported to determine that "[i]t is in the national security interests of the United States to issue this Exemption for the reasons stated in paragraphs 1 and 3 of this proclamation." *Id.* Paragraph 1 asserted that "[m]aintaining a robust domestic chemical industry is vital to safeguarding the supply chains that underpin our economy and to reducing the Nation's dependence on foreign control over materials critical to national resilience." *Id.* at 34,587. Paragraph 3 asserted that "[t]he HON Rule imposes substantial burdens on chemical manufacturers already operating under stringent regulations," and posited that "the timeline for compliance" with the HON Rule "would require shutdowns or massive capital investments before any proven pathway to compliance exists" and would "weaken key supply chains, increase dependence on foreign producers, and impair our ability to respond effectively in a time of crisis." *Id.*

82.     The Exemption Proclamation and "Annex I" were published in the Federal Register on July 23, 2025. *Id.* at 34,587-91.

83.     The Exemption Proclamation included no facility-, standard-, or technology-specific determinations. Instead, the Exemption Proclamation broadly and conclusory purported to "determine" that the technology to implement the 2024 HON Rule (in its entirety) was not available and that exemptions are in the national security interests of the United States.

84.     For example, the HON Proclamation purports to exempt from ethylene oxide standards facilities that do not emit ethylene oxide, and thus to which the ethylene oxide control requirements do not apply.

85.     The HON Proclamation purports to exempt from fenceline monitoring requirements facilities that have successfully implemented fenceline monitoring, either due to consent decree requirements or the requirements of other hazardous air pollutant standards.

86.     The HON Proclamation purports to exempt from ethylene oxide control requirements facilities that already have air pollution control devices and/or flares that would meet those standards.

87.     The HON Proclamation purports to exempt facilities from requirements for which "technology" is not needed to "implement" the standards, such as more frequent leak monitoring.

88.     The HON Proclamation purports to exempt from the HON standards facilities that have or are in the process of retiring their HON-regulated units.

89.     The HON Proclamation's indiscriminate exemptions apply without any consideration of whether the facilities have the technology and operational capability to implement the 2024 HON Rule's standards.

*Technology to implement the Rule's requirements is widely available*

90.     The Proclamation's unsupported determinations are unambiguously contradicted by factual evidence, including EPA's own findings and record for the 2024 HON Rule.

91.     *Ethylene oxide control requirements*: Technology to implement the ethylene oxide control requirements is widely available.

92.     For example, for the requirement to control emissions from process vents using ethylene oxide, the Rule allows facilities a range of options, including that they may use a control device that reduces ethylene oxide to by greater than or equal to 99.9 percent by weight or may simply use a flare operating in compliance with the revised operating and monitoring requirements. *See* 40 C.F.R. § 63.113(j).

93.     Air pollution control devices that are capable of meeting the standards are commercially available and feasible to implement.

94.     Flares that are capable of meeting the standards are commercially available and feasible to implement. Many exempted facilities already possess and operate flares capable of meeting the standards.

95.     The exempted facilities either do not need any technology to implement aspects of these standards, already have in place the technology necessary to implement other aspects of the standards, or can obtain the widely commercially available and technically feasible technology to implement other aspects of these standards.

96.     The same air pollution control devices or flares needed to comply with the control requirements of the 2024 HON Rule are widely used by owners and operators of equipment and processes that are subject to similar ethylene oxide standards imposed in 2020 by the

Miscellaneous Organic Chemical Manufacturing hazardous air pollutant standards (known as the "MON Rule").

97.     Many facilities regulated by the MON Rule are co-located with equipment and processes regulated by the HON Rule. On information and belief, only 14 of the exempted facilities would be subject to the ethylene oxide control requirements of the 2024 HON Rule. On information and belief, 9 of those 14 exempted facilities are subject to the MON Rule. As discussed below, EPA assumed for certain HON facilities co-located with MON facilities that "the HON facility likely upgraded at least one HON flare already." It is therefore likely that many of the exempted facilities already have the required control technology in place.

98.     Technology to implement the 2024 HON Rule's ethylene oxide wastewater controls is available.

99.     The controls for wastewater streams in ethylene oxide service can be implemented with a device called a steam stripper, a technology and a method that has been available since at least 1992, when EPA analyzed the effectiveness of steam stripping to remove organic pollutants from wastewater streams in the original HON rulemaking.

100.    HON-regulated facilities already use the technological controls necessary to comply with the wastewater requirements on non-ethylene oxide wastewater streams.

101.    *Fenceline monitoring*: Technology to implement the fenceline monitoring requirement is available.

102.    The majority of exempted facilities would only be required to use passive diffusive tube monitors to comply with the fenceline monitoring requirements for benzene, chloroprene, 1,3-butadiene, and ethylene dichloride. Fenceline monitoring with passive diffusive

tube monitors has been successfully implemented in the petroleum refineries source category since 2018.

103.    Many refineries are co-located with HON-regulated processes. On information and belief, of the 39 exempted facilities that would be required by the 2024 HON Rule to conduct passive fenceline monitoring for at least one pollutant, 10 of these facilities are already conducting this very same passive fenceline monitoring consistent with the standards for the refineries source category.

104.    The monitoring technology used by refineries since 2018 is the same technology that the 2024 rule requires for measuring benzene, chloroprene, 1,3-butadiene, and ethylene dichloride. Under the 2024 HON Rule, the majority of HON-regulated sources, including the majority of exempted facilities, would be required to conduct only the passive diffusive tube monitoring.

105.    Some facilities would be required to use canister sampling technique Method 327 to comply with the fenceline monitoring requirements for ethylene oxide and vinyl chloride. On information and belief, only 17 of the 50 exempted facilities would be required to use canister monitoring under Method 327.

106.    Canister sampling using Method 327 is an available technology.

107.    Canister sampling has been an EPA-approved method since at least 1989. The differences between Method 327 and its immediate precursor (Method TO-15A) have to do with "Best Practices" and "enhanced [quality assurance/quality control]," 89 Fed. Reg. at 43,008, not a change in the underlying sampling technology.

108.    In developing the 2024 Rule, EPA requested fenceline monitoring data from eleven HON facilities. EPA required that these facilities use a modified Method TO-15 for

26

certain pollutants, in effect requiring what would become Method 327. The subject facilities were able to comply.

109.    Today, multiple laboratories in the United States are offering Method 327 services. Canister sampling using Method 327 is an available technology.

110.    *Leak detection and repair requirements:* Technology to implement the 2024 Rule's leak detection and repair requirements is available.

111.    The technology to monitor heat exchange systems employs common sampling and analysis methods. As such, the Rule does not require facilities to install or implement any new technology.

112.    For connectors in ethylene oxide service, the Rule simply requires facilities to conduct the same kind of leak detection practices using the same devices or equipment that facilities had already conducted pursuant to the previous HON requirements, but on a more frequent basis and with quicker repair based on a lower leak concentration. The updated requirements apply narrowly to a subset of facilities subject to the Rule—just those that use ethylene oxide, which EPA estimated only to be 15 existing facilities at the time.

113.    *Work practice standards*: Technology to implement work practice standards is available.

114.    The work practice standards for pressure relief devices, storage vessels, and other equipment are implemented through routine inspection and maintenance, operator training, and

the use of widely available devices including flow indicators, level indicators, temperature indicators, pressure indicators.

115.    *Bypass prohibition*: The bypass prohibition requirements do not require facilities to install or implement any new technological controls; it simply prohibits facilities from bypassing the controls that currently exist.

116.    *Flare operating and monitoring standards*: Technology to comply with the Rule's flare operating and monitoring requirements is widely available.

117.    For many exempted facilities, the necessary technology to comply with the flare operating and monitoring standards is already in place.

118.    The 2024 HON Rule incorporates by reference the flare operating and monitoring requirements established in the 2015 Refineries Rule, which have long been in effect. *See* 40 C.F.R. §§ 63.108(a), 63.508(a). Many exempted facilities are also regulated under that Refineries Rule.

119.    There is no need to install new technology to implement many of the flare operating and monitoring requirements. Certain of the revised operating and monitoring requirements do not necessitate additional equipment, or such equipment is already in place at exempted facilities. For example, the requirement for facilities to use a shorter averaging time is

important for the purposes of compliance, but only requires different calculations and not different equipment.

120.    EPA estimated that only about half of HON-regulated operators may need to make some upgrades to better monitor and operate their existing flares.

121.    Even where the installation of new monitoring equipment may be required, all of this technology is readily available and already in use.

122.    Refineries have complied with the flare operating and monitoring requirements since 2019, and other types of petrochemical facilities—such as MON and ethylene production—have complied since 2023. Of the exempted facilities, 12 are co-located with refineries, 21 are co-located with units subject to the MON rule, and three are co-located with ethylene production units. A total of 29 exempted facilities are therefore co-located with one or more of these other units.

123.    In the 2024 HON Rule, EPA assumed that HON-regulated facilities that are co-located with MON or ethylene production sources had likely upgraded at least one of their HON-regulated flares already. Many of the exempted facilities, therefore, likely already have the technology required to implement the standard in place.

*The Court's equitable authority to review ultra vires Executive action*

124.    The Exemption Proclamation exceeds the President's statutory authority because, by granting sweeping exemptions to one quarter of regulated sources without making facility-, standard-, or technology-specific determinations, the Proclamation exceeds the bounds of the President's Section 7412(i)(4) authority.

125.    The Proclamation effectively amends the compliance dates of EPA's 2024 Rule, an action outside the bounds of Section 7412(i)(4). Section 7412(i)(4) is a narrow exemption

applicable in specific statutorily defined circumstances; it does not give the President authority to amend EPA standards. Only EPA may amend those standards and only after notice and comment rulemaking.

126.    Case law in this Circuit generally allows for review of presidential actions to ensure conformity with statutory requirements, provided that "the authorizing statute or another statute places discernible limits on the President's discretion." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (citing, *inter alia*, *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996)).

127.    The statutory provision at issue, Section 7412(i)(4), provides such discernable limits on the President's discretion by requiring a determination that, for specific facilities, "technology to implement" a standard "is not available" and that the exemption "is in the national security interests of the United States." 42 U.S.C. § 7412(i)(4).

128.    The Court has the power to review the Proclamation to discern whether the President's exercise of statutory authority was unlawful because the necessary factual predicate required by the Clean Air Act is not present, and because the HON Proclamation unlawfully exercises authority not conveyed by Section 7412(i)(4), contrary to Congress's explicit restrictions on stay regulations and compliance deadlines. The Court therefore has the power to declare the HON Proclamation is unlawful and *ultra vires*.

## STANDING

129.    Plaintiffs' members live, work, and recreate in areas affected by the excess pollution that is and will be emitted from the exempted facilities. Plaintiffs' members are harmed

by breathing air pollution from the exempted facilities and are concerned that exposure to hazardous air pollutants from the exempted facilities could have harmful impacts on their health.

130.    Plaintiffs' members stood to benefit from the ethylene oxide requirements, which were slated to go into effect July 15, 2026. Exempted facilities are now able to emit toxic air pollution at higher levels than otherwise would have been allowed, for years beyond the Rule's mandate. Plaintiffs' members are harmed by the excess emissions that will result from the HON Proclamation exemptions.

131.    Plaintiffs' members also stood to benefit from the leak detection and repair requirements, maintenance work practice standards, and other requirements that were slated to go into effect July 15, 2027. Exempted facilities are now not required to comply with operational practices, monitoring, and prohibitions that would reduce the emission of toxic air pollutants. Plaintiffs and plaintiffs' members are harmed by the excess emissions that will result from the HON Proclamation exemptions.

132.    Exposure to ethylene oxide, chloroprene, vinyl chloride, benzene, 1,3-butadiene, and other hazardous air pollutants emitted by exempted facilities causes adverse health effects.

133.    On average, census blocks containing the exempted HON-regulated facilities face cancer risks of 71 per million, compared to national cancer risk average of 28 per million. In some affected communities, the cancer risk is 300 or 400 per million, 10 to 14 times greater than the national average. In these communities, 38 percent of cancer risk can be attributed to industrial pollutant sources like HON-regulated facilities, as opposed to the national average of just 2 percent attributable to industrial pollution sources.

134.    Plaintiffs' members also stood to benefit from reduced exposure to the pollutants subject to the fenceline monitoring requirements, also slated to go into effect July 15, 2026.

Facilities subject to the fenceline monitoring requirements would have to take corrective action that would reduce hazardous air pollutant emissions. The exemptions remove those requirements and increase the likelihood of hazardous pollutant exposures in the communities surrounding the exempted facilities. Plaintiffs and their members are harmed by increased exposure to hazardous air pollutants as a result of the HON Proclamation.

135.    The HON Rule fenceline monitoring provisions also require facilities to submit quarterly fenceline emissions reports to EPA, which EPA then makes available to the public. The HON Proclamation exempts Annex I facilities from fenceline monitoring requirements. Those exemptions deny Plaintiffs and their members the emissions information those reports would provide.

136.    Some Plaintiffs and their members would use such information to raise public awareness of air pollution and to further Plaintiffs' and their members' advocacy, education, and outreach efforts to reduce air pollution and protect public health. Plaintiffs and their members will be deprived of information they would have used to evaluate their pollution exposure and health risks in areas affected by emissions from the exempted facilities. That information would also allow some Plaintiffs to make educated decisions about how they engage in advocacy to reduce air pollution. Plaintiffs and Plaintiffs' members are therefore harmed by the HON Proclamation exemptions.

137.    For example, Plaintiff EJHA works to provide organizing, capacity, and technical support to communities and enhance the public's understanding of the health and safety implications of hazardous chemicals. In collaboration with the Coalition to Prevent Chemical Disasters, EJHA launched and now maintains an online tracker that tracks incidents involving hazardous chemicals. EJHA also offers information and analysis based on publicly reported

facility emissions information to educate and support its member affiliate organizations to build grassroots power to remedy and redress the health and safety legacy of chemical pollution in their affiliates' communities.

138.    For example, EJHA has created facility profiles from emissions data for specific facilities of concern in EJHA affiliate communities. EJHA has used facility emissions data to support affiliates in commenting on facility air permits, including for some HON facilities. EJHA has used facility emissions data to contribute to comments on the 2024 HON Rule and other EPA rulemakings that address chemical facilities. EJHA uses facility emissions data to provide affiliate members with information to advocate within their home communities, and to connect affiliates' localized pollution concern to federal policy.

139.    EJHA also convenes and facilitates a joint working group on hazardous facilities with the environmental health network Coming Clean. Several EJHA member organizations participate regularly in the Hazardous Facilities Team, which supports information sharing between place-based environmental justice groups working on local issues and campaigns related to the impacts of hazardous facilities (including HON facilities) in their neighborhoods and provides a space for translating local needs into federal policy. The Team works collaboratively to advance federal policies that will support local needs and establish a more protective "floor" of protections from hazardous facilities at the federal level to protect all communities across the country. Reducing exposure to and cancer and other health effects harms from hazardous air pollutants like ethylene oxide, chloroprene, 1,3-butadiene and dioxins has been a top priority of this Team since its inception.

140.    EJHA's affiliate members have members in communities like Westlake, Louisiana, Louisville, Kentucky, and Houston, Texas, which are home to facilities that received

exemptions under the HON Proclamation. Because of the exemptions, EJHA will be deprived of emissions information that would allow it to support its member organizations and effectively advocate in furtherance of its mission.

141.    EJHA has advocated extensively for fenceline monitoring in the HON Rule and other NESHAP rules, as well as in other policy spaces. EJHA believes fenceline monitoring data (particularly when made available in real time) is critical to community members' ability to take action to protect themselves and their families in times of chemical release and other pollution incidents. Several EJHA affiliate member organizations have as a core tenet of their local work and mission providing community members accurate pollution information and emergency planning and preparedness training in the absence of prevention requirements at the federal level or adequate emergency preparedness and communication at the local level. There is also reason to expect that the 2024 HON Rule's fenceline monitoring requirements would help to prevent catastrophic chemical disasters in EJHA affiliate members' communities by providing earlier warning of a malfunction or other issues before they become a disaster.

142.    Jim Vandenbosch is a member of NRDC. He lives less than three miles from the Citgo Petroleum Corporation Lemont Refinery, which received an exemption under the HON Proclamation. The Lemont Refinery emits, among other hazardous air pollutants, 1, 3-butadiene and benzene. Mr. Vandenbosch regularly smells a strong chemical odor from the direction of the refinery and has observed plumes and fires coming from the facility. As a result of the HON Proclamation, the Lemont Refinery will emit more hazardous air pollutants during the two-year exemption period. Mr. Vandenbosch is concerned about the health risk of exposure to the hazardous air pollutant emissions from the Lemont Refinery.

143.    Sharon Cayette Lavigne is the Director/Founder and a member of RISE St. James. She is a lifelong resident of St. James, Louisiana. Ms. Lavigne lives and regularly visits areas near numerous Louisiana facilities that have received exemptions under the HON Proclamation. These include the Denka Performance Elastomer facility in St. John the Baptist Parish, and the DuPont Specialty Products Pontchartrain Site in St. John the Baptist Parish; and the BASF North Geismar site, BASF Geismar site, Shell Geismar chemical plant, Westlake Vinyls plant, and Rubicon Geismar plant in Ascension Parish. These five facilities in Ascension Parish are located directly across the Mississippi River from where one of Ms. Lavigne's granddaughters lives. Another of Ms. Lavigne's granddaughters attends Southern University Laboratory School which is 3.7 miles from the Formosa Plastics Plant in Baton Rouge. Ms. Lavigne is concerned about her own and family members' exposure to the hazardous air pollutant emissions from these facilities that will continue for an additional two years due to the HON Proclamation. Ms. Lavigne is specifically concerned for these facilities' effects on her own health, as she already has health issues including autoimmune hepatitis. Because of the HON Proclamation, Ms. Lavigne is concerned that these facilities will not have to comply with fenceline monitoring requirements or the more stringent controls of the HON Rule and will emit more hazardous air pollutants during the two-year exemption period.

144.    Diana LeBlanc is a resident of Port Allen, Louisiana and a member of LEAN. Ms. LeBlanc lives and spends time near the Dow facility in Plaquemine, Louisiana and the Formosa facility in Baton Rouge, both of which received exemptions under the HON Proclamation. Ms. LeBlanc suffers from asthma and an immune deficiency disorder, and she is concerned that hazardous air pollution from these facilities will worsen these conditions and expose her and her family to other health risks, including cancer.

35

145.    Concerned Citizens of St. John and Environmental Defense Fund member Letitia Taylor lives in St. John the Baptist parish in Louisiana, about one mile from Denka Performance Elastomer's neoprene plant, which received an exemption under the HON proclamation. While producing neoprene, the Denka facility emits chloroprene, a dangerous chemical. Due to the HON proclamation, the Denka facility will be allowed to continue to emit hazardous air pollutants during the two-year extension. Ms. Taylor is concerned about the impacts of Denka's emissions on her and her family's health, and she spends less time outdoors due to these concerns.

146.    Melanie Oldham is a Sierra Club member and lives five miles from the exempted BASF facility in Freeport, Texas. Ms. Oldham suffers from frequent coughs and colds and is concerned about the impacts of the air pollution from the BASF Freeport facility, among other facilities, on her health. She avoids spending time outdoors, and enjoys the time she does spend outdoors less, as a result of these concerns.

147.    Jennifer Hadayia is the Executive Director of Air Alliance Houston, an organization dedicated to reducing the public health impacts of air pollution in the Houston area. Ms. Hadayia lives in Houston, Texas, and regularly travels throughout Harris County for work and to visit family. As a result, Ms. Hadayia spends time near HON facilities, including the exempted Celanese Clear Lake and Ineos Styrolution facilities in Pasadena, Texas. Ms. Hadayia is concerned about the impact of these facilities' pollution on her health.

148.    Ana Parras is the co-founder and executive co-director of t.e.j.a.s. Ms. Parras lives approximately halfway between the Houston Ship Channel and downtown Houston, near many HON facilities, including the exempted Cealnese Clear Lake and INEOS Styrolution facilities in Pasadena. Ms. Parras suffers from hypersensitivity pneumonitis, a respiratory condition that

makes it difficult to breathe. Ms. Parras is concerned about the impacts of the exempted

facilities' emissions on her health. Ms. Parras and t.e.j.a.s. participated in the rulemaking process

underlying the HON Rule, as well as litigation defending the rule against industry legal

challenges. Ms. Parras is concerned that the exemptions will delay compliance with the HON

Rule's fenceline monitoring requirements at nearby facilities. Without these fenceline monitoring

requirements, t.e.j.a.s. will not be able to fully inform its constituents about potential exposure

level, diminishing its ability to educate and conduct outreach to its constituents. The exemption

for compliance with the fenceline monitoring requirements would also delay pollution reductions

and deprive Ms. Parras, her family, and T.e.j.a.s.'s constituents of the health protections that

fenceline monitoring would provide.

**CLAIMS FOR RELIEF**

**COUNT ONE:**
**Unlawful Executive Action in Violation of the Clean Air Act**
**(Nonstatutory Review for Violations of Federal Law by Federal Officials;**
**Against All Defendants)**

149.    Plaintiffs incorporate by reference Paragraph 1-148.

150.    The President has limited authority to exempt stationary sources from duly

promulgated hazardous air pollutant regulations solely by virtue of the authority delegated by

Congress in 42 U.S.C. § 7412(i)(4). The President lacks any independent authority under the

U.S. Constitution to issue the exemptions.

151.    Section 7412(i)(4) permits the President to exempt a source from a hazardous air

pollutant standard only if "the technology to implement such standard is not available" and if an

exemption is in the national security interests of the United States.

152.    Whether technology to implement a standard is or is not available is a discrete,

yes-or-no factual inquiry that limits the President's discretion to grant exemptions.

153.    Section 7412(i)(4) establishes a judicially manageable standard with clear and precise limits of the sort federal courts routinely construe to determine whether officials have acted consistent with law.

154.    There is no statutory basis for the President's indiscriminately broad determinations that technology to implement the 2024 HON Rule is not available or that granting exemptions from that Rule is in the national security interests of the United States. The President patently misconstrued the statutory terms "technology" and "not available" in purporting to exercise the Section 7412(i)(4) exemptions authority.

155.    The HON Proclamation's purported determination that technology needed to implement the various diverse standards of the 2024 HON Rule is not available for various diverse HON-regulated facilities is a conclusory statement without specific findings as to any specific standard, any specific technology, or any specific facility.

156.    Technology to implement the 2024 HON Rule is in fact available. The relevant technologies to implement each aspect of the 2024 HON Rule standards are in widespread use among chemical manufacturers regulated by the HON Rule and similar regulated sources.

157.    Other requirements of the 2024 HON Rule do not require facilities to obtain or deploy any new "technology" within the meaning of Section 7412(i)(4). For instance, leak monitoring requirements simply require more frequent monitoring of the same type the exempted sources are already required to undertake. Similarly, maintenance work practice standards simply require different operational practices to prevent and minimize emissions during maintenance activities facilities already undertake.

158.    The purported determination that technology to implement the standards is not available is unambiguously contradicted by factual evidence. The HON Proclamation's cursory and conclusory statements to the contrary cannot be credited.

159.    The President's purported determination that the technology to implement the 2024 HON Rule is not available rests on an unlimited, untenable interpretation and application of the authority conveyed by Section 7412(i)(4) of the Clean Air Act.

160.    The President patently misconstrued the statutory term "national security" in purporting to exercise the Section 7412(i)(4) exemptions authority.

161.    National security concerns "only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare." *Cole v. Young*, 351 U.S. 536, 544 (1956).

162.    The HON Proclamation's purported determination that it is in the national security interests of the United States to issue the exemption is a conclusory statement that reveals no specific consideration whether the varied chemical products produced by exempted sources—including chemicals used for artificial sweeteners, cleaning agents, dyes and textiles, household and personal care products, pesticides, and plastic packaging—have any national security nexus.

163.    The HON Proclamation's purported determination that it is in the national security interests of the United States to issue the exemption is a conclusory statement without specific findings that the purported compliance burdens on any specific facility threatens national security.

164.    The President's overly broad interpretation of "national security" is inconsistent with the statute.

165.    Because the President grossly exceeded the bounds of his statutory authority by purporting to exempt stationary sources from standards for which the technology to implement is available and the exemptions do not further national security interests, the HON Proclamation is plainly in excess of the President's delegated powers and contrary to the statute's specific limitations on those powers. The President's action is contrary to the Clean Air Act and is ultra vires.

166.    The Court possesses inherent equitable power to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Congress has nowhere foreclosed review of the interpretation and application of 42 U.S.C. § 7412(i)(4). There is no alternative statutory procedure for review of Plaintiffs' claim.

167.    Because the Exemption Proclamation violates the Clean Air Act and is ultra vires, EPA actions implementing or giving effect to the proclamation likewise violate the Clean Air Act and are ultra vires.

**COUNT TWO:**
**Ultra vires, de facto rulemaking without statutory authority**
**(Nonstatutory review of action in excess of statutory authority by federal officer; against all Defendants)**

168.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-167.

169.    Congress required EPA to provide for existing sources' compliance with hazardous air pollutant standards "as expeditiously as practicable," and set concrete boundaries on EPA's flexibility to set compliance deadlines "in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A).

170.    Congress gave EPA and state permitting authorities discrete, limited authority to grant an existing source "up to 1 additional year to comply" with standards promulgated under subsection (d) "if such additional period is necessary for the installation of controls." 42 U.S.C. § 7412(i)(3)(B).

171.    Congress further conferred discrete, limited authority on EPA to stay the effectiveness of rules, including hazardous air pollutant standards, for no more than three months. 42 U.S.C. § 7607(d)(7)(B).

172.    Congress directed EPA to provide for public notice and comment on EPA actions to revise hazardous air pollutant standards, their compliance dates, or to grant source-specific deadline extensions. 42 U.S.C. § 7607(d)(5), (h).

173.    The exemption authority conveyed in Section 7412(i)(4) must be construed congruously with the authorities and limitations Congress enacted in Sections 7412 and 7607.

174.    EPA and the President are bound by the Clean Air Act's duties with respect to implementing Section 7412(i)(4), following rulemaking procedures, and being bound by lawfully adopted regulations.

175.    Reading Section 7412(i)(4) to authorize exemptions for a large swath of the regulated source category, from every single standard and other requirement of a rule, without facility- or standard-specific justification tied to the statutory factors, is contrary to the context, purpose, and structure of the Clean Air Act. The HON Proclamation's extremely broad sweep reflects an interpretation of the Section 7412(i)(4) authority that would swallow and render superfluous statutory limits.

176.    The content, context, and scope of the HON Proclamation demonstrates that the Proclamation is not an "exemption" within the meaning of Section 7412(i)(4).

41

177.    The HON Proclamation is functionally a rulemaking and/or stay pending reconsideration granted without observance of the procedural and substantive limitations Congress enacted in Section 7412 and 7607 of the Clean Air Act. The Proclamation was issued without observance of the statutory requirements for rulemaking or for granting a stay pending reconsideration.

178.    EPA invited requests for presidential exemptions explicitly in the context of its announced reconsideration of the 2024 HON Rule and seven other hazardous air pollutant rules. *See* supra ¶¶ 53, 54. EPA has stated that the exemptions are offered "while EPA reconsiders" the underlying rule. *See* EPA, Clean Air Act Section 112 Presidential Exemption Information, https://perma.cc/NPT5-RAQY (last accessed Oct. 20, 2025).

179.    The President indiscriminately granted exemptions from all compliance obligations of the 2024 HON Rule, without particularized consideration of the specific standards, technologies or practices needed to comply, or facilities and their particular products and processes, all of which is necessary to determine whether technology is not available to implement the standards and whether an exemption is in the national security interests of the United States.

180.    The HON Proclamation's purported exercise of Section 7412(i)(4) exemption authority is in fact an exercise of rulemaking and/or stay authority despite the President lacking such power. The Clean Air Act gives only EPA that authority and only after following certain procedures in certain circumstances.

181.    The sweeping HON Proclamation exceeds the narrow bounds of Section 7412(i)(4) to achieve improper goals prohibited by other provisions of the Clean Air Act. In granting compliance relief that far exceeds the Section 7412(i)(4) authority, the President

bypassed and contravened the statutory requirements on rulemaking and reconsideration to accomplish sweeping compliance exemptions unauthorized by law and in excess of the President's statutory authority.

182.    The HON Proclamation is beyond the authority conveyed by the Clean Air Act and is *ultra vires*.

183.    Because the HON Proclamation is beyond the Clean Air Act authority and ultra vires, EPA actions implementing or giving effect to the proclamation are similarly ultra vires.

## RELIEF REQUESTED

WHEREFORE Plaintiffs request that the Court:

A.    Declare that the HON Proclamation is unlawful and invalid and that the Annex I sources remain subject to the 2024 HON Rule as promulgated;

B.    Issue injunctive relief:

    i.    prohibiting EPA and Administrator Lee Zeldin from implementing, relying on, or giving effect to the HON Proclamation, including through implementation of the Clean Air Act's Title V operating permit program; and

    ii.    directing EPA to promptly notify, in writing, the operators of facilities listed in Annex I and relevant state, local, and/or Tribal permitting authorities that the HON Proclamation is unlawful and invalid, and that any facilities that the HON Proclamation purported to exempt may not lawfully delay or avoid compliance with the deadlines promulgated by the 2024 Rule by relying on the HON Proclamation.

C.    Awarding Plaintiffs their fees and costs of litigation as authorized by law;

D.    Granting such other relief as the Court deems just and proper.

Dated:  October 22, 2025     Respectfully submitted,


/s/ Sarah A. Buckley
Sarah A. Buckley (Va. Bar No. 87350), *pro hac vice pending*
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
sbuckley@nrdc.org
Tel: (202) 836-9555

*Counsel for Plaintiffs Natural Resources Defense Council and Environmental Justice Health Alliance for Chemical Policy Reform*

Adam Kron (D.C. Bar No. 992135)
Kathleen Riley (D.C. Bar No. 1618580)
Deena Tumeh (D.C. Bar No. 488201)
Earthjustice
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
akron@earthjustice.org
kriley@earthjustice.org
dtumeh@earthjustice.org
Tel: (202) 794-8039

*Counsel for Plaintiffs Texas Environmental Justice Advocacy Services, Air Alliance Houston, Concerned Citizens of St. John, Louisiana Environmental Action Network, RISE St. James Louisiana, and Sierra Club*

Abel Russ (D.D.C. Bar No. 1007020)
Environmental Integrity Project
888 17th St. NW, Suite 810
Washington, DC 20006
aruss@environmentalintegrity.org
Tel: (802) 482-5379

*Counsel for Plaintiff Environmental Integrity Project*

Rosalie Winn (Colorado Bar No. 52662),
*pro hac vice pending*
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
rwinn@edf.org
Tel: (303) 447-7212

Samantha Liskow, (New York Bar No.
5545140), *admission pending*
Environmental Defense Fund
257 Park Avenue South
New York, NY 10010
sliskow@edf.org
Tel: (212) 616-1247

*Counsel for Plaintiff Environmental Defense Fund*