# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES, et al., | Civil No. 1:25-cv-03745 |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, et al. | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
ROBERT N. STANDER
Deputy Assistant Attorney General
Environment & Natural Resources Division

HALI KERR
Attorney-Advisor
EPA Office of General Counsel
Washington, DC

DANIEL J. MARTIN
LAURA BROWN
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 598-1869
Daniel.Martin3@usdoj.gov

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

   1.  The Clean Air Act ........................................................................................................ 2

   2.  EPA's 2024 HON Rule ................................................................................................ 3

   3.  The President's 2025 HON Proclamation .................................................................... 4

   4.  Plaintiffs' Challenges .................................................................................................. 5

STANDARD OF REVIEW ...................................................................................................... 5

ARGUMENT ........................................................................................................................... 6

   1.  The Clean Air Act's Comprehensive Judicial Review Scheme Bars Review of the
      President's HON Proclamation. ................................................................................... 7

   2.  To the Extent Ultra Vires Review is Available Outside of the Clean Air Act, How the
      President Exercised his Exemption Discretion Remains Unreviewable ........................... 9

   3.  EPA Has Not Taken Action to Implement the HON Proclamation and is Not a Proper
      Party Here. ................................................................................................................... 13

   4.  Plaintiffs Lack Standing to Challenge the HON Proclamation's Exemptions for 39
      Facilities. ..................................................................................................................... 16

        A.    Plaintiffs Have Not Sufficiently Alleged Injury Resulting from All Exempted
             Facilities. ............................................................................................................ 17

        B.    Plaintiffs Cannot Establish Standing Based on an Informational Injury. ............. 18

CONCLUSION ......................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
  946 F.3d 615 (D.C. Cir. 2020) ............................................................. 19

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) ............................................................. 17

*Bates v. Rumsfeld*,
  271 F. Supp. 2d 54 (D.D.C. 2002) ......................................................... 6

*Bennett v. Spear*,
  520 U.S. 154 (1997) ....................................................................... 14

*Biden v. Texas*,
  597 U.S. 785 (2022) ....................................................................... 11

*Block v. Cmty. Nutrition Inst.*,*
  467 U.S. 340 (1984) ........................................................................ 8

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*,*
  333 U.S. 103 (1948) .................................................................... 9, 15

*Colon v. Carter*,
  633 F.2d 964 (1st Cir. 1980) .............................................................. 9

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
  144 F.4th 296 (D.C. Cir. 2025) ........................................................... 19

*Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*,
  250 U.S. 163 (1919) ....................................................................... 9

*Dalton v. Specter*,*
  511 U.S. 462 (1994) ............................................................. 9, 10, 13, 15

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) ........................................................... 14

*Davis v. Sarles*,
  134 F. Supp. 3d 223 (D.D.C. 2015) ........................................................ 6

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ........................................................... 11

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ............................................................ 16

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................. 18

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................... 9

*Friends of Animals v. Jewell*,
    828 F.3d 989 (D.C. Cir. 2016) .................................................. 19

*Glob. Health Council v. Trump*,\*
    153 F.4th 1 (D.C. Cir. 2025) ................................................. 9, 10

*Gustave-Schmidt v. Chao*,
    226 F. Supp. 2d 191 (D.D.C. 2002) ........................................... 6

*Harrison v. PPG Indus., Inc.*,
    446 U.S. 578 (1980) ................................................................... 8

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................. 11

*Hinton v. Corr. Corp. of Am.*,
    624 F. Supp. 2d 45 (D.D.C. 2009) ............................................. 6

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ................................................................. 16

*Indep. Mkt. Monitor for PJM v. FERC*,
    162 F.4th 1167 (D.C. Cir. 2025) ......................................... 19, 20

*Jama v. ICE*,
    543 U.S. 335 (2005) ................................................................. 11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ............................................................... 5, 6

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*,
    507 U.S. 163 (1993) ................................................................... 6

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 16

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................. 18

*NRC v. Texas*,\*
    605 U.S. 665 (2025) ....................................................... 7, 10, 12

*NRDC v. Bodine*,
  471 F. Supp. 3d 524 (S.D.N.Y. 2020) ................................................................. 19

*Oljato Chapter of Navajo Tribe v. Train*,
  515 F.2d 654 (D.C. Cir. 1975) ........................................................................... 8

*Parrino v. FHP, Inc.*,
  146 F.3d 699 (9th Cir. 1998) .............................................................................. 6

*PETA v. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ................................................................. 19, 20

*Sierra Club v. EPA*,
  873 F.3d 946 (D.C. Cir. 2017) ......................................................................... 13

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) .......................................................................................... 18

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .......................................................................................... 16

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .............................................................................................. 6

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .......................................................................................... 18

*Trump v. Hawai'i*,*
  585 U.S. 667 (2018) ......................................................................... 9, 10, 11, 12, 13

*Trump v. Orr*,
  146 S. Ct. 44 (2025) .......................................................................................... 15

*United States v. Gaubert*,
  499 U.S. 315 (1991) ............................................................................................ 6

*United States v. George S. Bush & Co.*,
  310 U.S. 371 (1940) ............................................................................................ 9

*Utah Ass'n of Cntys. v. Bush*,
  316 F. Supp. 2d 1172 (D. Utah 2004) ............................................................... 10

*Warth v. Seldin*,
  422 U.S. 490 (1975) .......................................................................................... 16

**Statutes**

5 U.S.C. § 704 ........................................................................................................ 13

iv

22 U.S.C. § 211a ............................................................................................................ 15

42 U.S.C. § 7401(b) ......................................................................................................... 2

42 U.S.C. § 7412 ........................................................................................................... 2, 4

42 U.S.C. § 7412(b) ......................................................................................................... 2

42 U.S.C. § 7412(d) ...................................................................................................... 2, 14

42 U.S.C. § 7412(d)(6) .................................................................................................... 2

42 U.S.C. § 7412(f)(2)(A) ............................................................................................... 2

42 U.S.C. § 7412(i) .......................................................................................................... 2

42 U.S.C. § 7412(i)(3) ..................................................................................................... 14

42 U.S.C. § 7412(i)(3)(A) ................................................................................................ 2

42 U.S.C. § 7412(i)(4)* ............................................................................ 3, 4, 9, 11, 14, 15

42 U.S.C. § 7414(c) ......................................................................................................... 19

42 U.S.C. § 7604 ........................................................................................................... 7, 8

42 U.S.C. § 7607* ............................................................................................................ 7

42 U.S.C. § 7607(b) ......................................................................................................... 13

42 U.S.C. § 7607(b)(1) ................................................................................................... 7, 8

42 U.S.C. § 7607(d) .......................................................................................................... 7

42 U.S.C. § 7607(e) .......................................................................................................... 8

**Code of Federal Regulations**

40 C.F.R. pt. 63, subpt. F ................................................................................................. 3

40 C.F.R. pt. 63, subpt. G ................................................................................................ 3

40 C.F.R. pt. 63, subpt. H ................................................................................................ 3

40 C.F.R. pt. 63, subpt. I ................................................................................................. 3

40 C.F.R. pt. 63, subpt. U ................................................................................................ 3

40 C.F.R. pt. 63, subpt. W ............................................................................................... 3

**Federal Register Notices**

59 Fed. Reg. 19402 (Apr. 22, 1994) ................................................................................. 3

60 Fed. Reg. 12670 (Mar. 8, 1995) ................................................................................. 3

61 Fed. Reg. 46906 (Sept. 5, 1996) ................................................................................ 3

88 Fed. Reg. 25080 (Apr. 25, 2023) ............................................................................... 3

89 Fed. Reg. 42932 (May 16, 2024) ............................................................................... 3

90 Fed. Reg. 34587 (July 23, 2025)......................................................................... 4, 5, 12

## INTRODUCTION

The Clean Air Act protects the nation's air quality through a broad range of programs, each tailored by Congress to address an air pollution problem. As relevant to this action, the Act directs the Environmental Protection Agency ("EPA") to regulate hazardous air pollutants by setting emission standards based on the emissions reductions that are achievable and sufficient to protect public health and the environment.

As a general matter, the statute instructs EPA to promulgate compliance deadlines for emission standards that come into effect within three years. But, recognizing that neither Congress nor EPA could foresee all eventualities, the Clean Air Act reserves a special place for the President to relieve emissions sources from those deadlines. In particular, the President may exempt any stationary source from compliance with an emission standard for a period of not more than two years if the President determines that the technology to implement that standard is not available and that it is in the national security interests of the United States to do so.

President Trump exercised this authority in July 2025, exempting certain chemical manufacturing plants from EPA's 2024 emission standards governing the chemical manufacturing industry. As authorized by the Clean Air Act, the President chose to issue this exemption after determining: (1) that the technology to achieve these standards is not available; and (2) that the exemption is in the national security interests of the United States.

Plaintiffs' Complaint challenges these exemptions on the grounds that the President's technology and national security determinations are erroneous. But Congress has foreclosed review of those determinations by enacting the Clean Air Act's comprehensive judicial review scheme without providing for review of such determinations. The Court should dismiss the Complaint.

1

## BACKGROUND

**1.  The Clean Air Act**

The Clean Air Act contains seven subchapters, each designed to address a particular air pollution problem while advancing the Act's overall goal of "protect[ing] and enhanc[ing] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b). Relevant here, Subchapter I addresses air quality and emission limitations.

This case concerns one method of addressing air quality and emission limitations, the National Emission Standards for Hazardous Air Pollutants. Clean Air Act § 112; 42 U.S.C. § 7412. These standards regulate hazardous air pollutants that can cause adverse health or environmental effects, such as asbestos, benzene, and chlorine. *Id.* § 7412(b). The Clean Air Act requires EPA to set standards for categories of sources that emit air toxics. *Id.* § 7412(d). Eight years after setting those standards, EPA must complete a risk review, assessing whether the standards provide "an ample margin of safety" for public health and the environment. *Id.* § 7412(f)(2)(A). Separately, EPA must complete a recurring technology review of these standards every eight years. *Id.* § 7412(d)(6).

When EPA promulgates an emission standard for a category or subcategory of existing sources under CAA section 112, EPA generally must establish a compliance date that provides for compliance as expeditiously as practicable, but in no event later than three years after the standard's effective date. *Id.* § 7412(i)(3)(A). Consistent with other environmental statutes, Congress also provided for certain compliance exemptions. *Id.* § 7412(i).

Specifically as relevant here, when an emission standard implicates national security, the President, rather than EPA, may exempt any source from compliance for a period of not more than two years "if the President determines that the technology to implement such standard is not

2

available and that it is in the national security interests of the United States to do so." *Id.*

§ 7412(i)(4). The President may extend this exemption period for additional two-year periods

and must report each exemption (or extension) to Congress. *Id.* In contrast to its provisions

governing EPA's rulemaking authority, *see id.* § 7607(d), the Act establishes no procedural

requirements for the President's exemption authority, *see id.* § 7412(i)(4), and does not subject

the President's determinations to judicial review, *see id.* § 7607(b)(1).

## 2.  EPA's 2024 HON Rule

EPA first promulgated emission standards for the synthetic organic chemical

manufacturing industry in 1994. 59 Fed. Reg. 19402 (Apr. 22, 1994). Those standards are

generally reflected in 40 C.F.R. part 63, subparts F, G, H, and I. EPA first promulgated national

emission standards for certain polymer and resins manufacturing sources in 1995 and 1996. 60

Fed. Reg. 12670 (Mar. 8, 1995); 61 Fed. Reg. 46906 (Sept. 5, 1996). Those standards are

generally reflected in 40 C.F.R. part 63, subparts U and W.

In April 2023, EPA proposed amendments to these standards based on its periodic

technology review of those standards. 88 Fed. Reg. 25080 (Apr. 25, 2023). After considering

public comments on the proposed rule, EPA promulgated a final rule in May 2024 entitled, "New

Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and

National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical

Manufacturing Industry and Group I & II Polymers and Resins Industry." 89 Fed. Reg. 42932

(May 16, 2024). That rule is commonly referred to (including by Plaintiffs in their Complaint) as

the "HON Rule" because it mainly concerns the various standards for the synthetic organic

chemical manufacturing industry, which EPA collectively refers to as the Hazardous Organic

NESHAP or HON. The HON Rule set compliance deadlines for meeting the standards as July

3

15, 2026, or July 15, 2027, depending on the particular standard. HON Rule, 89 Fed. Reg. at 43236.

### 3. The President's 2025 HON Proclamation

On July 17, 2025, President Trump issued a proclamation under his Clean Air Act section 112(i)(4) authority, 42 U.S.C. § 7412(i)(4), exempting a specified list of stationary sources (Annex I) from the HON Rule for two years. Regulatory Relief for Certain Stationary Sources To Promote American Chemical Manufacturing Security (the "HON Proclamation"), 90 Fed. Reg. 34587 (July 23, 2025). Specifically, the HON Proclamation stated that the President was exempting the Annex I sources from compliance with "those aspects of the HON Rule that were promulgated under section 112 of the Clean Air Act, 42 U.S.C. § 7412 for a period of 2 years beyond the HON Rule's relevant compliance dates[.]" *Id.* at 34587. Thus, for the sources in Annex I the HON Rule will not apply until two years after the rule's compliance deadlines (*i.e.*, until July 15, 2028, for the 2026 compliance deadlines and until July 15, 2029, for the 2027 compliance deadlines). *Id.* The Annex I sources remain regulated by the emission standards in effect before the HON Rule's promulgation.

In support of the exemption, the HON Proclamation stated that the nation's domestic chemical manufacturing sector was vital to "safeguarding the supply chains that underpin our economy and to reducing the Nation's dependence on foreign control over materials critical to national resilience," citing the need for continued domestic production in light of expanded adversary influence over foreign manufacture. *Id.* The HON Proclamation also stated that many of the HON Rule's testing and monitoring requirements were not available because they have not been demonstrated at the necessary scale or cannot be implemented safely or consistently under real-world conditions, considering the "significant variation in site conditions, permitting realities, and equipment configurations" across diverse facilities. *Id.*

Based on the foregoing, the President made two determinations in support of the exemption. First, he determined that the technology to implement the HON Rule was not available because it "does not exist in a commercially viable form sufficient to allow implementation of and compliance with the HON Rule" by the compliance deadlines. *Id.* Second, he determined that it is "in the national security interests of the United States to issue this Exemption for the reasons stated" in the Proclamation. *Id.*

### 4. Plaintiffs' Challenges

Plaintiffs are ten organizations and associations that allege they have members who "live, work, and recreate in areas affected by the excess pollution that is and will be emitted from the exempted facilities." Dkt. No. 1 ¶ 129. Plaintiffs brought the instant suit against President Trump, EPA, and EPA Administrator Lee Zeldin on October 22, 2025, and upon Defendants' motion the Court extended the deadline to answer to January 29, 2026. Minute Order (Dec. 5, 2025), Dkt. No. 32.

In their Complaint, Plaintiffs seek a declaration that the HON Proclamation is unlawful and they seek an injunction preventing EPA from effectuating the exemption. Compl. ¶¶ 149–183; ¶¶ A–B. Plaintiffs identify two claims for relief in their Complaint, both styled as "nonstatutory review." *Id.* at pp. 37, 40. Count One alleges that the President has violated the Clean Air Act by issuing the exemption. *Id.* at p. 37. Count Two alleges that the President lacked authority to issue the exemption here. *Id.* at p. 40.

### STANDARD OF REVIEW

Federal courts have "limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994) (citations omitted). Thus, before a federal district court may consider the merits of a lawsuit, it

must determine it has subject matter jurisdiction to preside over the issue(s) raised. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). There is a presumption against subject matter jurisdiction, and "the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citation omitted).

In deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court must "accept as true all the factual allegations in the complaint." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993) (citing *United States v. Gaubert,* 499 U.S. 315, 327 (1991)). But the court is not limited to the allegations in the complaint; the court may also consider "such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." *Bates v. Rumsfeld*, 271 F. Supp. 2d 54, 60 (D.D.C. 2002) (citation omitted).

A motion under Rule 12(b)(6) "challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim." *Davis v. Sarles*, 134 F. Supp. 3d 223, 226 (D.D.C. 2015). In making its determination on a 12(b)(6) motion, the court may "consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted). The court may also consider "documents 'upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)).

## ARGUMENT

Plaintiffs' Complaint disavows a cause of action against the President and EPA under either the Clean Air Act or the Administrative Procedure Act. *See* Compl. at pp. 37, 40

("nonstatutory review"). Thus, it appears Plaintiffs attempt to "dress up a typical statutory-authority argument as an ultra vires claim." *NRC v. Texas*, 605 U.S. 665, 682 (2025). However, ultra vires review is extremely narrow and is "unavailable . . . if a statutory review scheme forecloses all other forms of judicial review" and only applies if an agency taken action "entirely in excess of its delegated powers and contrary to a *specific prohibition*" in a statute. *Id*. at 681 (emphasis in original, quotation and internal citation omitted).

The Court should dismiss the Complaint on this basis. First, ultra vires review is unavailable because the Clean Air Act forecloses such review. Second, even if review were available, the President has not acted in excess of his delegated powers or contrary to a specific prohibition in the Clean Air Act. Third, EPA has not taken any reviewable final action and so is not a proper party to this challenge to presidential action. Fourth, as an alternative, the Court should significantly narrow the scope of the Complaint because Plaintiffs lack standing to challenge many of the exempted facilities.

**1. The Clean Air Act's Comprehensive Judicial Review Scheme Bars Review of the President's HON Proclamation.**

The Court should dismiss the Complaint because Congress has foreclosed Plaintiffs' nonstatutory review claims in the context of Clean Air Act presidential exemptions.

The Clean Air Act sets forth a comprehensive and unambiguous judicial review scheme that governs both review of governmental action, 42 U.S.C. § 7607, and governmental inaction, 42 U.S.C. § 7604. Clean Air Act section 307 governs review of EPA action by individually listing each type of EPA action seriatim and then assigning review of those actions to either the regional courts of appeals or the District of Columbia Circuit. 42 U.S.C. § 7607(b)(1). In such cases, section 307 also establishes the record for review, the standard of review, and the available causes of action. *Id*. § 7607(d). And finally, if that was not enough, it provides that other methods

of judicial review are not authorized "except as provided in this section." *Id.* § 7607(e); *see*

*Oljato Chapter of Navajo Tribe v. Train*, 515 F.2d 654, 664 (D.C. Cir. 1975) (Clean Air Act

supplants APA review). The Supreme Court has interpreted section 307(b)(1) broadly to cover

every way EPA may exercise its power under the Clean Air Act. *See Harrison v. PPG Indus.,*

*Inc.*, 446 U.S. 578, 587–89 (1980) (phrase "any other final action" is to be construed literally to

reach any final EPA action). For cases of agency inaction, Congress created a specific cause of

action in district court to challenge an alleged failure to perform "any act or duty under this

chapter which is not discretionary," 42 U.S.C. § 7604(a)(2), subject to the express condition of

advance notice, *id.* § 7604(b).

Where, as here, Congress has provided "a detailed mechanism for judicial consideration

of particular issues at the behest of particular persons," the Court has rejected challenges falling

outside of that scheme. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). In *Block*, for

instance, the Secretary of Agriculture was authorized to issue orders regulating the milk market

under the Agricultural Marketing Agreement Act of 1937. *Id.* at 342. The statute authorized dairy

handlers to challenge those orders using a bespoke statutory procedure but was silent about milk

consumers' rights. *Id.* at 346–347. Notwithstanding the lack of an express statement that such

judicial review was precluded, the Court had no difficulty in concluding that "congressional

intent to preclude judicial review [was] 'fairly discernible' in the detail of the legislative

scheme." *Id.* at 351.

Likewise with the Clean Air Act, Congress has clearly indicated that judicial review of

presidential exemptions under section 112(i)(4) is unavailable. First, Congress did not include

presidential exemptions in the list of actions that the Clean Air Act subjects to judicial review,

despite its near-exhaustive list of other types of reviewable actions. *See* 42 U.S.C. § 7607(b)(1)

8

(listing only actions of "the Administrator"). Second, Congress required the President to "report" each exemption to itself. *Id.* § 7412(i)(4). While congressional supervision "does not provide the immediate protection that the [plaintiff] seeks, it does evince a congressional intent to review the President's decisions and safeguard the environmental interests at stake itself." *Colon v. Carter*, 633 F.2d 964, 967 (1st Cir. 1980).

Plaintiffs accordingly cannot satisfy the first prong of ultra vires review—that Congress has not already acted to foreclose judicial review. The Court should dismiss the Complaint on that basis.

## 2. To the Extent Ultra Vires Review is Available Outside of the Clean Air Act, How the President Exercised his Exemption Discretion Remains Unreviewable.

Even assuming that Plaintiffs may seek judicial review outside of the narrow confines of the Clean Air Act, the Court should nonetheless dismiss this action. As an unbroken line of Supreme Court precedent makes clear, where a statute "commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton v. Specter*, 511 U.S. 462, 477 (1994); *see also Trump v. Hawai'i*, 585 U.S. 667 (2018); *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103 (1948); *United States v. George S. Bush & Co.,* 310 U.S. 371 (1940); *Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163 (1919).

As stated above, Plaintiffs' Complaint does not appear to include claims under the Administrative Procedure Act's or Clean Air Act's judicial review mechanisms and so Defendants assume that Plaintiffs are attempting to bring a nonstatutory ultra vires claim. The scope of review in such a challenge is extremely narrow, comprising at most review for constitutionality and whether the President exceeded a specific statutory prohibition on his authority. *See Franklin*, 505 U.S. at 801 (presidential acts may be reviewed for constitutionality

but not abuse of discretion.); ); *see also Glob. Health Council v. Trump,* 153 F.4th 1, 20 (D.C. Cir. 2025) ("To prevail on an ultra vires claim, a plaintiff must establish that (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim and (3) the challenged action is plainly in excess of [the President's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." (internal quotations omitted)).

Plaintiffs assert no constitutional challenge. Therefore, this Court's review is limited to whether the President has exceeded the statute's limitations. For that analysis, this Court must circumscribe its review to asking (a) whether the statute confers the discretion that the President has exercised; and (b) whether the President exceeded a specific statutory prohibition on his authority. *See Hawai'i*, 585 U.S. at 686–88 (first discussing whether the Immigration and Nationality Act gives the President discretion to suspend entry of noncitizens based on nationality, then reviewing whether the President's action comported with "any textual limit on the President's authority"); *NRC*, 605 U.S. at 681 (ultra vires review applies only when an agency has taken action both (1) entirely in excess of delegated powers and (2) contrary to a specific prohibition). Judicial review is not available to evaluate "the President's judgment as to the existence of the facts on which his discretionary judgment is based," or "to assess a particular exercise of presidential discretion." *Utah Ass'n of Cntys. v. Bush*, 316 F. Supp. 2d 1172, 1186 (D. Utah 2004); *see also Dalton*, 511 U.S. at 474 (assuming *arguendo* that courts may review whether the President has violated a statutory mandate outside the framework of the Administrative Procedure Act, "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President").

Applied to the HON Proclamation in this case, Clean Air Act section 112(i)(4) fits squarely within the category of statutes that commit discretion to the President. In contrast to the remainder of section 112, which instructs that EPA "shall" take various actions in a specific sequence, section 112(i)(4) states that the President "may" exempt any stationary source from compliance with "any standard or limitation under" section 112, so long as the President makes the necessary determinations, limits the exemption to two years, and reports to Congress. 42 U.S.C. § 7412(i)(4). "May" does "not just suggest discretion, it clearly connotes it." *Biden v. Texas*, 597 U.S. 785, 802 (2022) (emphasis and internal quotation marks omitted). "That connotation is particularly apt where, as here, 'may' is used in contraposition to the word 'shall.'" *Id.* (quoting *Jama v. ICE*, 543 U.S. 335, 346 (2005)). Likewise, Congress's use of the word "determines" reflects the culmination of Presidential decision-making, as opposed to discrete and easily discernible procedural checkboxes more amenable to judicial second-guessing. *Cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). The statute's explicit reference to national security concerns reinforces that conclusion. The D.C. Circuit has cautioned that "courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010). Thus, there can be no doubt from the plain text of the statute that President Trump was within the boundaries of the authority Congress conferred upon him when he issued the exemption. *See Hawai'i*, 585 U.S. at 684 ("[8 U.S.C. §] 1182(f) vests the President with 'ample power' to impose entry restrictions." (citation omitted)).

Moreover, Plaintiffs cannot satisfy the next prong of ultra vires review that the President violated a "*specific prohibition*" against his action in the Clean Air Act. *NRC*, 605 U.S. at 681. The exemption applies only to specific "standards" set by EPA—namely, "those aspects of the HON Rule that were promulgated under section 112 of the Clean Air Act." 90 Fed. Reg. at 34587. The exemption lasts only the duration allowed by the statute—two years. *Id.* And the exemption is predicated on the determinations required by statute—that the "technology to implement the HON Rule is not available" and the exemption is "in the national security interests of the United States[.]" *Id.* at 34588. The President therefore complied with the Clean Air Act by exercising no more than the discretion entrusted to him in the statute and by complying with the limitations Congress placed on that discretion; that is, by making the required determinations in support of an exemption that clearly falls within the statute. *See Hawai'i*, 585 U.S. at 686–88; *NRC*, 605 U.S. at 681.

The Complaint's proposed scope of judicial review vastly exceeds the limited jurisdiction recognized by the precedents cited above. Though Plaintiffs attempt to set up a dispute over the Clean Air Act's meaning by casting their claim as the President "misconstru[ing]" the Clean Air Act, *e.g.*, Compl. ¶¶ 154, 160, the gravamen of the Complaint is that Plaintiffs disagree with the President's determinations on technology availability and national security. For instance, Plaintiffs would have this Court make factual inquiries into whether "[t]echnology to implement the 2024 HON Rule is in fact available" *id.* ¶ 156, and whether the domestic chemical manufacturing industry's inputs and outputs actually "have any national security nexus," *id.* ¶ 162. Likewise, Plaintiffs allege that the President "grossly exceeded the bounds of his statutory authority" because "the technology to implement is available and the exemptions do not further national security interests." *Id.* ¶ 165.

The Court should reject Plaintiffs' requests to expand judicial review of the President's factual determinations in violation of Supreme Court precedent. Even setting aside the mind-boggling discovery and trial proofs that would be necessary for this Court to complete a nationwide review of the chemical manufacturing industry, available technology, and the nexus to national security, engaging in that sort of review would enmesh this Court in questions of "Presidential discretion as to political matters beyond the competence of the courts to adjudicate." *Dalton*, 511 U.S. at 475 (quotation omitted). Indeed, Plaintiffs' request for "a searching inquiry into the persuasiveness of the President's justifications is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Hawai'i*, 585 U.S. at 686. In such circumstances, the Supreme Court has never required the President to make a predicate determination in "sufficient detail to enable judicial review." *Id.*

The Court should therefore dismiss Counts One and Two against the President for lack of jurisdiction and failure to state a claim.

### 3. EPA Has Not Taken Action to Implement the HON Proclamation and is Not a Proper Party Here.

Even assuming that ultra vires review is available here despite the Clean Air Act's comprehensive scheme, the Complaint likewise fails to state a claim against EPA because EPA has not taken any action susceptible to review under the Clean Air Act, Administrative Procedure Act, or ultra vires review.

First, under the Clean Air Act, EPA is not a proper party here. As with the Administrative Procedure Act, which does not permit judicial review before "agency action" is "final," 5 U.S.C. § 704, lawsuits against EPA under the Clean Air Act are not ripe until EPA has taken "final action." 42 U.S.C. § 7607(b); *see also Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) ("[F]inal action" in the Clean Air Act is synonymous with "final agency action" in the

13

Administrative Procedure Act.). "Final action" means "action" that (1) marks the "consummation of the agency's decisionmaking process" and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and internal quotation marks omitted). Plaintiffs have failed to identify any official EPA act that even remotely qualifies as "action" under this standard; nor can they, as EPA has done nothing to implement the HON Proclamation.

Second, assuming that EPA can be sued for Clean Air Act violations on an ultra vires theory, Plaintiffs fail to allege that EPA has taken action that violates a specific provision of the Clean Air Act. The Clean Air Act is comprehensive and unambiguous in its division of authority between EPA, States, and the President. In the normal course, Congress entrusted EPA with setting standards and compliance deadlines for regulating hazardous air pollutants. *Id.* § 7412(d), (i)(3). But in the unique case of national security, Congress entrusted the President, and *only* the President, with the authority to issue an exemption. *Id.* § 7412(i)(4). The statutory text is clear that EPA has no role in effectuating such national security exemptions, and the Complaint does not allege that EPA has taken any action to do so here. Accordingly, the Complaint fails to allege that EPA is violating or plans to violate federal law. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive *acts* ultra vires, courts are normally available to reestablish the limits on his authority." (emphasis added)).

Moreover, to the extent that Plaintiffs seek to include EPA in this case on the speculative theory that EPA might take some action *in the future* to implement the HON Proclamation, that theory is neither ripe nor an avenue for relief where the real party in question is the President. Certainly, final agency action is traditionally reviewable when Congress has entrusted authority and discretion to act to an agency head, even if the President directs how he wishes that agency

14

to proceed. But, as discussed above, when Congress enacts a statute entrusting discretion to the President, how the President exercises that discretion is not reviewable. *Dalton*, 511 U.S. at 476. The mere fact that a plaintiff sues an agency defendant who will ministerially implement that exercise of discretion does not transmute the claim from unreviewable to justiciable. *Id.*; *see also Chi. & S. Air Lines, Inc.*, 333 U.S. at 113–14 (no review of Civil Aeronautics Board decision where statute committed discretion to review decision to President, even though organic act generally permitted judicial review).

The Supreme Court reaffirmed this longstanding distinction between agency action delegated to an agency head and agency action implementing discretion vested in the President only last year. *See Trump v. Orr*, 146 S. Ct. 44, 46 (2025). In the context of the federal passport issuance law, the State Department issues passports "under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. When certain plaintiffs sought to challenge President Trump's executive order governing sex on passports, the Supreme Court granted a stay application from the State Department seeking relief from an order against its implementation of that directive. *See Orr*, 146 S. Ct. at 46. The Court explained that respondents were not likely to prevail in "arguing that the State Department acted arbitrarily and capriciously by declining to depart from *Presidential rules that Congress expressly required it to follow*." *Orr*, 146 S. Ct. at 46 (emphasis added; citing 22 U.S.C. § 211a).

So too here. The Clean Air Act entrusts the decision whether to grant an exemption entirely to the President. 42 U.S.C. § 7412(i)(4). Any future EPA action to implement an exemption (in addition to being unripe, not plausibly alleged, and speculative) would be merely ministerial and not subject to review. The Court should therefore dismiss EPA and Administrator Zeldin as Defendants because they have taken no action susceptible to challenge.

15

**4. Plaintiffs Lack Standing to Challenge the HON Proclamation's Exemptions for 39 Facilities.**

Finally, Plaintiffs lack Article III standing to challenge the HON Proclamation's exemptions for 39 of the 50 facilities identified in Annex I. To the extent the Court does not dismiss the Complaint in full for the reasons described above in Sections I and II, it should narrow the Complaint and consider relief only with regard to the 11 facilities that Plaintiffs have alleged concretely affect their members.

Standing requires that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). A plaintiff seeking relief must establish the three elements constituting the "irreducible constitutional minimum" of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff has the burden of showing: "that it has suffered a concrete and particularized injury that is: (1) actual or imminent; (2) caused by or fairly traceable to, an act that the litigant challenges in the instant litigation; and (3) redressable by the court." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (internal quotation and citation omitted). The injury cannot be "'conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

A plaintiff organization, like the ten Plaintiffs here, may establish "associational standing" based on injury to its members by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Alternatively, to show standing on its own behalf, the organization itself must meet the same standing test that applies to individuals: an actual or threatened injury

in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision. *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).

Plaintiffs' Complaint asserts standing based on two types of alleged injuries: (1) harm from "increased exposure to hazardous air pollutants as a result of the HON Proclamation," Compl. ¶ 134, and their members' concerns about such increased exposure, Compl. ¶ 142–148; and (2) an informational injury on the grounds that exempt facilities are no longer required to conduct "fenceline monitoring," reports of which Plaintiffs allege must be made available to the public, Compl. ¶¶ 134–141.[1] As for relief, Plaintiffs seek a declaration from this Court that the Proclamation "is unlawful and invalid and that the Annex I sources remain subject to the 2024 HON Rule." *See* Compl. § "Relief Requested." But, as detailed below, Plaintiffs have not pleaded facts sufficient to support their allegations of injury from the increased emissions at 39 of the exempted facilities listed in Annex I. Additionally, Plaintiffs claim of informational injury fails because they do not have a right to the information they seek.

### A. Plaintiffs Have Not Sufficiently Alleged Injury Resulting from All Exempted Facilities.

As noted above, Plaintiffs allege that their members are harmed by "excess" exposure to hazardous air pollutants because the HON Proclamation exempted 50 facilities listed in its Annex I from compliance with the HON Rule. Compl. ¶¶ 1, 129–134. Yet Plaintiffs allege facts supporting harm to their members arising from "excess" emissions at only 11 of the facilities listed in Annex I.[2] Compl. ¶¶ 142–148. With respect to the remaining 39 facilities, Plaintiffs have

---

[1] Fenceline monitoring refers to monitoring for specific air pollutants along the perimeter of the facility's property line.

[2] Plaintiffs identify members with concerns regarding the following exempted facilities: (1) Citgo Petroleum Corporation's Lemont Refinery in Illinois; (2) Denka Performance's

not pleaded any facts to support their assertion that their members have been or will be harmed by excess emissions from those facilities. And Plaintiffs' generic assertion that their members will be harmed by breathing air pollution from exempted facilities lacks any factual support. *See* Compl. ¶ 129. It is long accepted that allegations of "generalized harm to . . . the environment will not alone support standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (holding that requirements of standing are not met when plaintiff alleges harm in an "immense tract of territory"). Moreover, any alleged general harm caused by potential "excess" emissions is nonsensical because the exemptions are, at most, delaying *reductions* by a period of two years, not allowing for increased emissions. *See* 90 Fed. Reg. at 34587.

Similarly, Plaintiffs have not alleged a specific injury to their organizations that could support standing in their own right. Plaintiffs' alleged injury to their advocacy efforts, *see* Compl. ¶ 139, is not sufficient because organizations that "seek to do no more than vindicate their own value preferences through the judicial process" generally cannot establish standing. *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Thus, Plaintiffs have not alleged facts sufficient to support associational standing.

### B. Plaintiffs Cannot Establish Standing Based on an Informational Injury.

Moreover, Plaintiffs cannot establish standing (for the 39 facilities described above, or any other facility) based on an alleged informational injury because they are not entitled to the

---

Elastomer facility in Louisiana; (3) DuPont Specialty Products' Pontchartrain facility in Louisiana; (3) BASF's North Geismar facility in Louisiana; (4) BASF's Geismar facility in Louisiana; (5) Shell's Geismar facility in Louisiana; (6) Westlake Vinyl's facility in Ascension Parrish, Louisiana; (7) Formosa Plastics' facility in Baton Rouge, Louisiana; (8) Dow's facility in Plaquemine, Louisiana; (9) BASF's facility in Freeport, Texas; (10) Celanese's Clear Lake facility in Texas; and (11) Ineos Styrolution's facility in Texas. Compl. ¶¶ 142–148.

fenceline monitoring reports they seek. To establish injury in fact based on informational interests, Plaintiffs must demonstrate: (1) they have been deprived of information that, in their interpretation, *a statute* requires the government or a third party to disclose to them; and (2) they suffer, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure. *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). Although the D.C. Circuit has, in the past, found that an organization may have standing based on informational harm even though the organization had no legal right to it, *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (citation omitted), "the Supreme Court has since 'cautioned against'" that approach, *Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1173 (D.C. Cir. 2025) (quoting *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025)). Moreover, even if a plaintiff organization can show that its interests are harmed, it must, to establish standing, also show that it has used resources to counteract that harm. *PETA v. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015).

    Here, Plaintiffs have not established that they (or their members) are legally entitled to the fenceline monitoring reports that they seek. It is true that the HON Rule requires facilities to conduct fenceline monitoring and submit monitoring reports to EPA. HON Rule, 89 Fed. Reg. at 43227–34, 43254, 43260. Additionally, under the Clean Air Act, to the extent EPA receives monitoring reports, it must make them available to the public. *See* 42 U.S.C. § 7414(c). However, *the Clean Air Act* does not require that EPA collect fenceline monitoring reports in the first instance; that requirement came from EPA's decision to impose such reporting in the HON Rule. Absent that legal duty, Plaintiffs cannot claim an entitlement to monitoring reports that the statute does not require. *See Jewell*, 828 F.3d at 992; *NRDC v. Bodine,* 471 F. Supp. 3d 524, 535

(S.D.N.Y. 2020) (finding no informational injury to support standing where plaintiff had not demonstrated legal entitlement to information).

But, even if the Court were to find that such entitlement exists and accept as true Plaintiffs' allegation that their organizational missions have been harmed by EPA's failure to provide monitoring reports (that are not statutorily required), Plaintiffs must also show that they have "used [their] resources to counteract that harm." *PETA,* 797 F.3d at 1094. Plaintiffs' Complaint does not contain any allegations that they have expended resources to ameliorate the alleged harm to their missions. *See Indep. Mkt. Monitor for PJM*, 162 F.4th at 1174 (finding no standing based on alleged informational injury where plaintiff "does not identify programmatic expenditures it must make to fill the gap caused by [the] absence" of information) (internal quotations omitted). Thus, Plaintiffs have not adequately alleged an informational injury.

## CONCLUSION

The Complaint seeks injunctive relief against the President for exercising discretion conferred upon him by Congress and for which Congress foreclosed judicial review. That exercise of discretion is accordingly unreviewable, and including EPA as a party makes no difference to that fundamental principle. The Court should dismiss the Complaint.

Dated:  January 29, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

ROBERT N. STANDER
Deputy Assistant Attorney General
Environment & Natural Resources Division

/s/ *DanielJMartin*
DANIEL J. MARTIN
LAURA BROWN
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 598-1869
Daniel.Martin3@usdoj.gov

21