**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) Civil Action No. 1:25-cv-03745-CRC ) |
| v. | ) ) |
| DONALD TRUMP, *et al.*, | ) ) |
| *Defendants*. | ) ) |

**<u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS AND PLAINTIFFS' MEMORANDUM IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

STATUTORY BACKGROUND....................................................................................................2

    A.    The Act's Requirements for Setting Standards......................................................2

    B.    Clean Air Act Procedural Requirements...............................................................5

    C.    The President's Section 7412(i)(4) Exemption Authority .....................................5

PROCEDURAL & FACTUAL BACKGROUND ...........................................................................6

    A.    The HON Rule .......................................................................................................6

    B.    President Trump's Clean Air Act Rollback Agenda.............................................10

STANDARD OF REVIEW ..........................................................................................................11

ARGUMENT ...............................................................................................................................12

I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE PROCLAMATION...........12

    A.    Plaintiffs Have Associational Standing ...............................................................13

    B.    Plaintiffs Have Informational Standing ...............................................................17

II.    THE PROCLAMATION IS JUDICIALLY REVIEWABLE .........................................20

    A.    Congress Has Not Barred Judicial Review...........................................................22

    B.    The President's Bounded Exemption Authority is Susceptible to Review............25

    C.    Judicial Review is Available to Discern Whether the Proclamation Misconstrued the Statute........................................................................................30

        1.    The Court can review whether the President patently misinterpreted the scope of his authority. ...................................................30

        2.    Plaintiffs need not demonstrate that the President has acted contrary to a specific statutory prohibition. .................................................34

III.    THE PROCLAMATION EXCEEDS THE PRESIDENT'S AUTHORITY......................37

    A.    The President's Determinations are Pretextual and Not Entitled to Any Presumption of Regularity. .................................................................................38

    B.    On Its Face, the Proclamation Grossly Exceeds the President's Authority...........42

ii

1.    The President's Section 7412(i)(4) authority is limited to determining whether "the technology to implement" a standard is "not available." ...................................................................................43

2.    The Proclamation is unlawful because it misconstrues "available" to be "achievable" ...................................................................47

C.    The Proclamation Unlawfully Exempts Standards that are Not Eligible for an Exemption Because No Technology is Needed to Implement Them, Evincing an Utterly Unreasonable Interpretation of "Technology." .....................48

1.    Work Practice Standards.............................................................................49

2.    Bypass Prohibition.................................................................................50

3.    Startup Shutdown Exemption ...................................................................51

D.    The Proclamation Evinces an Utterly Unreasonable Interpretation of "Available." ...........................................................................................51

1.    The Proclamation unlawfully exempts standards where the technology needed to implement them is available. .................................51

2.    Leak Detection and Repair.........................................................................52

3.    Fenceline Monitoring................................................................................52

4.    Flare Operating and Monitoring Standards.............................................52

E.    The Proclamation improperly construes "not available" to mean that more time is needed for compliance .............................................................57

IV.    EPA AND ADMINISTRATOR ZELDIN ARE PROPER PARTIES. ...........................58

CONCLUSION....................................................................................................61

# TABLE OF AUTHORITIES

**Pages(s)**

**Cases**

*Action All. v. Heckler*,
789 F.2d 931 (D.C. Cir. 1986).............................................................................................18

*AFGE v. Dep't of Educ.*,
25-cv-3553, 2025 WL 3123707.............................................................................................12

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003)..................................................................................30, 31, 57

*Air All. Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018).............................................................................................46

*Am. Fed'n of Labor and Congress of Indus. Orgs. v. Dept. of Labor*,
778 F. Supp. 3d 56 (D.D.C. 2025).........................................................................................30

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023)..........................................................................................21, 25

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012)...............................................................................................29

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902)................................................................21, 22, 31, 34, 35, 36, 42

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)..............................................................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................................12

*ASPCA v. Feld-Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011).................................................................................................20

*Bennett v. Spear*,
520 U.S. 154 (1997)..............................................................................................................29

*Biden v. Texas*,
597 U.S. 785 (2022)..............................................................................................................29

*Block v. Community. Nutrition Inst.*,
467 U.S. 340 (1984)..............................................................................................................23

*Bluewater Network v. EPA*,
370 F.3d 1 (D.C. Cir. 2004)................................................................................26, 28

*Bowen v. Mich. Acad. of Fam. Phys.*,
476 U.S. 667 (1986)......................................................................................................23

*Campaign for Accountability v. DOJ*,
155 F.4th 724 (D.C. Cir. 2025)....................................................................................19

*Carroll v. Safford*,
44 U.S. 441 (1845).......................................................................................................21

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)....................................20, 21, 25, 35, 36, 61, 62

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022)..............................................................................34, 36

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*,
333 U.S. 103 (1948).....................................................................................................27

*Chiron Corp. v. Nat'l Transp. Safety Bd*,
198 F.3d 935 (D.C. Cir. 1999)..............................................................................17, 18

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017)...............................................................................5, 38, 46

*Clean Wis. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020).................................................................................14

*Clinton v. City of New York*,
524 U.S. 417 (1998).....................................................................................................61

*Colon v. Carter*,
633 F.2d 964 (1st Cir. 1980).................................................................................24, 25

*Cook v. Trump*,
804 F. Supp. 3d 14 (D.D.C. 2025)..............................................................................59

*Ctr. for Biological Diversity v. Burgum*,
2026 WL 180258 (D.D.C. Jan. 23 2026)...................................................................16

*Ctr. for Biological Diversity v. Dep't of Interior*,
144 F.4th 296 (D.C. Cir. 2025)....................................................................................16

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023)......................................................................................19

v

*Dakota Cent. Tel. Co. v. State of South Dakota ex rel. Payne*,
250 U.S. 163 (1919).................................................................................................27

*Dalton v. Specter*,
511 U.S. 462 (1994).............................................................................................26, 27

*Dames & Moore v. Regan*,
453 U.S. 654 (1981).................................................................................................21

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988)................................................................................24

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017)................................................................................20

*Envtl. Def. Fund v. EPA*,
922 F.3d 446 (D.C. Cir. 2019)................................................................................17

*FEC v. Akins*,
524 U.S. 11 (1998)...................................................................................................19

*Fed. Educ. Ass'n v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025).....................................................................38, 39

*Fed. Educ. Ass'n v. Trump*,
No. 25-5303, 2025 WL 2738626 (D.C. Cir. 2025)..............................26, 29, 30, 31, 32, 38, 59

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976).................................................................................................35

*Fed. Express Corp. v. U.S. Dep't of Commerce*,
39 F.4th 756 (D.C. Cir. 2022).................................................................................32

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)...........................................................................................25, 27

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016)................................................................................19

*Friends of the Earth v. Laidlaw*,
528 U.S. 167 (2000).................................................................................................15

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025).................................................22, 25, 31, 34, 36, 42

*Griffith v. Fed. Lab. Rels. Auth.*,
842 F.2d 487 (D.C. Cir. 1988)................................................................................57

*Harmon v. Brucker*,
355 U.S. 579 (1958)...................................................................................21, 35, 36

*Harris v. Sebelius*,
932 F. Supp. 2d 150 (D.D.C. 2013) .............................................................11

*Healthy Gulf v. Dep't of Interior*,
152 F.4th 180 (D.C. Cir. 2025)...............................................................13, 16

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*,
71 F.4th 59 (D.C. Cir. 2023)........................................................................36

*Heckler v. Chaney*,
470 U.S. 821 (1985).....................................................................................29

*Hindes v. FDIC*,
137 F.3d 148 (3rd Cir. 1998) .......................................................................52

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977).....................................................................................13

*Int'l Harvester Co. v. Ruckelshaus*,
478 F.2d 615 (D.C. Cir. 1973)................................................................26, 28

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949).....................................................................................20

*Laufer v. Naranda Hotels, LLC*,
60 F.4th 156 (4th Cir. 2023) ........................................................................17

*Learning Res., Inc. v. Trump*,
607 U.S. ___ (2026)......................................................................................37

*Leedom v. Kyne*,
358 U.S. 184 (1958).....................................................................................34

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................................................12, 17

*Mass. Lobstermen's Ass'n v. Raimondo*,
141 S. Ct. 979 (2021)..................................................................21, 31, 32, 33

*Mass. Lobstermen's Ass'n v. Ross*,
945 F.3d 535 (D.C. Cir. 2019)................................................................30, 35

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999).....................................................................................35

*Mountain States Legal Found. v. Bush*,
    306 F.3d 1132 (D.C. Cir. 2002)......................................................................22, 31

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) .......................................................................31, 32

*Nat. Res. Def. Council v. EPA*,
    529 F.3d 1077 (D.C. Cir. 2008)........................................................................4, 15

*Nat. Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014)............................................................................15

*Nat. Res. Def. Council v. EPA*,
    808 F.3d 556 (2d Cir. 2015)...........................................................................26, 28

*Nat'l Ass'n of Postal Supervisors v. USPS*,
    26 F.4th 960 (D.C. Cir. 2022)........................................................................22, 25

*Nat'l Lime Ass'n v. EPA*,
    233 F.3d 625 (D.C. Cir. 2000)................................................................3, 23, 44, 46

*Nat'l Sec. Archive v. CIA*,
    104 F.4th 267 (D.C. Cir. 2024)............................................................................20

*Nat'l Treasury Emps. Union v. Trump*,
    780 F. Supp. 3d 237 (D.D.C. 2025).......................................................26, 38, 39, 42

*New Mexico v. Musk*,
    784 F. Supp. 3d 174 (D.D.C. 2025).....................................................................34

*New York v. Biden*,
    636 F. Supp. 3d 1 (D.D.C. 2022).........................................................................61

*Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    103 F.4th 45 (D.C. Cir. 2024)..............................................................................36

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025)...........................................................................................34

*Patel v. Garland*,
    596 U.S. 328 (2022)...........................................................................................24

*PETA v. USDA*,
    797 F.3d 1087 (D.C. Cir. 2015)............................................................................19

*President v. Vance*,
    627 F.2d 353 (D.C. Cir. 1980)..............................................................................61

*Revolution Wind v. Burgum*,
    25-cv-02999 (D.D.C. Sept. 22, 2025)........................................................................................39

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006).....................................................................................................................12

*S. Ry. Co. v. Seaboard Allied Milling Corp.*,
    442 U.S. 444 (1979)...................................................................................................................24

*Sierra Club v. EPA*,
    129 F.3d 137 (D.C. Cir. 1997).............................................................................................14, 48

*Sierra Club v. EPA*,
    479 F.3d 875 (D.C. Cir. 2007).............................................................................................44, 47

*Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008)..................................................................................................51

*Sierra Club v. EPA*,
    895 F.3d 1 (D.C. Cir. 2018)........................................................................................................44

*Sissel v. U.S. Dep't of Health & Hum. Servs.*,
    760 F.3d 1 (D.C. Cir. 2014)........................................................................................................11

*Stark v. Wickard*,
    321 U.S. 288 (1944)...................................................................................................................33

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996)....................................................................................................59

*Train v. City of New York*,
    420 U.S. 35 (1975).....................................................................................................................35

*Trump v. Hawaii*,
    585 U.S. 667 (2018)...................................................................................................................27

*Trump v. Orr*,
    146 S. Ct. 44 (2025)...................................................................................................................59

*Tulare Cnty. v. Bush*,
    306 F.3d 1138 (D.C. Cir. 2002).............................................................................................26, 31

*U.S. Sugar Corp. v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016)...........................................................................................3, 4, 45

*U.S. Sugar Corp. v. EPA*,
    671 F. App'x 822 (D.C. Cir. 2016)................................................................................................3

*United States v. George S. Bush & Co.*,
   310 U.S. 371 (1940)...............................................................................................27

*United States v. Lee*,
   106 U.S. 196 (1882)...............................................................................................21

*United States v. Palomar-Santiago*,
   593 U.S. 321 (2021)...............................................................................................28

*United States v. Warnagiris*,
   21-cr-0382-PLF, 2025 WL 341990 (D.D.C. Jan. 30, 2025)....................................33

*Waterkeeper All. v. EPA*,
   853 F.3d 527 (D.C. Cir. 2017)...............................................................................18

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019)..........................................................................16

*Ex Parte Young*,
   209 U.S. 123 (1908)...............................................................................................31

*Ysleta Del Sur Pueblo v. Texas*,
   596 U.S. 685 (2022)...........................................................................................24, 47

**Statutes**

10 U.S.C. § 2903...............................................................................................26, 27

16 U.S.C. § 431.......................................................................................................26

42 U.S.C. § 7411.....................................................................................................45

42 U.S.C. § 7412.........................1, 2, 3, 4, 5, 6, 11, 22, 29, 36, 37, 39, 43, 44, 46, 47, 48, 49, 58

42 U.S.C. § 7414.....................................................................................................17

42 U.S.C. § 7475.....................................................................................................24

42 U.S.C. § 7604.....................................................................................................23

42 U.S.C. § 7607...........................................................................5, 23, 37, 38, 46, 59

**Consitutional Provisions**

U.S. Const. art. III, § 2, cl. 1 ..................................................................................21

**Code of Federal Regulations**

40 C.F.R. § 63.100....................................................................................................7

x

40 C.F.R. § 63.102 ................................................................................................................51

40 C.F.R. § 63.104 ..............................................................................................................8, 53

40 C.F.R. § 63.108 ...........................................................................................................7, 9, 57

40 C.F.R. § 63.113 ...................................................................................................7, 8, 9, 40, 50

40 C.F.R. § 63.114 .............................................................................................................9, 50

40 C.F.R. § 63.115 ................................................................................................................54

40 C.F.R § 63.116 ................................................................................................................54

40 C.F.R. § 63.119 ......................................................................................7, 8, 9, 40, 49, 50, 53

40 C.F.R. § 63.127 .............................................................................................................9, 51

40 C.F.R. § 63.128 ................................................................................................................54

40 C.F.R. § 63.139 ................................................................................................................54

40 C.F.R. § 63.145 ................................................................................................................54

40 C.F.R. § 63.148 .............................................................................................................9, 51

40 C.F.R. § 63.165 .............................................................................................................9, 50

40 C.F.R. § 63.168 ................................................................................................................52

40 C.F.R. § 63.174 ..........................................................................................................9, 52, 53

40 C.F.R. § 63.184 .............................................................................................................7, 8

40 C.F.R. § 63.311 ................................................................................................................17

40 C.F.R. § 63.485 ................................................................................................................54

40 C.F.R. § 63.490 ................................................................................................................54

40 C.F.R. § 63.497 ................................................................................................................51

40 C.F.R. § 63.508 .................................................................................................................9

40 C.F.R. § 63.670 .............................................................................................................9, 56

40 C.F.R. § 63.2445 ..............................................................................................................56

40 C.F.R. § 63.2450 ..............................................................................................................56

40 C.F.R. part 60, appendix A ..............................................................................................53

**Federal Register Notices**

62 Fed. Reg. 2722 (Jan. 17, 1997) ........................................................................................53

88 Fed. Reg. 55858 (Aug. 16, 2023).......................................................................................4

89 Fed. Reg. 42932 (May 16, 2024) .................................................6, 7, 9, 51, 52, 56

90 Fed. Reg. 34587 (July 23, 2025) .........................................10, 44, 45, 47, 48, 49, 58

**Other Authorities**

Black's Law Dictionary (6th Ed. 1990).................................................................................43

Merriam Webster Online Dictionary ..............................................................................43, 47

Fed. R. Civ. P. 56.................................................................................................................12

Fed. R. Civ. P. 12.................................................................................................................11

Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539 (2005)........................................33

Louis L Jaffe, *The Right to Judicial Review*, 71 Harv. L. Rev. 401 (1958) .................................20

S. Bray & P. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1798-99 (2022).................................................................................................................................31

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

The following is a glossary of acronyms and abbreviations used in the brief:

| | |
|---|---|
| EPA | Environmental Protection Agency |
| EJHA | Environmental Justice Health Alliance |
| HON | Hazardous Organic NESHAP |
| LDAR | Leak Detection and Repair |
| MACT | Maximum Achievable Control Technology |
| MON | Miscellaneous Organic NESHAP |
| NESHAP | National Emissions Standards for Hazardous Air Pollutants |
| P&R | Polymers and Resins |
| SOCMI | Synthetic Organic Chemical Manufacturing Industry |

**INTRODUCTION**

In 2024, EPA restricted hazardous air pollutant emissions from petrochemical facilities with its "HON Rule" (Hazardous Organics NESHAP), including by setting stricter limits for ethylene oxide, a carcinogen that the agency determined is 30 times more toxic than previously understood. EPA estimated that the HON Rule would reduce cancer risk by 96 percent in communities surrounding the facilities.

With the stroke of his pen, in July 2025, President Trump swept away those protections from 50 facilities in states from Louisiana to Michigan. He did so invoking Section 7412(i)(4) of the Clean Air Act, which authorizes exemptions only if the President determines that "technology to implement [a hazardous air pollutant] standard is not available and that it is in the national security interests of the United States to do so." 42 U.S.C. § 7412(i)(4). No previous president has ever used the Section 7412(i)(4) authority, but President Trump has used it seven times in the last year to exempt more than 180 facilities from hazardous air pollutant standards.

Although the President's proclamation ("Proclamation") recites the words, "I determine" that the necessary factual predicates are met, the Proclamation's content and application show it for what it is: pretext. The Proclamation identifies no particular "technology" that is "not available" to implement any specific standard. It also evinces an utterly unreasonable interpretation of those terms, given that facilities that have already demonstrated their ability to implement HON standards—including standards that require no technology at all—were exempted based on the purported unavailability of technology to do so.

The Proclamation represents a patent misconstruction of the President's statutory authority, turning a narrow exemption meant to address specific technological circumstances into a license to excuse facilities from pollution limits at the President's whim. That is not the

1

authority Congress conveyed in Section 7412(i)(4), and this Court has the equitable authority to enforce Congress's chosen limits and declare the Proclamation unlawful and *ultra vires*.

STATUTORY BACKGROUND

As EPA describes, for years the Clean Air Act ("Act") failed to substantially reduce emissions of "very threatening" hazardous air pollutants. EPA, *1990 Clean Air Act Amendment Summary: Title III, Air Toxics*, https://www.epa.gov/clean-air-act-overview/1990-clean-air-act-amendment-summary-title-iii [https://perma.cc/69XU-ZQCU] (last visited March 2, 2026). In response, Congress crafted a comprehensive plan in its 1990 Clean Air Act Amendments to "dramatically accelerate progress in controlling major toxic air pollutants." *Id.* With those amendments, Congress listed 189 air toxics for regulation and compelled EPA to develop rigorous standards based on the best demonstrated control technologies or practices for controlling emissions of these hazardous chemicals, and to update them regularly to address health risks and technological developments. *Id.*

This portion of the Act, Section 7412, creates a comprehensive scheme for regulating facilities that emit hazardous air pollutants.[1] It includes strict timelines for EPA to both set standards and to periodically update those standards to reflect improvements in pollution controls and revisions needed to protect public health.

### A.    The Act's Requirements for Setting Standards

The Clean Air Act mandates that EPA identify and list all categories of major sources of hazardous air pollutants. 42 U.S.C. § 7412(c). For each listed "category" (i.e., an industry type), EPA must (1) establish initial standards, then (2) periodically review and revise those standards

---

[1] Under the Clean Air Act's internal numbering, 42 U.S.C. § 7412 is known as Section 112. Plaintiffs refer to "Section 7412" throughout this brief, but there are certain quotations that refer to "Section 112."

2

if certain statutory criteria are met. *Id.* § 7412(d)(1), (d)(6), (f)(2). EPA has a "clear statutory obligation" to establish limits for each hazardous air pollutant that a category emits. *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 633-634 (D.C. Cir. 2000). As discussed below, at every step EPA sets standards that it determines can be achieved.

EPA sets emission standards by determining the "maximum achievable control technology," known as "MACT floors." It also determines whether more stringent standards are "achievable" considering cost and other factors. *Id.* at 629. EPA refers to both these standards as maximum achievable control technology or "MACT." *See id.*

EPA must then regularly review and revise its standards. First, under Section 7412(d)(6), EPA reviews standards every eight years and revises them "as necessary," taking into account "developments" in pollution control technologies and practices. 42 U.S.C. § 7412(d)(6). Second, under Section 7412(f)(2)(A), EPA reviews standards within eight years after promulgation to determine if health or environmental risks remain. 42 U.S.C. § 7412(f)(2)(A). EPA must revise the standards if needed to ensure an ample margin of safety to protect public health. *Id.*

Whether establishing or revising standards, EPA sets standards that it determines are achievable by the industry, considering factors like the emissions reductions that have already been achieved, the means of doing so (i.e., whether through improvements in technology or processes), and, in some cases, costs. For example, MACT floors reflect the emissions levels that have already been "achieved" by the best performing facilities in a category, which establishes their achievability by their peers. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 594 (D.C. Cir. 2016) (cleaned up), *amended on reh'g en banc*, 671 F. App'x 822 (D.C. Cir. 2016) *and* 671 F. App'x 824 (D.C. Cir. 2016); *see* 42 U.S.C. § 7412(d)(3).

3

So, too, for the revisions under Sections 7412(d)(6) and 7412(f)(2). When conducting a technology review under Section 7412(d)(6), EPA bases any new standards on "developments in practices, processes, and control technologies" that EPA identifies, and to ensure that the industry can achieve the new standard, EPA evaluates factors like technical feasibility and estimated costs (among others) before revising standards to conform to such new developments. 42 U.S.C. § 7412(d)(6); 88 Fed. Reg. 55858, 55867 (Aug. 16, 2023) (describing EPA's approach to Section 7412(d)(6) technology reviews). Similarly, before setting new standards to protect health under Section 7412(f)(2), EPA evaluates the potential costs of any new standards. *See Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1083 (D.C. Cir. 2008) (allowing EPA to consider costs in 7412(f)(2) reviews); *see also* 88 Fed. Reg. 55863 (describing EPA's approach to 7412(f)(2) reviews).

Though EPA sets standards that are achievable by an industry, individual facilities within an industry may need to take steps to comply. *See U.S. Sugar Corp.*, 830 F.3d at 594 (noting that floor standards ensures that "all [] sources at least clean up their emissions to the level that their best performing peers have shown can be achieved"). The Act requires EPA to set strict deadlines for compliance by all existing sources. For standards revised under Section 7412(d)(6), EPA must "provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A). For health-based standards revised under Section 7412(f)(2), standards must apply 90 days after their effective date, except that EPA may extend that deadline for up to two years if EPA determines it is "necessary for the installation of controls." *Id.* § 7412(f)(4). Separately, EPA or state permitting authorities may extend compliance for up to one additional year if a facility demonstrates "such additional period is necessary for the installation of controls." *Id*. § 7412(i)(3)(B).

4

**B.      Clean Air Act Procedural Requirements**

The Clean Air Act sets out rulemaking requirements that apply to "the promulgation or revision of any . . . emission standard or limitation under section 7412(d)." *Id*. § 7607(d)(1)(C). Those include requirements to provide public notice and opportunity to comment on the standard and the data and methodologies used in setting it. *Id*. § 7607(d)(3), (d)(5).

The Act also provides procedures for reconsidering a promulgated rule. EPA can "convene a proceeding for reconsideration of [a] rule," but must "provide the same procedural rights as would have been afforded" in the original proceeding. *Id*. § 7607(d)(7)(B). The Act states, however, that reconsideration "shall not postpone the effectiveness of the rule," except that EPA or a reviewing court may stay the effectiveness of the rule "for a period not to exceed three months." *Id*. Section 7607(d)(7)(B) is the sole authority EPA has to stay a rule after its effective date has passed. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

**C.      The President's Section 7412(i)(4) Exemption Authority**

Section 7412(i)(4) authorizes the President, in narrowly prescribed circumstances, to "exempt any stationary source from compliance" with hazardous air pollutant standards promulgated under Section 7412, "for a period of not more than 2 years." 42 U.S.C. § 7412(i)(4). The President may do so only if he "determines [1] that the technology to implement such standard is not available and [2] that it is in the national security interests of the United States to do so." *Id*. The President may extend the exemption "for 1 or more additional periods, each period not to exceed 2 years." *Id*. Additionally, this exemption provision requires the President to "report to Congress with respect to each exemption (or extension thereof)." *Id*. Before 2025, no President had ever used this authority. Statement of Undisputed Material Facts ("SUMF") ¶ 24.

**PROCEDURAL & FACTUAL BACKGROUND**

The facilities covered by the HON Rule manufacture chemicals and synthetic rubbers, emitting hazardous air pollutants in the process. Two of these pollutants are ethylene oxide and chloroprene, which EPA has concluded in recent years are much more carcinogenic than previously understood. SUMF ¶¶ 27-30, 35-36. Emissions of these hazardous air pollutants contribute to cancer risk hotspots, such as in St. John the Baptist Parish, Louisiana. *Id.* ¶¶ 34, 37, 55. Breathing these and other hazardous air pollutants can cause many health harms in addition to cancer, and children are particularly vulnerable. *See id.* ¶¶ 29-48.

A.      **The HON Rule**

In a final rule published May 16, 2024, EPA revised three sets of emission standards under Section 7412: (1) Hazardous Organic National Emission Standards for Hazardous Air Pollutants ("Hazardous Organic NESHAP" or "HON"), which apply to the Synthetic Organic Chemical Manufacturing Industry ("SOCMI") source category; (2) NESHAP for the Group I Polymers and Resins ("P&R I") source categories; and (3) NESHAP for the Group II Polymers and Resins source categories ("P&R II" and, collectively with P&R I, "P&R"). SUMF ¶ 2 (89 Fed. Reg. 42932). In this rule, referred to collectively as the "HON Rule," EPA revised all three of these sets of standards under the Section 7412(d)(6) technology review. SUMF ¶ 3 (89 Fed. Reg. 42934); 42 U.S.C. § 7412(d)(6). Additionally, to reduce risk below "unacceptable" levels, the agency also revised the standards for SOCMI facilities that use, store, or emit ethylene oxide and for the Neoprene Production source category under Group I Polymer and Resins, which emits chloroprene, pursuant to EPA authority under Section 7412(f)(2). SUMF ¶¶ 5, 28 (89 Fed. Reg. 42945-46).

As a result of EPA's technology review, the HON Rule updates requirements for flares, heat exchange systems, process vents, pressure relief devices, storage vessels, and general

6

provisions such as those relating to startup, shutdown, and malfunctions. SUMF ¶¶ 3-4 (89 Fed. Reg. 42934, 42946, 42948-49, 43023). The compliance deadline for these requirements is July 15, 2027. 40 C.F.R. § 63.100(k)(10).

As a result of EPA's residual risk review, the HON Rule establishes ethylene oxide control requirements for process vents and storage vessels that handle ethylene oxide. SUMF ¶¶ 5, 56. Those standards can be met either by installing an air pollution control device that meets certain performance standards, SUMF ¶ 56, or a flare that satisfies standards already required at other types of facilities. SUMF ¶¶ 56, 66; *see* 40 C.F.R. §§ 63.113(j), 63.119(a)(5), 63.108(a). The compliance deadline for these requirements is July 15, 2026. 40 C.F.R. § 63.100(k)(11).

EPA also required a subset of facilities that use, store, or emit one or more of six pollutants—benzene, 1,3-butadiene, chloroprene, ethylene dichloride, ethylene oxide, and vinyl chloride—to sample along the facility's property boundary (known as the "fenceline"). SUMF ¶ 111 (89 Fed. Reg. 42949); 40 C.F.R. § 63.184. These provisions require facilities to conduct ambient monitoring at the fenceline for these pollutants and, if the concentration exceeds a certain level, to take corrective action to identify the source of excess emissions. 40 C.F.R. § 63.184(a), (b), (e). The compliance deadline for facilities to begin fenceline monitoring is July 15, 2026, and July 15, 2027, for facilities to begin corrective action. 40 C.F.R. § 63.100(k)(12).

The revised standards established a variety of requirements applicable to different chemical manufacturing process units. Different HON facilities have different arrays of such units, and thus are subject to different combinations of requirements, based on the facility design and the pollutants emitted. For example, facilities that do not use or emit ethylene oxide would not be required to comply with ethylene oxide-specific requirements. *See* SUMF ¶¶ 56, 61.

7

Facilities that do not emit one or more of the six pollutants with fenceline monitoring requirements would not be required to comply with the fenceline monitoring requirements. *See* SUMF ¶ 136.

Furthermore, the various standards are met using different technologies or practices. The requirements can be grouped and summarized as follows:

1.    Ethylene oxide control requirements: The HON Rule requires facilities that use, store, or emit ethylene oxide to reduce ethylene oxide emissions from process vents and storage vessels by either (1) venting the ethylene oxide to a control device that reduces emissions by a certain amounts (for example, greater than or equal to 99.9 percent by weight), or (2) venting the ethylene oxide to a flare that meets preexisting performance, operation, and maintenance requirements. *See* SUMF ¶ 56; 40 C.F.R. §§ 63.113(j) (process vents), 63.119(a)(5) (storage vessels).

2.    Fenceline monitoring: The HON Rule requires facilities that use, store, or emit one or more of benzene, 1,3-butadiene, chloroprene, ethylene dichloride, ethylene oxide, and vinyl chloride to sample along the facility's fenceline. SUMF ¶ 111; *see* 40 C.F.R. § 63.184. The Rule provides standardized sampling procedures for each of the pollutants. *See id*. § 63.184(a), (b). If the samples show concentrations above a certain level (the "action level"), the facility's owner or operator must take specified actions to identify the root cause of the exceedance and take corrective action. SUMF ¶¶ 112, 119, 123; 40 C.F.R. § 63.184(d)(3), (e), (f).

3.    Leak detection and repair requirements: The HON Rule requires facilities to implement new leak detection and repair processes for ethylene oxide, including more frequent monitoring, with a lower leak concentration requiring repair, shorter deadlines to repair leaks, and limitations on any repair delay. SUMF ¶¶ 85-86, 91, 96, 101; *see, e.g.*, 40 C.F.R.

8

§§ 63.104(g)(6) (requirements for heat exchange systems), 63.174(a)(3), (b)(3)(vi), (d), (g)(3) (requirements for connectors), 63.171(f) (delay of repair limitations). Facilities must also implement more frequent leak detection for all HON pollutants from heat exchange systems. SUMF ¶¶ 103-105 (89 Fed. Reg. 42978).

4.      Work practice standards: the HON Rule establishes work practice standards like routine inspection and maintenance programs and operator training to prevent and minimize hazardous pollutant emissions from pressure relief devices. SUMF ¶¶ 80-83; *see* 40 C.F.R. § 63.165(e)(3)(i)-(iii). The Rule also prescribes how and when operators can open process equipment, including recordkeeping requirements and restrictions on the amount of ethylene oxide released from maintenance vents, and standards for maintaining storage vessels. SUMF ¶¶ 74-77; *see* 40 C.F.R. §§ 63.113(k) (work practice standards for maintenance vents), 63.119(b)(7) (work practice standards for planned routine maintenance of storage vessels).

5.      Bypass prohibition: The HON Rule also prohibits HON facilities from bypassing air pollution control devices at any time, such as during maintenance, making a bypass a violation of applicable emission standards in most instances. SUMF ¶ 137; *see* 40 C.F.R. §§ 63.114(d)(3) (process vents), 63.119(e)(7) (storage vessels), 63.127(d)(3) (transfer racks), 63.148(f)(4) (vapor collection systems and closed vent systems).

6.      Operating and monitoring requirements for flares: The HON Rule sets revised operating and monitoring requirements for flares used as air pollution control devices. SUMF ¶ 68; 40 C.F.R. §§ 63.108, 63.508. The requirements mirror and cross-reference the flare requirements in EPA's 2015 hazardous air pollutant rules for refineries. SUMF ¶ 69; 40 C.F.R. § 63.670.

9

**B.       President Trump's Clean Air Act Rollback Agenda**

On July 17, 2025, President Trump issued a proclamation purporting to exempt 52 HON facilities from "those aspects of the HON Rule that were promulgated under section 112 of the Clean Air Act, 42 U.S.C. 7412 for a period of 2 years beyond the HON Rule's relevant compliance dates." 90 Fed. Reg. 34587, 34587-88 (July 23, 2025) ("Proclamation"). Two of those listed facilities appear to be duplicates, and so the Proclamation in effect exempts 50 facilities from *all* aspects of the HON Rule. SUMF ¶ 20.

To support this sweeping exemption, the President parrots the two determinations required by the statute: (1) that "the technology to implement the HON Rule is not available" and (2) that it is "in the national security interests of the United States to issue this Exemption." 90 Fed. Reg. 34588. The Proclamation did not explain which "technolog[ies]" were not "available," but gestured at "testing and monitoring requirements" that it said "rely on technologies that are not practically available, not demonstrated at the necessary scale, or cannot be implemented safely or consistently under real-world conditions." *Id*. 34587.

The Proclamation was one of four exemption proclamations issued on July 17, and one of seven issued in 2025. SUMF ¶ 25. No prior president had ever issued Section 7412(i)(4) exemptions. SUMF ¶ 24. The exemptions issued in 2025 exempt more than 180 facilities that emit hazardous air pollutants. SUMF ¶ 25.

President Trump's exemption proclamations are tools of a deregulatory effort announced shortly after he took office. On March 12, 2025, in a press event billed as "the greatest day of deregulation our nation has seen," EPA announced that it would "reconsider" the HON Rule and thirty-one other regulations protecting human health and the environment. SUMF ¶ 11. That same day EPA announced it was reconsidering the HON Rule and stated "[t]he Trump Administration is considering a 2-year compliance exemption via Section 7412(i)(4) of the Clean

10

Air Act for affected facilities while EPA goes through the rulemaking process." SUMF ¶ 12. The Office of Information and Regulatory Affairs estimated that it would take until June 2026 for EPA to complete final reconsideration of the HON Rule. SUMF ¶ 17.

Not content to wait on EPA's reconsideration, which would be subject to the Clean Air Act's substantive and procedural standards, the administration began laying the groundwork to exempt HON facilities and other industries from Section 7412 rules. Shortly after its reconsideration announcement, EPA published a fact sheet on its webpage inviting "[a]ny source interested in a Presidential exemption" from nine hazardous air pollutant rules that had been updated in 2024, including the HON Rule, to "provide their recommendations to EPA by March 31, 2025." SUMF ¶ 13. The fact sheet explained that "[s]ources need only provide why technology is unavailable and why it is in the national security interests of the United States to provide the exemption." *Id.*

On or about March 24, 2025, EPA posted a new webpage announcing it had established "an electronic mailbox"—airaction@epa.gov—"to allow the regulated community to request a Presidential Exemption under section 112(i)(4)." SUMF ¶ 14. EPA asked that requests be submitted within a week*. Id.*

## STANDARD OF REVIEW

In analyzing motions to dismiss under either Rule 12(b)(1) or 12(b)(6) of the Federal Rules of Civil Procedure, "[t]he court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor, but is not required to accept the plaintiff's legal conclusions as correct." *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). The plaintiff bears the burden of establishing subject matter jurisdiction. *Harris v. Sebelius*, 932 F. Supp. 2d 150, 151 (D.D.C. 2013). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain

11

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009 (cleaned up)).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *AFGE v. Dep't of Educ.*, 25-cv-3553, 2025 WL 3123707, at \*3 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE PROCLAMATION

Plaintiffs have standing to bring this action. A plaintiff has standing when it has suffered an injury in fact that is concrete and particularized and actual or imminent, the injury is fairly traceable to the defendant, and the injury would likely be redressed by the requested judicial relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. FAIR*, 547 U.S. 47, 53 (2006).

Here, through a single proclamation, the President has deprived thousands of Plaintiffs' members who live, work, and recreate near the 50 exempted chemical plants that emit hazardous air pollutants from the HON Rule's vital protections, which EPA estimated would reduce the number of people facing elevated cancer risk from HON emissions by between 94 and 96 percent. SUMF ¶¶ 51, 53, 144. As a result, Plaintiffs' members will suffer real harms to their health, and aesthetic and recreational interests, as well as be deprived of vital monitoring information that they would use to protect their health. Plaintiffs thus have standing to challenge the Proclamation.

12

## A.     Plaintiffs Have Associational Standing

Plaintiffs have standing to bring this case on behalf of their members because those members would have standing in their own right; the interests at stake are germane to Plaintiff organizations' purposes; and neither the claims asserted nor relief requested require individual participation. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Healthy Gulf v. Dep't of Interior*, 152 F.4th 180, 189 (D.C. Cir. 2025).

Plaintiffs have members who suffer injuries-in-fact from increased harmful emissions from the exempted facilities. As set forth in detail in the attached declarations, Plaintiffs' members live, work, recreate, or otherwise frequent areas in close proximity to the exempted facilities. *See* SUMF ¶ 144; *see also* Compl. ¶¶ 142-148. Those facilities emit hazardous air pollutants—including ethylene oxide, chloroprene, benzene, and vinyl chloride—that cause cancer and non-cancer health risks. *See* SUMF ¶¶ 27-48. This increased exposure to harmful emissions from the exempted facilities leads to cognizable injuries to Plaintiffs' members and supporters.

Exposure to ethylene oxide, chloroprene, vinyl chloride, benzene, 1,3-butadiene, and other hazardous air pollutants emitted by the exempted facilities causes harm. *See* SUMF ¶¶ 30-53. EPA concluded that toxic emissions from P&R I and HON facilities caused "unacceptable cancer risk" in nearby communities. SUMF ¶¶ 27-28. Specifically, EPA estimated that HON emissions caused 154,600 people living near HON-regulated facilities to have a significantly elevated risk of cancer. SUMF ¶¶ 50, 52.

The HON Rule addressed these risks by requiring HON and P&R facilities to reduce their hazardous air pollutant emissions through emissions controls, fenceline monitoring, leak detection, and work practice standards. SUMF ¶¶ 5-6, 51-54. EPA established these standards to "address the unacceptable risk and achieve an ample margin of safety to protect public health" at

13

affected sources, and estimated that the HON Rule would reduce the number of people living near these facilities who experience an elevated cancer risk by over 94 percent. SUMF ¶¶ 28-29, 50-53.

Because of the Proclamation, however, Plaintiffs' members will be exposed to higher emissions than they would have without the exemptions, and face health risks from these increased emissions. *See* SUMF ¶¶ 147, 152; Compl. ¶¶ 142-148; *see also Clean Wis. v. EPA*, 964 F.3d 1145, 1156 (D.C. Cir. 2020) ("Adverse health effects likewise constitute Article III injuries, even if a petitioner merely asserts realistic health concerns instead of providing medical evidence").

Defendants do not seriously contest that Plaintiffs' members living near exempted facilities are harmed by the Proclamation. Mot. at 16, 17. Instead, they argue that Plaintiffs' members are not harmed by "excess" emissions because the exemption merely delays the emission reductions of the HON Rule. *Id.* 18. But the exemption *does* "allow[] for increased emissions," *id.*: it allows the 50 exempted facilities to emit more pollutants than they otherwise would—and more than their non-exempted peers do—which means that Plaintiffs' members are necessarily being exposed to *more* pollution *now* than they would be but for the exemptions. *See Sierra Club v. EPA*, 129 F.3d 137, 139 (D.C. Cir. 1997) (finding injury-in-fact where delaying required pollution controls "subjects affected parties to the environmental exposures which the regulatory provisions suspended by the grace period seek to limit"). And as EPA concluded in its risk review for HON sources, the emissions from these facilities are exposing neighboring communities—and Plaintiffs' members in those communities—to unacceptable health risks. SUMF ¶¶ 28-29, 144-48. Once harmful pollution is emitted into the air, it cannot be taken back

14

out. *See, e.g.,* SUMF ¶ 31. The additional two years of exposure to that harmful pollution constitutes a concrete and particularized risk to Plaintiffs' members. *See* SUMF ¶ 48.

Relatedly, Plaintiffs' members worry about their exposure to the increased hazardous air pollutants emitted by these facilities. SUMF ¶¶ 147, 152. Many members can smell or see emissions from facilities outside their homes. SUMF ¶ 145. Some already suffer from asthma, respiratory conditions, and other adverse health effects, which they believe are caused or exacerbated by pollution from these facilities. SUMF ¶ 146. Plaintiffs' members spend less time outside, keep their windows closed, and take other steps to reduce their exposure, resulting in aesthetic and recreational injuries. SUMF ¶ 148; *see also Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1017–18 (D.C. Cir. 2014) (finding members' concerns about health risks from emissions from the burning of some hazardous waste, including in some cases spending less time outdoors, enough to satisfy injury in fact).

These injuries are directly traceable to the Proclamation, which is the sole legal act authorizing the facilities not to comply with the HON Rule's requirements. *See Nat. Res. Def. Council,* 755 F.3d at 1017 ("It is well-established that standing will lie where a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." (cleaned up)). And they would be redressed by a favorable decision declaring the Proclamation unlawful, restoring their obligations to comply with the HON Rule and thereby reducing harmful emissions and members' exposure. *See Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000) (finding redressability satisfied where relief would lessen environmental harm).

Plaintiffs also satisfy the other standards for associational standing: pollution reduction and public health protection are germane to Plaintiffs' purposes, and neither the claims asserted

15

nor the relief requested require individual member participation. *See* SUMF ¶ 143; Compl. ¶¶ 11-20, 149-83.

Defendants' argument that this case should be narrowed to concern a fraction of the exempted chemical facilities lacks merit. Mot. at 16, 17-18. Plaintiffs need not demonstrate injury regarding each of the dozens of exempted facilities subject to the single challenged action (the Proclamation) to satisfy "concrete and particularized harm." *Contra* Mot. at 16, 17-18; *compare Healthy Gulf¸* 152 F.4th at 189-190 (standing to challenge the Secretary of the Interior's five-year leasing schedule where at least one member would be injured by the release of some specific lease blocks), *with Ctr. for Biological Diversity v. Dep't of Interior*, 144 F.4th 296, 300 (D.C. Cir. 2025) (no standing where plaintiffs challenged "more than 4,000 permits for oil and gas wells on public land" and "[r]ather than explain how one or more of the challenged permits would likely injure them," plaintiffs "challenge[d] all the permits in the aggregate").

Plaintiffs are challenging a single, unitary government action: the Proclamation. The claims Plaintiffs bring and the relief we request apply to the Proclamation as a whole. *See* Compl. At 43 ("Relief Requested"). The Proclamation, issued via a single Federal Register notice, treats the exempted facilities uniformly: *all* Annex I facilities are exempted from *all requirements* of the HON Rule for the same reasons, regardless of individual differences. SUMF ¶ 22. Thus, Plaintiffs must not demonstrate standing as to each exempted facility in order to challenge the Proclamation. *See Ctr. for Biological Diversity v. Burgum*, 2026 WL 180258, at *6 (D.D.C. Jan. 23 2026) (where an environmental organization challenged "only a single (in)action," it did not need to demonstrate its members were harmed by any specific decommissioning actions or decisions); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 62

16

(D.D.C. 2019) (standing to challenge lease sale without needing to show that member declarants "visited or plan[ned] to visit" every specific parcel in the "thousands of acres" of affected area).

Furthermore, although they need not show this to satisfy standing, Plaintiffs' members and supporters *do* live and spend time near *all* of the exempted facilities. The attached declarations provide evidence that Plaintiffs collectively have members near each of the fifty exempted facilities who will be harmed by the emissions. SUMF ¶¶ 143-44; Fashho Decl. ¶ 3, Ex. 3; Barone Decl. ¶¶ 23, 25, Ex. 1.

### B.    Plaintiffs Have Informational Standing

Plaintiffs also have informational standing. Plaintiffs and their members suffer an informational injury because the Proclamation deprives them of the exempted facilities' emissions data, including in particular fenceline monitoring data.

Plaintiffs' entitlement to fenceline monitoring data and other information required to be disclosed under the HON rule constitutes a "legally protected interest," as required by Article III of the Constitution. *See Lujan*, 504 U.S. at 560. It follows that the denial of information to which plaintiffs are *legally* entitled can give rise to an informational injury. Here, the HON Rule requires reporting of fenceline monitoring data, which both the Act and EPA's implementing regulations require EPA to publicly disclose, and the Proclamation deprive Plaintiffs of that information. 42 U.S.C. § 7414(c); 40 C.F.R. § 63.311(j). This "den[ial of] information to which [plaintiffs] clai[m] entitlement" is sufficient for an informational injury. *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 166 (4th Cir. 2023) (holding denial of information gave rise to Article III standing, where claim of entitlement arose from a regulation); *see, e.g.*, *Chiron Corp. v. Nat'l Transp. Safety Bd*, 198 F.3d 935, 942 (D.C. Cir. 1999) (concluding no informational injury existed where plaintiffs pointed to no entitlement in "statute, regulations, or other sources of law"); *see Envt'l. Def. Fund v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (explaining that "a

17

denial of access to information qualifies as an injury in fact where a statute (on the claimants'

reading) requires that the information be publicly disclosed and there is no reason to doubt their

claim that the information would help them" (cleaned up)).

Informational standing is not negated simply because the Clean Air Act information

gathering authority is implemented by regulation. *See Waterkeeper All. v. EPA*, 853 F.3d 527,

534 (D.C. Cir. 2017) (finding informational injury where the agency's final rule had the effect of

cutting back on reporting and disclosure requirements). The Government cites no legal support to

contend otherwise. Nor could they, as this circuit has entertained claims where the interest was

based on other sources of law—including regulations. S*ee, e.g., Chiron Corp.*, 198 F.3d at 942

(finding no informational injury only where plaintiffs pointed to no entitlement in "statute,

regulations, or other sources of law"); *cf. Action All. v. Heckler*, 789 F.2d 931, 937-38 (D.C. Cir.

1986) (assessing whether organization was injured by agency regulations that required fewer

disclosures than otherwise provided by government-wide regulations).

By exempting covered facilities from the HON Rule, the Proclamation suspends those

facilities' obligation to generate and disclose fenceline monitoring data. Plaintiffs and their

members have shown that they would use fenceline monitoring data in numerous ways, like

educating their members about emissions from the exempted facilities to enable members to

reduce their own exposure to the hazardous air pollutants and educating their communities about

emissions. SUMF ¶¶ 149-50. For example, Plaintiff Environmental Justice Health Alliance

("EJHA") has used emissions data to create facility profiles to support EJHA member

affiliates—like Plaintiff Texas Environmental Justice Advocacy Services—in understanding

facility emissions and local pollution risks, connecting local pollution concerns to federal policy,

and to comment on facility air permits. SUMF ¶ 151. EJHA affiliates have and would use

18

fenceline monitoring data to inform themselves and their neighbors to make informed health choices and take action to try to reduce exposure. *Id.* Fenceline monitoring data would be critical to EJHA affiliates' ability to take action to protect themselves from hazardous air pollutant exposures and to prevent chemical disasters by identifying when leaks or malfunctions may be occurring at a facility. *Id.* It follows that the lack of fenceline monitoring data prevents Plaintiffs from educating their members, and members from taking steps to reduce pollution exposure. The Proclamation deprives Plaintiffs and their members of that information from the exempted facilities.

Where Plaintiffs have established their legal entitlement to the fenceline monitoring information, there is no additional requirement that they have "used resources to counteract that harm." Mot. at 19 (*citing PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)). Defendants' argument conflates "informational standing" with "organizational standing." Under long-standing D.C. Circuit precedent, there is no requirement to show an expenditure of resources in the informational standing context. *See Campaign for Accountability v. DOJ*, 155 F.4th 724, 733-35 (D.C. Cir. 2025) (no expenditure of resources requirement); *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685-87 (D.C. Cir. 2023) (same); *Friends of Animals v. Jewell*, 828 F.3d 989, 992-95 (D.C. Cir. 2016) (same); *FEC v. Akins*, 524 U.S. 11, 21-23 (1998) (same). Defendants' reliance on *Independent Market Monitor for PJM v. FERC*, , is misplaced, as *PJM* is an organizational standing case. *See* 162 F.4th 1167, 1172-73 (D.C. Cir. 2025) (analyzing standing according to the organizational standing testand relying on organizational standing cases such as *PETA*, 797 F.3d 1087); *see also id.* at 1175 (Edwards J. concurring) ("This case is not about informational standing . . . Organizational and informational standing are distinct concepts."). Where informational standing is a distinct theory of standing

19

from organizational standing, there is no need to demonstrate expenditure of resources. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378-79 (D.C. Cir. 2017) (analyzing organizational and informational standing separately); *ASPCA v. Feld-Entm't, Inc.*, 659 F.3d 13, 23-25 (D.C. Cir. 2011) (same).

The informational injury demonstrated here is traceable to the Proclamation, which unlawfully exempts certain facilities from complying with the HON Rule's fenceline monitoring provisions, thereby depriving Plaintiffs of information they are entitled to receive. A decision declaring the Proclamation unlawful and enjoining EPA and its Administrator from implementing it or giving effect to it would restore the fenceline monitoring requirements, redressing Plaintiffs' injury. *See Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 (D.C. Cir. 2024) (finding traceability satisfied where the informational injury was fairly traceable to the withholding of information and redressability satisfied where relief would require the disclosure of information). This suffices for informational standing.

## II.    THE PROCLAMATION IS JUDICIALLY REVIEWABLE

When an official steps beyond legal limitations and acts *ultra vires*, "courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (holding that where the Executive's "powers are limited by statute," "his actions beyond those limitations . . . are *ultra vires* his authority and therefore may be made the object of specific relief"); Louis L Jaffe, *The Right to Judicial Review*, 71 Harv. L. Rev. 401, 401, 403 (1958) ("[T]he availability of judicial review is, in our system and under our tradition, the necessary premise of legal validity.").

The Supreme Court has long recognized that even in the absence of a statutory cause of action, federal courts can, pursuant to their inherent equitable power, "prevent an injurious act by

20

a public officer" taken without legal authority. *Carroll v. Safford*, 44 U.S. 441, 463 (1845); *see* U.S. Const. art. III, § 2, cl. 1 (granting federal courts the "Judicial Power" to decide "all Cases, in Law and Equity"); *see also, e.g.*, *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) (explaining that federal courts have equitable jurisdiction to provide relief "to one who has been injured by an act of a government official which is in excess of his express or implied powers"). The availability of equitable jurisdiction to review executive officials' conduct "reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). In short, to ensure that that "no officer of the law may set that law at defiance with impunity," courts "generally have jurisdiction to grant relief" when an official acts beyond his statutory authority. *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

That is true whether it is the Postmaster General or the President exercising statutorily delegated power. *Reich*, 74 F.3d at 1332 ("[W]e think it untenable to conclude that there are no judicially enforceable limitations on presidential actions[.]"); *accord United States v. Lee*, 106 U.S. 196, 220 (1882) ("All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."). Both the D.C. Circuit and the Supreme Court have recognized that "a claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023); *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981) (resolving on the merits a claim that the President and the Treasury Secretary went "beyond their statutory and constitutional powers"); *see also Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980-81 (2021) (Mem.) (Roberts, C.J. respecting the denial of certiorari).

21

In Section 7412(i)(4), Congress conferred on the President a narrow authority to issue exemptions from hazardous air pollutant standards under specified circumstances. The authorization states its own limitation: the President must "determine" that "technology to implement such standard is not available," meaning the determination must be based on some apprehension of circumstances related to the "availab[ility]" of "technology" to "implement" a particular "standard." He must also determine that granting an exemption is in the national security interests of the United States. 42 U.S.C. § 7412(i)(4). The undisputed facts show that the Proclamation facially exceeds the authority conveyed. *See McAnnulty*, 187 U.S. at 110 (explaining that where there is "a clear mistake of law as applied to the admitted facts," the courts "must have power in a proper proceeding to grant relief").

The Court has jurisdiction to review those claims under the D.C. Circuit's *ultra vires* precedents. First, the Clean Air Act neither prohibits nor provides an alternative cause of action for our claims. *See Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). Second, the authority is also not so wholly committed to the President's discretion that it is unreviewable. *See Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). And, third, the review we seek is consistent with the scope of review recognized by the D.C. Circuit and supported by a long history of cases examining *ultra vires* executive action. *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002).

### A.    Congress Has Not Barred Judicial Review.

Here "(1) review is not expressly precluded by statute, [and] (2) 'there is no alternative procedure for review of the statutory claim.'" *Glob. Health Council*, 153 F.4th at 20 (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)).

First, the Court's equitable jurisdiction to remedy lawless executive action is not displaced, either expressly or impliedly, by the Clean Air Act's judicial review provisions. Those

22

provisions, located at Sections 7604 and 7607(b), provide a cause of action or judicial review for action or inaction "of the [EPA] Administrator," and neither explicitly govern nor bar judicial review of Presidential action under the Act. 42 U.S.C. §§ 7604(a), 7607(b). Section 7604 authorizes civil suits "against the Administrator" for nondiscretionary actions he has failed to take. *Id.* § 7604(a)(2). Section 7607(b) provides for judicial review of "action[s] of the Administrator." *Id.* § 7607(b)(1). As the Supreme Court has repeatedly held, statutes that provide specifically for review of *some* actions do not foreclose review of others. *Bowen v. Mich. Acad. of Fam. Phys.*, 476 U.S. 667, 674 (1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)).

Likewise, the prohibition on "[o]ther methods of judicial review" in Section 7607(e) applies only to review "of regulations or orders *of the Administrator* under this chapter." *Id.* § 7607(e). That provision may displace Administrative Procedure Act review of *EPA* action, as the cases Defendants cite (at 7-8) hold, but it is irrelevant to this Court's equitable authority to review the President's Proclamation.

Defendants' other citations are likewise inapposite. The decision in *Block v. Community. Nutrition Inst.*, 467 U.S. 340 (1984), concerned whether consumers could get judicial review of a "market order" when Congress had made such orders reviewable only by certain parties and only after exhausting proceedings before the Secretary of Agriculture. The Court in *Block* reasoned that "when a statute provides a detailed mechanism for judicial consideration *of particular issues* at the behest of particular persons, judicial review *of those issues* at the behest of other persons may be found to be impliedly precluded." *Block*, 467 U.S. at 349. In other words, because Congress allowed a specific claim to be pressed by *someone*, through a specific mechanism, review outside that mechanism was not permitted. In contrast, Defendants contend that *no one*

23

can seek review of the President's invocation of Section 7412(i)(4) because actions of the *Administrator* are reviewable through another process. That inference does not hold.

That is consistent with the courts' presumption that judicial review of executive determinations is available, even "when [the] statute is silent." *Patel v. Garland*, 596 U.S. 328, 346 (2022); *see also S. Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 454 (1979) ("[W]e will not lightly interpret a statute to confer unreviewable power[.]"). As the D.C. Circuit has stated: "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority. Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior[.]" *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).

This is not that "rare[]" circumstance. *Id.* In fact, there are other strong reasons to find that review of the President's Proclamation is not precluded. Congress has shown elsewhere in the Clean Air Act that when it intends to prohibit judicial review of Presidential action, it does so explicitly. Congress gave the President authority to approve variances from certain preconstruction requirements for major emitting facilities "if he finds that such variance is in the national interest." 42 U.S.C. § 7475(d)(2)(D)(ii). Congress then stated that that "[n]o Presidential finding shall be reviewable in any court." *Id*. There is no such prohibition in Section 7412(i)(4). Congress has not prohibited judicial review of Presidential exemption proclamations and that choice must be given effect. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022).

Finally, the fact that the President must report to Congress "with respect to each exemption" does not foreclose judicial review. *See* Mot. at 9. Requiring reports on the executive's actions does not evince Congress's intent to bar judicial review of those actions. The First Circuit's decision in *Colon v. Carter*, 633 F.2d 964, 967 (1st Cir. 1980), concerned whether certain action under the Refugee and Education Assistance Act is exempted from the National

24

Environmental Policy Act, which generally requires environmental reviews of major federal action, *see id*. at 965-67, or reviewable under the Administrative Procedure Act, *id*. at 967. It does not bear on the Court's equitable jurisdiction to review *ultra vires* executive action.

There is also "no alternative procedure" for review of our claims. *See Glob. Health Council*, 153 F.4th at 20. The Clean Air Act does not provide a mechanism for review. The Administrative Procedure Act does not provide a mechanism for review of this action. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). And there is no further agency action required to effectuate the Proclamation; the exemption from the HON Rule exists now by operation of law. *Accord* Brief of Amici Curiae American Chemistry Council & American Fuel & Petrochemical Manufacturers at 10 (Dkt. 37). The *ultra vires* review Plaintiffs seek, then, is available.

**B.      The President's Bounded Exemption Authority is Susceptible to Review.**

The limited exemption authority also constrains the President's discretion in ways that make the Proclamation susceptible to judicial review. "So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971. That makes sense, for "[e]ven when the Congress gives substantial discretion to the President by statute," courts "presume" that Congress "intends that the President heed" its statutory commands, and "'expects the courts to grant relief when an executive agency violates such a command.'" *Am. Forest Res. Council*, 77 F.4th at 797 (quoting *Reich*, 74 F.3d at 1328).

That is the case here. Section 7412(i)(4) plainly delineates the outer limits of the President's authority by specifying the determinations the President must make to issue an exemption: first, whether "the technology to implement [the] standard is not available," and

second, whether "it is in the national security interests of the United States to do so." Setting

aside the second prong, what constitutes "the technology [necessary] to implement [the]

standard" and whether it is "available" is not the kind of delicate political question within the

President's unique constitutional competence. In fact, assessing whether such terms have been

appropriately interpreted and applied is a familiar inquiry for federal courts.[2] Much like the

monument designation criteria of the Antiquities Act, *see* 16 U.S.C. § 431, or the exclusion

criteria in the Federal Service Labor-Management Relations Statute, Section 7412(i)(4)'s

requirements "cabin the President's discretion and delineate the outer bounds of his authority,

thereby readily enabling *ultra vires* review." *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL

2738626, at *8 (D.C. Cir. 2025) (Pan, J., concurring); *see, e.g.*, *Tulare Cnty. v. Bush*, 306 F.3d

1138, 1140-41 (D.C. Cir. 2002) (reviewing monuments designation); *Nat'l Treasury Emps.*

*Union v. Trump*, 780 F. Supp. 3d 237, 258-59 (D.D.C. 2025) (reviewing FSLMRS exclusions as

*ultra vires*).

Section 7412(i)(4)'s limits are entirely unlike the broad grants of discretion to the

President that courts have concluded are unreviewable. In *Dalton v. Specter*, 511 U.S. 462

(1994), the Base Closures and Realignment Act simply stated that the President "shall" submit a

report to Congress "containing the President's approval or disapproval" of the Defense Base

Closure and Realignment Commission's recommendations. 10 U.S.C. § 2903(e) (1990), Defense

Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, 104 Stat. 1485 (1990). It

---

[2] *See*, *e.g.*, *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 570 (2d Cir. 2015) (reviewing EPA treatment of "available" water pollution control "technologies"); *Bluewater Network v. EPA*, 370 F.3d 1, 22–23 (D.C. Cir. 2004) (reviewing EPA determination about availability of technologies to achieve emission reductions from nonroad engines); *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 628029 (D.C. Cir. 1973) (reviewing EPA's interpretation of whether alternative control technologies for motor vehicle emissions "are not available or have not been available for a sufficient period of time").

provided no criteria for the President to apply—or for a court to review—leaving the Supreme Court to conclude that "nothing in § 2903(e) prevents the President from approving or disapproving the recommendations for whatever reason he sees fit." *Dalton*, 511 U.S. at 476.

The other cases Defendants cite (Mot. at 9) are similarly inapt. The Court explained in *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992), that the census statute at issue "does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census,'" quite unlike the required determination of factual predicates in Section 7412(i)(4). In *Dakota Cent. Tel. Co. v. State of South Dakota ex rel. Payne*, 250 U.S. 163, 181 (1919), the President was conferred authority to take possession of telephone and telegraph lines "whenever he shall deem it necessary for the national security or defense"; in Section 7412(i)(4), he must also determine that technology to implement the standard is not available. The Civil Aeronautics Board foreign air transportation orders that were at issue in *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948), were "unconditionally subject to the President's approval." *Id*. at 106. And in *United States v. George S. Bush & Co.*, 310 U.S. 371, 376, 378-79 (1940), the determination of foreign exchange value was left to the President's "judgment."

And Defendants' objection to and position on the *scope* of review of an *ultra vires* claim against the President, *see* Mot. at 9 (stating review of "whether the President exceeded a specific statutory prohibition on his authority" is "extremely narrow"), is a separate question (that we address in Part II.C, below) from whether any discretion that Congress conferred is so vast that courts should find that review is unavailable. The decision in *Trump v. Hawaii*, 585 U.S. 667, 684 (2018), for instance, assumed that review was available but applied a deferential standard of review to the President's proclamation prohibiting the entry into the United States of nationals of

27

predominantly Muslim countries because the relevant provision of the Immigration and Naturalization Act "exudes deference to the President in every clause."

Regardless, Section 7412(i)(4) stands in contrast with Defendants' cases because it provides readily discernible limits and judicially manageable standards for adjudicating when the President has strayed beyond those limits. Congress conditioned the President's exercise of exemption authority on a determination that "technology" to implement a hazardous air pollutant standard is "not available." What constitutes "technology" and what makes it "available" or not is not the kind of delicate political question within the President's unique constitutional competence. In fact, assessing whether such terms have been appropriately interpreted and applied is a familiar inquiry for federal courts. *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 808 F.3d at 570 (reviewing EPA treatment of "available" water pollution control "technologies"); *Bluewater Network v. EPA*, 370 F.3d 1, 22-23 (D.C. Cir. 2004) (reviewing EPA determination about availability of technologies to achieve emission reductions from nonroad engines); *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 641-42 (D.C. Cir. 1973) (reviewing EPA's interpretation of whether alternative control technologies for motor vehicle emissions "are not available or have not been available for a sufficient period of time").

The fact that one of the two determinations that the President must make relates to national security does not pull the exemptions authority into *Dalton*'s ambit. *Contra* Mot. at 11. Even assuming the President's determination was supported by bona fide national security concerns, Section 7412(i)(4)'s determination requirements are joined by the conjunctive "and": the President must *both* determine that "technology to implement such standard is not available" *and* determine that granting an exemption is in "the national security interests of the United States." *See United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021) ("The requirements

28

are connective by the conjunctive 'and,' meaning defendants must meet all three."). The inquiry as to whether "technology" is "not available" is thus both conceptually and grammatically removed from "the realm of foreign policy or national security," Mot. at 11 (quoting *El Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010)), falling firmly within the competence and jurisdiction of courts to interpret.

Defendants' other attempts to squeeze unlimited discretion out of Section 7412(i)(4)'s bounded authority are unavailing. The use of "may" versus "shall," for instance, *see* Mot. at 11, surely connotes only that the President is not *obligated* to grant exemptions from the important, health-protective standards that Congress commanded that EPA "shall promulgate," 42 U.S.C. § 7412(d). *See Biden v. Texas*, 597 U.S. 785, 802 (2022) (explaining that the use of the word "may" connotes that the Secretary "has the authority, but not the duty" to use a particular authority). It does not signal unreviewable discretion.

Next, Defendants rely on the word "determines." Courts regularly review executive "determinations"; indeed, the existence of a "determination" is usually a sign that a final decision has been made so that judicial review can begin. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (reviewable final agency action is one in which "rights or obligations have been determined" (citation omitted); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 388 (D.C. Cir. 2012) (explaining that courts may withhold judicial review of prudentially unripe actions that remain in "indeterminate form"). And we are not aware of any case—including *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), *see* Mot. at 11—that indicates the word "determines" commits that determination to the decisionmaker's absolute discretion. *Accord Fed. Educ. Ass'n*, 2025 WL 2738626, at *7-8. The Section 7412(i)(4) requirement that the President make a determination as to certain facts—namely, whether there is some "technology" needed to implement the

29

"standard" that is "not available"—emphasizes that the decision is *not* committed to the President's whim, but *must* be based on the existence of a facts that would allow the President to so "determine."

In the end, Section 7412(i)(4) "does not confer absolute discretion on the President such that courts cannot discern the limits of his authority," and is therefore "'susceptible to review for *ultra vires* acts that clearly violate its terms.'" *Fed. Educ. Ass'n*, 2025 WL 2738626, at *7 (citing *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971). Accordingly, this Court has the constitutional duty and equitable authority "to 'reestablish the limits on' executive authority 'when an executive acts *ultra vires*." *Am. Fed'n of Labor and Congress of Indus. Orgs. v. Dept. of Labor*, 778 F. Supp. 3d 56, 88 (D.D.C. 2025) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)); *see also Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003).

**C.    Judicial Review is Available to Discern Whether the Proclamation Misconstrued the Statute.**

Our claims are also consistent with the scope of review under the *ultra vires* standard. We do not ask the Court to nit-pick the President's factual findings, but rather to hold that the face of the Proclamation and the undisputed facts demonstrate that the President's determination evinces a patently unreasonable misconstruction of the statute, and accordingly that he has exceeded that authority.

**1.    The Court can review whether the President patently misinterpreted the scope of his authority.**

In *ultra vires* review of Presidential actions, the D.C. Circuit has distinguished between "two types of claims," (1) "those justiciable on the face of the proclamation," which involve "questions of statutory interpretation" that can be decided "as a matter of law" and (2) "those requiring factual development." *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535, 540 (D.C. Cir.

30

2019), *cert. denied* 141 S. Ct. 979 (2021) (quoting *Tulare*, 306 F.3d at 1140); *see also Mountain States*, 306 F.3d at 1133; *accord Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023).

As to the first category, the D.C. Circuit has long held that "[judicial] review is available to ensure that the [President's] Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority." *Mountain States Legal Found.*, 306 F.3d at 1136. If "in any view of the facts," an official has made a "clear mistake of law," courts have the equitable authority to declare that mistake and protect the public from "the absolutely uncontrolled and arbitrary action of a public . . . officer, whose action is unauthorized by any law." *McAnnulty*, 187 U.S. at 109, 110; *see also Aid Ass'n for Lutherans*, 321 F.3d at 1174 ("An agency construction of a statute" is *ultra vires* if "the disputed [action] defies the plain language of a statute" or "the agency's construction is utterly unreasonable and thus impermissible").[3]

Some recent cases have enunciated the standard as whether a government official has acted "plainly in excess of [his] delegated powers and contrary to a specific prohibition in [a] statute." *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9 (quoting *Glob. Health Council*, 153 F.4th at 20). But there too, the D.C. Circuit considered whether the asserted authority misinterprets the authorizing statute. *Id.* The court has "ruled in favor of plaintiffs alleging *ultra vires* government conduct when the challenged action is based on unexplained and obvious deviations from the statutory text," *id.* (citing *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 973-74), "and when the government's interpretation of its statutory authority would 'lead[] to an absurd result,'" *id.* (citing *Aid Ass'n for Lutherans*, 321 F.3d at 1176). The court has also noted that "a showing that

---

[3] Contrary to Amicis' contention, Amicus Br. at 5, no statutory cause of action is needed to invoke a court's equity jurisdiction. *See* S. Bray & P. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1798-99 (2022); *see, e.g.*, *Ex Parte Young*, 209 U.S. 123, 150-51 (1908).

the government has attempted to enlarge its authority in bad faith can bolster an *ultra vires* claim." *Id*. (citing *Barwood, Inc. v. District of Columbia*, 202 F.3d 290, 294 (D.C. Cir. 2000)).

As to the second, for "those [claims] requiring factual development," "the precise 'scope of judicial review' remains an open question," but the facts must show some aspect of the action "that exceeds the President's statutory authority." *Mass. Lobstermen's Ass'n*, at 540 (quoting *Mountain States*, 306 F.3d at 1133); *accord Murphy Co.*, 65 F.4th at 1131. Additionally, rebutting the presumption of regularity allows review of erroneous factual conclusions. *Fed. Educ. Ass'n*, 2025 WL 2738626, at *8.

The review we seek is consistent with these precedents. As we demonstrate below, the President has plainly misinterpreted the authority conveyed in Section 7412(i)(4), evident from the face of the Proclamation and the very standards from which nearly a quarter of the regulated industry is now exempt. And the President has deployed this new, expansive authority to absurd effect: claiming that "technologies" are not "practically available," he has nonetheless exempted nearly a quarter of HON facilities, many of which need to install *no* new technology to comply, *see infra* Part III.C, and others that have already successfully implemented some of the HON Rule standards, like fenceline monitoring, *see infra* Part III.D; SUMF ¶¶ 130-31.

These precedents also foreclose the sweeping implications of Defendants' position that *no* review is available "'to assess a particular exercise of presidential discretion.'" Mot. at 10 (quoting *Utah Ass'n of Cntys. v. Bush*, 316 F. Supp. 2d 1172, 1186 (D. Utah 2004)). Plaintiffs do not dispute that an *ultra vires* claim must be addressed to fundamental legal infirmities that go beyond a "garden-variety error[] of law or fact." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022) (quoting *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)). But it *cannot* be the case that the President's action is insulated from review

32

by the mere intonement, "I determine that technology is not available." *See* Mot. at 12. *Cf. United States v. Warnagiris*, 21-cr-0382-PLF, 2025 WL 341990, at *4 (D.D.C. Jan. 30, 2025) ("[J]ust because the Proclamation was signed by the President does not transform up into down or down into up as if peering through the looking glass of Alice in Wonderland."). Under Defendants' formulation, to say that Congress conferred authority would be to decide that the authority was lawfully executed. That sort of question-begging is inconsistent both with common sense and with our legal tradition. *See, e.g.*, *Stark v. Wickard*, 321 U.S. 288, 310-11 (1944) ("The responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction.").

Any other interpretation renders Congress's express delineations of specific statutory authority a trojan horse for unlimited Presidential power. No matter what Congress says to guide or limit the President's authority, no matter what determinations he is required to make, any authority conveyed becomes effectively committed to his absolute discretion for want of review to enforce those limits. *Accord Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (Roberts, C.J., respecting the denial of certiorari) (observing that, in the absence of *ultra vires* review, any "statute permitting the President in his sole discretion to" take a given type of action could "transform[] into a [source of] power without any discernible limit") (Roberts, C.J., respecting the denial of certiorari); Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539, 576-77 (2005) ("Statutory authority is created, not by congressional action, but by virtue of the court's unwillingness to conclude that the president lacks authority for the action.").

33

### 2. Plaintiffs need not demonstrate that the President has acted contrary to a specific statutory prohibition.

Although the D.C. Circuit has in some *ultra vires* cases stated that plaintiffs must show *both* that the action is in excess of delegated powers "and contrary to a specific prohibition in the statute that is clear and mandatory," *Glob. Health Council*, 153 F.4th at 20, that standard should not apply here. The "specific prohibition" language in *Global Health Council* and others has its origins and application in cases like *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), where Congress has channeled judicial review to a particular statutory structure for judicial review. *See New Mexico v. Musk*, 784 F. Supp. 3d 174, 205 (D.D.C. 2025) (explaining *Leedom* and *Changji Esquel* "address *ultra vires* claims . . . when a statute precludes judicial review"). In such cases, where review in equity may amount to "an easy end-run" around statutory limitations to review, courts have required challengers seeking equitable relief outside of that scheme to demonstrate that the action is not only in excess of delegated powers, but also contrary to a specific prohibition. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 655, 681 (2025). In such cases, the standard makes sense: if a plaintiff can get review of an official's action in violation of law through specifically delineated process, then a higher bar for equitable, *ultra vires* review avoids rendering that process moot.[4]

Because this "end-run" concern does not apply here, neither should the "specific prohibition" barrier. Consistent with Supreme Court and D.C. Circuit precedent, the ordinary *ultra vires* standard applied in *McAnnulty* and elsewhere applies to claims like ours: that the

---

[4] Both *Global Health Council* and *Nuclear Regulatory Commission* found channeling provisions that warranted the higher standard. *See Glob. Health Council*, 153 F.4th at 21 n.18 (plaintiffs must wait for Impoundment Control Act's "statutory processes run their course" before bringing suit); *Nuclear Regul. Comm'n*, 605 U.S. at 679-80 (statute limiting review of decision to persons who intervened in agency proceedings)

President has acted in excess of his statutorily delegated authority, and there is no alternative process that Plaintiffs are dodging by calling on the Court's equitable jurisdiction. *See supra* Part II.A; *see also Train v. City of New York*, 420 U.S. 35, 47 (1975) (holding that the President's order to impound funds was unauthorized by the statute); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 551-52 (1976) (stating the scope of review as "whether [the statute] also authorizes" the President's action); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 189-90 (1999) (holding that presidential order terminating Chippewa treaty rights lacked "constitutional or statutory authorization"); *see also Reich*, 74 F.3d at 1327-28 (noting that "[t]he reasoning of *McAnnulty* has been employed repeatedly" and recounting history of cases in *McAnnulty* tradition).

Where there is no statutory limitation on judicial review, as here, the Supreme Court (and the D.C. Circuit) have traditionally exercised its equitable powers and applied a simple default standard to adjudicate the claim: that is, whether the executive's action was authorized by law. The Supreme Court applied that standard more than a century ago in *McAnnulty*, where the Court set aside the Postmaster General's order declining to deliver mail to a disfavored business because it was "the result of a mistaken view of the law." *McAnnulty*, 187 U.S. at 110.

Notably, showing *both* that the President's action is in excess of the authority conferred *and* that it is contrary to a specific prohibition has not been a feature of the D.C. Circuit's monuments jurisprudence, the precedents most on point for the claims asserted here. *See, e.g.*, *Mass. Lobstermen's Ass'n*, 945 F.3d at 540. The D.C. Circuit also rejected the "specific prohibition" formulation in *Reich*, finding "it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution *or which contravene direct statutory prohibitions*, so long as the President *claims* that he is

35

acting pursuant to" some statutory grant. *Reich*, 74 F.3d at 1332 (emphasis added). Rather, *Reich* adopted the simple standard articulated in *McAnnulty* and reaffirmed in *Harmon v. Brucker* and others over the last century: "judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon*, 355 U.S. at 581-82 (citing *McAnnulty*, 187 U.S. at 108); *see also Reich*, 74 F.3d at 1327-30.

In any event, our claims are also sufficient to demonstrate that the Proclamation is contrary to a "specific prohibition" in the statute. *See Glob. Health Council*, 153 F.4th at 20; Mot. at 12. The D.C. Circuit in *Changji Esquel Textile Co. v. Raimondo*, explained that the "specific prohibition" requirement can be met several ways: through "error that is patently a misconstruction of the [statute], that disregards a specific and unambiguous statutory directive, *or* that violates some specific command of a statute will support relief." 40 F.4th 716, 722 (D.C. Cir. 2022) (cleaned up). Such a prohibition can and should be inferred from the very conferral of concretely delineated authority in the first place: to say, "you may do this when" implicitly says, "you *can't* do this *unless*." Put differently, for Congress to say that the President may grant exemptions if he determines "technology to implement a standard is not available" is also to say that the President *may not* grant such exemptions if that factual predicate is not present. *See Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) ("When draftsmen [] mention . . . one thing, like a grant of authority it necessarily, or at least reasonably, implies the preclusion of alternatives." (cleaned up)).

Not only that, the scope of the President's exemption authority must be read in the context of the other requirements and limitations that Congress mandated. *See Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 103 F.4th 45, 50 (D.C. Cir. 2024) ("[Statutory] text must be read in the context of the entire statute."). For instance, Congress limited EPA's ability to stay

the effectiveness of rules pending reconsideration, 42 U.S.C. § 7607(d)(7)(B), and allowed for one-year compliance extensions if "necessary for the installation of controls," *id*. § 7412(i)(3)(B). *See infra* Part III.B.1. In granting sweeping exemptions without facility-specific findings, premised not on whether "technology" for any particular standard is "available," the President is effectively exercising *not* exemptions authority, but the kind of reconsideration or stay pending reconsideration authority delegated to EPA—a power "different in kind, not degree" than the plain statutory text gives to the President. *See Learning Res., Inc. v. Trump*, 24-1287, slip op. at 9, 17 (2026) (rejecting President's interpretation of statute to confer broad tariff authority that would leave him "unconstrained by the significant procedural limitations in other tariff statutes and free to issue a dizzying array of modifications at will").

## III.    THE PROCLAMATION EXCEEDS THE PRESIDENT'S AUTHORITY.

The HON Proclamation exceeds the President's narrow scope of authority under Section 7412(i)(4) by invoking that authority for impermissible reasons, without the necessary predicates, and patently misconstruing the scope of his authority. The Proclamation—on its own merits and seen in the context of the unprecedented use of exemptions over the past year—is pretextual and is not entitled to any presumption of regularity.

Even setting that aside, the Court can and should declare the Proclamation is *ultra vires* and unlawful for three independent reasons. First, instead of making the limited determination of whether specific technology is available for a specific facility to implement particular standards, the President improperly and pretextually enlarged his authority to grant broad-brushed, pretextual exemptions from the entire HON Rule. Second, the Proclamation evinces an utterly unreasonable interpretation of "technology" by exempting facilities from standards that do not require technology to implement. Third, the Proclamation patently misconstrues the statute by

37

determining that clearly available technology is "not available." Any one of these grounds is sufficient to declare the Proclamation unlawful.

### A.    The President's Determinations are Pretextual and Not Entitled to Any Presumption of Regularity.

Defendants suggest that the Court cannot look behind the President's bare statement that technology to implement the HON Rule is not available. *See* Mot. at 12-13. But while the presumption of regularity may sometimes justify treating the President's determinations as determinative, no such bar applies when the presumption has been overcome. *See Fed. Educ. Ass'n*, 2025 WL 2738626, at *8. Here, "clear evidence" demonstrates the President "did not discharge his official duties properly." *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 89 (D.D.C. 2025) (cleaned up). The President's stated reasons for invoking Section 7412(i)(4) are a pretext, and the necessary predicates for invoking the authority do not exist.

First, context reveals that the exemptions were issued for "unrelated policy goals rather than based on the statutory criteria." *Nat'l Treasury Emps. Union*, 780 F. Supp. 3d at 254. On March 12, 2025, EPA announced that it intended to reconsider nine hazardous air pollution regulations, and simultaneously invited regulated industries to request two-year compliance exemptions from those regulations under Section 7412(i)(4). SUMF ¶¶ 11-12. In a "fact sheet" about its planned reconsideration of the HON Rule, EPA invited "[a]ny source interested in a Presidential exemption" to "provide their recommendations to EPA." SUMF ¶ 13. The connection is inescapable: Section 7412(i)(4) exemptions were offered to achieve what the Clean Air Act prohibits—a lengthy stay pending reconsideration. *Contra* 42 U.S.C. § 7607(d)(7)(B) (stating that reconsideration "shall not postpone the effectiveness of [a] rule" and that EPA may stay the effectiveness of a rule "for a period not to exceed three months"); *see also Clean Air Council*, 862 F.3d at 9 (holding EPA has no other authority to stay a rule).

38

That inference is supported by the bigger picture of the President's exemptions agenda. The President has delayed compliance with hazardous air pollutant rules at more than 180 facilities subject to six different regulations. SUMF ¶ 25. The Court should treat these unprecedented and sweeping actions with the skepticism that other courts have applied to "instance after instance" of this Administration's "departures from [the] tradition" that presidential administrations "act in obedience to their duty." *See Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d at 95 (cleaned up) (citing numerous cases); *see also, e.g.*, *Learning Resources*, 607 U.S. ___, slip op. at 8 (2026) (declining to credit this Administration's view on emergency tariff authority that would represent "a transformative expansion of the President's authority"); Order Granting Preliminary Injunction, *Revolution Wind v. Burgum*, 25-cv-02999 (D.D.C. Sept. 22, 2025) (Dkt. 36) (granting preliminary injunction against stop-work order that claimed national security concerns with offshore wind project).[5]

Second, the Proclamation itself and basic facts about the exempted facilities are "at odds" with the statutory standard, and thus support rebutting the presumption of regularity. *Nat'l Treasury Emps. Union*, 780 F. Supp. 3d at 254. Despite the requirement that the President determine that "technology to implement [the] standard is not available," 42 U.S.C. § 7412(i)(4), the Proclamation waived compliance with many regulatory requirements that do not require any technology whatsoever. *See infra* Part III.C. It waived compliance with requirements that overlap with requirements that the facilities should already have been complying with under other regulations. *See infra* Part III.D. Given how the standards work and which facilities received

---

[5] *See* Benjamin Storrow, *Judge reverses Trump order halting Revolution Wind*, POLITICO (Jan. 12, 2026), https://www.politico.com/news/2026/01/12/judge-reverses-trump-halting-revolution-wind-00722866 (describing September bench ruling rejecting Department of Interior's claim that the project constituted a threat to national security as "the height of 'arbitrary and capricious action'").

exemptions, the Proclamation is manifestly contrary to any plausible interpretation of the statutory requirements.

For example, the HON Rule's new ethylene oxide standards—the ones that require air pollution control devices, or different wastewater practices, *see* SUMF ¶¶ 56-57—apply only to facilities that use or produce ethylene oxide. *See, e.g.*, 40 C.F.R. § 63.113(j) (applying if process vent is in ethylene oxide service); 63.119(a)(5) (applying only if storage vessel is in ethylene oxide service). Based on information in EPA's risk review, only 13 of the 50 exempted facilities fit that description. SUMF ¶ 61. In other words, 75% of facilities that received exemptions are subject only to *non*-ethylene oxide-specific standards, like more frequent leak detection for heat exchange systems, work practice standards for pressure relief devices, operating and monitoring requirements for flares, and the new prohibition against bypassing air pollution control devices during maintenance.

*Those* standards, in turn, are not dependent on the application of any "technology." New leak monitoring requirements for heat exchange systems just require facilities to conduct essentially the same monitoring they already have to do more frequently, and to repair the leaks found more quickly. SUMF ¶¶ 85-101. Some work practice standards for pressure relief devices, storage vessels, and other equipment are implemented through routine inspection and maintenance, operator training, not any new technology. SUMF ¶¶ 75-76 (storage vessels), ¶ 82 (pressure relief devices). And yet the Proclamation determined that "technology" to implement those standards is "not available."

Similarly, the Proclamation exempts facilities from the same flare operating and monitoring requirements that have applied to petrochemical refineries since the 2015 Refineries Rule. SUMF ¶¶ 68-69. The same requirements also apply to facilities regulated by the

40

Miscellaneous Organic NESHAP (MON) and Ethylene Production NESHAP rules, and have had to comply with those requirements since 2023. SUMF ¶ 70. For example, 19 of the exempted facilities are co-located with one or more sources that are already subject to the updated flare standards in the MON, ethylene production, and/or refinery NESHAP. SUMF ¶ 73. Indeed, EPA explained in the HON Rule that it assumed that co-located facilities "likely upgraded at least one HON flare already." SUMF ¶ 72. And yet the Proclamation exempts those 19 facilities from those requirements because "technology to implement the standards is not available." SUMF ¶ 21 (90 Fed. Reg. 34588).

The examples continue. The Proclamation grants exemptions from fenceline monitoring provisions even to at least 11 facilities that are already conducting fenceline monitoring because of consent decree requirements or regulations under the Refineries Rule, SUMF ¶¶ 134-35, and the 10 facilities that conducted fenceline monitoring in response to EPA information collection requests in conjunction with the 2024 rulemaking, SUMF ¶ 130. Separate leak detection and repair requirements for equipment in ethylene oxide service simply require facilities to conduct the same kind of leak detection practices using the same devices and equipment that facilities should already have to comply with earlier HON requirements, just more frequently and with the obligation to repair leaks detected at a lower level than previously. SUMF ¶¶ 85-101. The bypass prohibition requirements do not require "technology" to comply; they just prohibit bypassing air pollution control devices when conducting maintenance. SUMF ¶ 138.

Finally, the paucity of the explanation provided in the Proclamation itself, especially viewed in light of the foregoing context, supports finding that the presumption of regularity has been rebutted. Despite the many varying requirements of the HON Rule—many of which do not depend on "technology" at all—and the varying contexts of HON facilities, the Proclamation

41

exempts all 50 facilities from the entirety of the HON Rule. It identifies no particular "technology" that is not "available," and provides no facility-specific analysis or standard-specific explanation for the President's determination. Together, the context, content, and application of the Proclamation demonstrate that "the President was indifferent to the purposes and requirements of [the Clean Air Act], or acted deliberately in contravention of them." *Nat'l Treasury Emps. Union*, 780 F. Supp. 3d at 254 (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989)).

**B.      On Its Face, the Proclamation Grossly Exceeds the President's Authority.**

The Proclamation is "plainly in excess" of the President's authority, *Glob. Health Council*, 153 F.4th at 20 (cleaned up), because the Proclamation on its face fails to make the kind of standard-specific determination that would comport with Section 7412(i)(4)'s authority. Instead, the President enlarged his authority, granting a sweeping exemption to nearly a quarter of the industry from the entire HON rule, without technology- or facility-specific determinations. "[I]n any view of the facts," the President has made a "clear mistake of law" by exempting facilities from standards that do not require "technology" or for which "technology" is already deployed at exempted facilities. *McAnnulty*, 187 U.S. at 109, 110.

The broad and unjustified sweep of the Proclamation suggests what context confirms: the Proclamation is being used as a pretext to effectively stay the HON Rule while EPA works to reconsider it.

Indeed, EPA's statements from the time confirm that the President was improperly enlarging the Section 7412(i)(4) exemption provision for the unauthorized purposes of providing a compliance delay pending reconsideration of the HON Rule: "[t]he Trump Administration is considering a 2-year compliance exemption via Section 112(i)(4) of the Clean Air Act for affected facilities while EPA goes through the rulemaking process." SUMF ¶ 12. If the President

42

believes that EPA got the HON Rule wrong in 2024, he may (as he has) direct EPA to conduct a new rulemaking to reconsider those standards. He may not, however, circumvent the substantive and procedural limitations that govern reconsideration by abusing Section 7412(i)(4) to issue sweeping exemptions divorced from facility- or technology- specific facts.

**1.     The President's Section 7412(i)(4) authority is limited to determining whether "the technology to implement" a standard is "not available."**

Section 7412(i)(4) grants the President narrow, carefully delineated authority to "exempt any stationary source from compliance with any standard or limitation under this section . . . if the President determines that the technology to implement such standard is not available." 42 U.S.C. § 7412(i)(4). The tools of statutory construction establish that the President may grant an exemption to an individual facility for which he determines that the technology for compliance with a particular "standard" is not ready for immediate use or cannot be accessed or obtained.

Under the plain terms of the provision, the President may only grant an exemption where the technology needed to implement the standard is "not available." 42 U.S.C. § 7412(i)(4). While Section 7412 does not define the term "available," dictionary definitions include: "present or ready for immediate use," "obtainable," "suitable," "usable," and "accessible." *See*, *e.g.*, AVAILABLE, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/available; AVAILABLE, Black's Law Dictionary (6th Ed. 1990). "Present," "accessible," and "obtainable" all speak to the physical presence of or physical access to a piece of technology.

So first, the President must make a determination that some technology is not present, accessible, or obtainable. More specifically, the President must determine that technology "to implement *such standard*" is not available—indicating the technology that would allow a facility to meet a specific standard. As the HON Rule demonstrates, hazardous air pollutant standards

43

encompassed within a rule for an industry category can span from work practices to minimize emissions during maintenance activities to requirements to vent pollutants for destruction at an air pollution control device or flare. These standards vary tremendously in regard to whether technology is required to implement them, and – if so – which specific technology can be used to implement them. *See, e.g.*, *Nat'l Lime Ass'n*, 233 F.3d at 634 (EPA may not "avoid setting standards for [hazardous air pollutants] not controlled with technology"); *Sierra Club v. EPA*, 895 F.3d 1, 19 (D.C. Cir. 2018) ("Nontechnology factors, such as the source of raw materials, can affect emissions levels and cannot be ignored."); *Sierra Club v. EPA*, 479 F.3d 875, 882-83 (D.C. Cir. 2007) (discussing EPA's consideration of both "air pollution control technology" and "non-technology pollution prevention techniques" such as material type). In fact, as discussed below, the HON Rule standards vary widely as to whether they require the implementation of *any* technology and whether any required technology is already in place.

To be consistent with the statutory text, then, the President must make a determination that "*the* technology" required to implement some particular "standard" (singular) is not available, 42 U.S.C. § 7412(i)(4), not an entire rule with numerous diverse standards spanning different equipment, processes, and control criteria. That is plainly not what the President did here. The HON Rule encompasses a wide array of requirements applicable to particular equipment and processes, not all of which are present at every HON facility, and not all of which rely on the application of any "technology." Rather than identify what technology is "not available" to implement which standard, the Proclamation vaguely asserts that "[m]any of the testing and monitoring requirements outlined in the HON Rule rely on technologies that are not practically available, not demonstrated at the necessary scale, or cannot be implemented safely or consistently under real-world conditions." 90 Fed. Reg. at 34587. Rather than making a

44

determination about particular technologies needed to "implement" specific standards, the Proclamation states broadly that "[t]he technology to implement *the HON Rule* is not available," and exempts facilities from *all* "aspects of the HON Rule that were promulgated under section [7412]." 90 Fed. Reg. 34587-88. The Proclamation thus issued across-the-board exemptions from all HON Rule requirements for each of the 50 exempted facilities. By failing to identify which "technology" was not available to "implement" which "standard," the Proclamation represents a clear mistake of law, and exceeds the authority conveyed in Section 7412(i)(4).

Second, the text of the exemption provision indicates the President must make determinations as to specific facilities. The President may grant an exemption as to "any stationary source," which the Act defines to mean "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. §§ 7411(a)(3), 7412(a)(3), (i)(4). Thus, unlike EPA's authority to set standards for an entire "category" (*i.e.*, industry-wide standards), *see id*. § 7412(d)(1)-(3), (f)(2), the President may exempt a "source" if he finds that the requisite technology is unavailable at the individual facility level. This is consistent with the broader structure of the Act, which specifically contemplates at the time new standards are set for an industry category, some facilities within the category may not currently comply with the new standards. *See, e.g.*, *U.S. Sugar Corp.*, 830 F.3d at 612 (upholding standards even where "few or no units [with the category] have achieved those standards for all pollutants"). Granting exemptions to nearly a quarter of a source category—particularly where there is no facility- or standard-specific explanation provided—is beyond the authority conferred in Section 7412(i)(4).

Statutory structure and context further confirm that the Proclamation falls outside the President's authority. If the President were permitted to exempt huge swaths of an industry from an entire suite of standards in this way, Section 7412(i)(4) would end run around the express and

exclusive mechanisms for providing additional time for compliance and correcting flawed standards. For example, the Clean Air Act expressly provides that, in setting and revising standards under Section 7412(d), EPA may set compliance deadlines of up to three years. 42 U.S.C. § 7412(i)(3)(A). If EPA later finds that an individual source requires a longer compliance schedule, the agency may provide an additional year for compliance. 42 U.S.C. § 7412(i)(3)(B).

Moreover, the Clean Air Act establishes a specific mechanism for *EPA* to reconsider and correct standards that may be based on flawed premises. Specifically, the Act mandates that stakeholders administratively petition EPA for reconsideration where there are errors in the rule that could not have been objected to during the rulemaking process. 42 U.S.C. § 7607(d)(7)(B). However, the filing of a reconsideration petition "shall not postpone the effectiveness of [a] rule," and EPA may only stay the effectiveness of the rule "for a period not to exceed three months" upon initiating a mandatory reconsideration proceeding. *Id*. This provision represents "Congress's clear intent to specifically limit the agency's authority" to reconsider rules. *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018); *see id.* at 1063 (noting that "EPA previously interpreted that provision as establishing the CAA's exclusive mechanism for staying the effectiveness of a final rule pending reconsideration") (emphasis added); *see also Clean Air Council*, 862 F.3d at 9.

The Proclamation's findings are much better understood as an improper attempt to shoehorn a stay of the HON Rule's requirements pending reconsideration. In fact, EPA has stated that it is undertaking reconsideration proceedings of the HON Rule, pursuant to petitions submitted by industry. SUMF ¶¶ 16-17. But the limited exemption authority under Section 7412(i)(4) does not permit the President to repurpose the provision to provide lengthy compliance delays while EPA conducts its reconsideration proceedings.

**2.      The Proclamation is unlawful because it misconstrues "available" to be "achievable."**

As a further matter, the President's determinations in the Proclamation improperly venture outside the determination of "available" into the broader consideration of whether technologies are "achievable." The Proclamation asserts that "[t]he HON Rule imposes requirements that assume uniform technological availability across facilities, despite significant variation in site conditions, permitting realities, and equipment configurations." 90 Fed. Reg. 34587. The text of the Act distinguishes between availability and achievability, and it is EPA's exclusive role to determine whether a standard is achievable, not the President's.

When setting major source standards under Section 7412(d), EPA: (1) sets floors for the category writ large, based on EPA's determination that those standards have already been "achieved" by the best performing facilities within the source category; and (2) sets beyond-the-floor standards based on EPA's determination that the standards are "achievable" for "sources in the category." 42 U.S.C. § 7412(d)(2), (3). Thus, EPA determines whether a standard has been "reach[ed]" or is "capable of being" reached. *See* ACHIEVE, Merriam Webster Online Dictionary, https://perma.cc/3JQC-QU5M ("to reach or bring about a desired end or goal"); ACHIEVABLE, Merriam Webster Online Dictionary, https://perma.cc/Y6SL-SUN4 ("capable of being achieved"). As described above, in determining whether a standard has been achieved or is achievable within a source category, EPA can assess how facilities within the industry will comply, including the technologies needed to do so. *Sierra Club,* 479 F.3d at 878 (explaining that the Clean Air Act "permits the Agency to look at technological controls to set emission standards").

Those textual differences are dispositive, because they carve out different roles for EPA and the President. *See Ysleta Del Sur*, 596 U.S. at 698 (stating the "usual rule against ascribing to

47

one word a meaning so broad that it assumes the same meaning as another statutory term" (cleaned up)). It is EPA's role to determine what emissions reductions can be "achieved" by the industry and set standards accordingly. Once EPA has set standards, the President has no authority to grant an exemption because he determines that a standard is unachievable. As that is what occurred here, the President improperly acted outside his limited Section 7412(i)(4) authority in issuing the Proclamation.

**C.      The Proclamation Unlawfully Exempts Standards that are Not Eligible for an Exemption Because No Technology is Needed to Implement Them, Evincing an Utterly Unreasonable Interpretation of "Technology."**

The President also exceeded his authority under 7412(i)(4) because where no technology is necessary to implement a Section 7412 standard, an exemption under Section 7412(i)(4) is patently unavailable. The Proclamation exemption "applies to *all compliance deadlines established under the HON Rule* applicable to the stationary sources listed in Annex I." 90 Fed. Reg. 34587 (emphasis added). However, here EPA set standards that on their face do not require technology to implement. Such standards are therefore ineligible for the Section 7412(i)(4) exemption and the President's grant of an exemption was clearly *ultra vires*.

In order to grant an exemption to a facility, the President must first determine that the EPA-identified compliance technology is not available. Text, structure, and context establish that this provision constrains the President's authority to determining whether "the technology to implement such standard," as identified by EPA when setting Section 7412 standards, is not available. 42 U.S.C. § 7412(i)(4) (emphasis added); *see supra* III.B. EPA can and does set standards that are based on "processes" or "practices," rather than "control technologies." *E.g.,* 42 U.S.C. § 7412(d)(6). EPA considers both "pollution control technology" and "non-technology pollution prevention techniques," such as training, material type, and equipment design. *Sierra Club,* 479 F.3d at 882–83 (discussing Section 7412(d)(3) MACT standard setting); *see also* 42

48

U.S.C. § 7412(d)(2) (enumerating different "measures" that EPA may consider in setting beyond-the-floor standards). Thus, the President is prohibited from granting an exemption for a standard under Section 7412(i)(4) where EPA has determined the standard can be implemented without technology.

Second, even if EPA's determinations do not conclusively make the standards ineligible for an exemption, many of the standards facially do not require technology to implement, making them ineligible for a 7412(i)(4) exemption.

Either way, because the Proclamation exempts listed facilities from the entire HON Rule, which includes standards that do not depend on any "technology," the Proclamation patently misconstrued the President's statutory authority and was *ultra vires*. The Proclamation rests on a determination that technology is required to implement the standards, when, as a matter of law, many of the standards do not. 90 Fed. Reg. 34587 (the HON Rule's standards "rely on technologies that are not practically available, not demonstrated at the necessary scale, or cannot be implemented safely or consistently under real-world conditions"). Because the President patently misconstrues the statute to apply to standards that do not require technology to be implemented, he clearly exceeded his authority.

### 1.    Work Practice Standards

For example, the HON Rule established several work practice standards under Section 7412(h) that on their face do not require technology to implement. Work practice standards for pressure relief devices, storage vessels, and other equipment are implemented through non-technological measures like routine inspection and maintenance, operator training, and procedures. SUMF ¶¶ 74-76, 80-82. For instance, to minimize the potential for fugitive emissions, the HON Rule prohibits operators from filling storage vessels during any period when control systems are down for planned maintenance. 40 C.F.R. § 63.119(e)(7)(iii). This

requirement merely prohibits filling a tank at a particular time, and of course no technology is required to abstain from filling a tank. *Id.* Similarly, during periods of storage vessel shutdown operations, the HON Rule requires operators to take certain actions, including removing as many liquids as practicable from the storage vessel and maintaining records. *See id.* §§ 63.119(a)(6) (applicable to SOCMI sources), 63.484(a), (t) (referencing 40 C.F.R. § 63.119 for the P&R I NESHAP). Several of these new work practice standards, such as draining liquids and recording-keeping, do not require the use of any new technology. *Id.*

Work practice standards for other equipment are similarly not dependent on technology. The HON Rule requires work practice standards for process vents that prohibit opening process equipment for maintenance unless the chemicals contained therein have been "drained and purged to a closed system" or otherwise are at a low enough level to be opened safely. *See* 40 C.F.R. §§ 63.113(k) (SOCMI), 63.487(i) (P&R I).

In another instance, the Rule establishes a work practice standard that requires facilities with pressure relief devices that vent to the atmosphere to implement three prevention measures and, when releases occur, to perform root cause analysis and take corrective action. *See* SUMF ¶ 80; 40 C.F.R. § 63.165(e)(3) (for HON); *id.* § 63.502(a) (for P&R I). Facilities may choose which prevention measures they take, and options include operator training, maintenance programs, and routine inspections. SUMF ¶ 82. While some compliance options may rely on "technology" in some sense, none of the above prevention measures do. *Id.* Because the President exempted facilities even from standards that do not require technology to implement, he patently misconstrued and grossly exceeded his statutory authority.

### 2.    Bypass Prohibition

The HON Rule also prohibited facilities from bypassing air pollution control devices in closed vent systems and venting emissions directly to the atmosphere. 40 C.F.R. §§ 63.114(d)(3),

63.127(d)(3), 63.148(f)(4), 63.497(d)(3). The bypass prohibition requirements do not require facilities to install or implement any new technological controls; they simply prohibit facilities from bypassing their currently-existing controls. *Id.* Were a facility to do so, it would be a violation of the standard. Accordingly, this standard is ineligible for an exemption under Section 7412(i)(4) as it does not require a "technology" to implement the standard.

### 3. Startup Shutdown Exemption

In the HON Rule, EPA removed the startup, shutdown, malfunction exemption that unlawfully allowed unlimited emissions during these times. SUMF ¶ 139 (89 Fed. Reg. 42951); *see Sierra Club v. EPA*, 551 F.3d 1019, 1028 (D.C. Cir. 2008) (vacating the startup, shutdown, malfunction exemption in Section 7412 general provisions). The Rule promulgated regulations clarifying that Section 7412 standards apply at all times, including periods of startup, shutdown, or malfunction. SUMF ¶ 140; 40 C.F.R. §§ 63.102(e) (for HON), 63.525(j) (for P&R II). EPA "determined that facilities in the SOCMI and P&R II source categories can meet the applicable MACT standards at all times, including periods of startup and shutdown," except for a few emissions points for which the HON Rule set an alternative standard. SUMF ¶ 141 (89 Fed. Reg. 42951). This HON Rule provision thus does not require the implementation of a technology, but rather removes an unlawful exemption from standards that would otherwise apply.

### D. The Proclamation Evinces an Utterly Unreasonable Interpretation of "Available."

#### 1. The Proclamation unlawfully exempts standards where the technology needed to implement them is available.

The Proclamation also evinces an utterly reasonable interpretation of "unavailable." The Proclamation purports to determine that "technology to implement" the HON Rule standards is "not available" at facilities that already possess the technology to implement the standard. As described below, many of the HON Rule standards rely on employing the same monitoring

51

technologies that exempted facilities have successfully been using, and are still required to use after the exemption took effect. Some of the standards merely change the frequency of monitoring; with or without the exemption, the underlying monitoring is still required. And some of the exempted facilities are using the technology in question due to requirements in other regulations.

It cannot be the case that technology is "not available" to a facility that already possesses the "technology" that would be needed to implement a standard. Yet the Proclamation, by purporting to exempt all listed facilities from all requirements of the HON Rule, indicates that the President has interpreted "not available" to encompass just such facilities. The Proclamation evinces a clear misinterpretation of the statute, so baseless as to be "blatantly lawless," and is contrary to the clear statutory prerequisite of the Presidential exemption authority. *See Hindes v. FDIC*, 137 F.3d 148, 164 (3rd Cir. 1998) (citations omitted).

Below are just a few examples out of many where the technology to implement standards is plainly available.

### 2. Leak Detection and Repair

The technology to implement the updated HON leak detection and repair requirements–volatile-organic-compound (VOC) instrument detectors–is undisputably available: exempted facilities were required to use the technology before the HON Rule and are still required to use it after the Proclamation.

The HON Rule updated the leak detection and repair requirements for valves, connectors, and pumps in ethylene oxide service. SUMF ¶ 86 (89 Fed. Reg. 42957). Specifically, the HON Rule altered the existing leak detection and repair requirements by lowering several but not all of the leak definition thresholds and, in some cases, requiring more frequent monitoring. *Id*.; 40 C.F.R. §§ 63.168(d)(5), 63.168(b)(2)(iv), § 63.174(b)(3)(vi). However, the Rule did not alter the

required technology for monitoring: prior to the HON Rule, facilities had to monitor pursuant to Method 21 under regulations that pre-dated the HON Rule, which requires a VOC instrument detector. *See id.* § 63.174(a)(1) ("The connectors shall be monitored to detect leaks by the method specified in § 63.180(b) of this subpart"); *id.* § 63.180(b)(1) ("Monitoring shall comply with Method 21 of 40 CFR part 60, appendix A"); SUMF ¶¶ 87-100. In the HON Rule preamble, EPA confirmed that "HON facilities already have an established [leak detection and repair] program that is currently monitoring valves, pumps, and connectors." SUMF ¶ 85. Thus, on the face of the regulations, it is patently unreasonable to conclude that technology to implement these leak detection requirements is "unavailable."

The same can be said of leak monitoring requirements for heat exchange systems. Prior to the HON Rule, HON facilities were required to monitor heat exchange systems for leaks SUMF ¶ 102 (62 Fed. Reg. 2733); 40 C.F.R. § 63.104 (1997). The 2024 HON Rule requires that facilities repair any ethylene oxide leaks detected from heat exchange systems within 15 days of sampling, instead of the previous standard of 45 days. SUMF ¶ 103; 40 C.F.R. § 63.104(h)(6), and requires more frequent leak monitoring (weekly instead of quarterly) for heat exchange systems in ethylene oxide service, SUMF ¶ 105; 40 C.F.R. § 63.104(g)(6)). It also prohibits delaying repairs after a leak is detected unless the equipment is isolated and no longer in ethylene oxide service. SUMF ¶ 104; 40 C.F.R. § 63.104(h)(6). Again, because these standards simply change the frequency of monitoring activities—and do not change the technology needed to do it—it is utterly unreasonable to interpret Section 7412(i)(4) to apply to those standards.

The HON Rule requires operators to measure hazardous air pollutant concentration in storage vessels during shutdown operations, using either EPA Method 18 or 25A, or another validated method. SUMF ¶ 77; 40 C.F.R. § 63.119(a)(6); *id.* § 63.484(a), (t). While these

methods require monitoring technology, the technology is available because Method 18 and Method 25A testing were already mandated by many provisions prior to the HON Rule. *See* SUMF ¶ 78; *see* 40 C.F.R. §§ 63.128(a)(9), 63.139(c)(1)(ii), 63.145(d)(4), 63.115(c)(2), 63.116(c)(3), 63.490(c)(1)(i)(D), (e)(1), 63.485(p)(4). The only difference is that facilities must use those monitoring methods at a new time—during shutdown operations, in addition to the other times facilities must use those methods under the prior standards. SUMF ¶ 77. Because facilities must *by law* already have the technology needed to comply with that standard, exempting facilities from that standard represents a patently unreasonable interpretation of the Section 7412(i)(4) exemption authority.

### 3. Fenceline Monitoring

The Proclamation evinces an utterly unreasonable interpretation of "not available" as applied to fenceline monitoring requirements. The HON Rule requires facilities that use, store, or emit one or more of benzene, 1,3-butadiene, chloroprene, ethylene oxide, or vinyl chloride, to monitor for the pollutant(s) they emit at the facility's fenceline. SUMF ¶ 111. Benzene, 1,3-butadiene, ethylene dichloride, and chloroprene are monitored using a passive diffusive sorbent tube method known as Method 325A/B. SUMF ¶ 119. Ethylene oxide and vinyl chloride are monitored using a canister sampling method known as Method 327. SUMF ¶ 123. Both monitoring methods are presently being used or have been used at several facilities that received an exemption. For example, in conducting the HON rulemaking, EPA required ten of the exempted facilities to conduct both passive fenceline monitoring and canister sampling, the two methods now required by the HON Rule. SUMF ¶¶ 128-130. All of these facilities were able to implement and conduct passive and canister fenceline monitoring for multiple sampling periods. *Id.* ¶ 131. In other words, ten of the exempted facilities had previously obtained, implemented, and used the very same technologies that the Proclamation found to be not available.

54

Beyond that, at least eleven of the exempted facilities are currently conducting Method 325A/B fenceline monitoring either because they are subject to identical fenceline monitoring requirements for benzene under the 2015 Refinery Rule or subject to fenceline monitoring requirements pursuant to a consent decree. SUMF ¶¶ 120-122, 134. Those facilities thus already possess the technology to conduct passive fenceline monitoring for pollutants covered under the HON Rule. As EPA found in its rulemaking, the only difference between the HON Rule standard and what those facilities are already doing is that the facilities would request that the laboratory process an additional analyte—that is, test for 1,3-butadiene, ethylene dichloride, or chloroprene, in addition to benzene, depending on the pollutants emitted by the particular facility. SUMF ¶ 135. EPA found that "the costs for adding a laboratory analysis for a second analyte are minimal." SUMF ¶ 135. Additionally, the vast majority of exempted facilities only have to conduct passive fenceline monitoring. Based on the pollutants they emit, only 40 of the 50 exempted facilities are subject to the fenceline monitoring requirements at all, and of those 23 need only conduct passive fenceline monitoring. SUMF ¶ 136.

Moreover, the fenceline monitoring technologies are widely used in similar industries. EPA first required passive fenceline monitoring under Methods 325A/B in a 2015 regulation at more than 110 refineries, many of which were co-located with HON facilities. SUMF ¶¶ 120-122, 73 (at least seven exempted facilities co-located with refineries). And Method 327 is not a new technology, but rather a revised canister sampling method based on Methods TO-15, first established in 1999, and Method TO-15A, with revisions related to best practices for cleanliness and data quality. SUMF ¶¶ 126, 132. The fact that U.S. laboratories are currently offering Method 327 analysis (SUMF ¶ 127) plainly shows that this sampling method is available.

### 4. Flare Operating and Monitoring Standards

The Proclamation's interpretation of "not available" is also utterly unreasonable with respect to the HON Rule's updated requirements for flares. First, the technology is widely available and in use across hundreds of sources located at petrochemical facilities and refineries. Like the fenceline monitoring requirements, EPA drew the HON Rule's flare requirements from the 2015 Refinery Rule, which required the application of the requirements at refineries starting in 2019. *See* SUMF ¶ 69 (89 Fed. Reg. 43016); 40 C.F.R. § 63.670. EPA has also applied these requirements to facilities in the petrochemical sector in the 2020 Miscellaneous Organic NESHAP (MON) rule and 2020 Ethylene Production rule. SUMF ¶ 70. MON and ethylene production facilities have been required to comply with these updated flare requirements since 2023. 40 C.F.R. §§ 63.2450(e), 63.2445(g) (MON); *id.* §§ 63.1103(e)(4), 63.1102(c)(8) (ethylene production).

Second, not only is the technology needed for the updated flare standards widely available, but it is actually in use at facilities covered by the HON Rule, including facilities that the Presidential Proclamation exempted from compliance with the flare requirements. For example, EPA found in the HON rulemaking that certain facilities covered by the rule—including both SOCMI and Polymers and Resins facilities—would not need to upgrade equipment to comply with the new requirements. SUMF ¶ 72. Specifically, for facilities co-located with sources covered by the Ethylene Production or MON rules—which required compliance with the flare requirements by 2023, as discussed above—EPA found that such facilities "likely upgraded at least one HON flare already." SUMF ¶ 72. Of the 50 exempted facilities, at least 19 facilities are co-located with one or more sources that are already subject to the updated flare standards: 12 are co-located with sources subject to the updated flare standards under the MON rule and/or ethylene production rule, and an additional seven unique facilities

56

are co-located with refineries. SUMF ¶ 73. Not only have these facilities likely upgraded at least one HON flare under EPA's assumption, but they have also *certainly* upgraded any flares subject to the updated flare requirements under the refinery, MON, and ethylene production NESHAP. In other words, the technology to comply with the flare requirements is clearly available and in place at nearly 40 percent of the exempted facilities.

Finally, as discussed above, a number of the updated flare requirements do not require any additional technology at all to implement. To take one example, the requirement that HON facilities calculate certain flare parameters on a 15-minute average instead of the three-hour average under the previous standards is a difference in the data and math used rather than a change in any technology. *See*, *e.g.*, 40 C.F.R. § 63.108(c), (l)(2), (m).

Thus, again, the HON Proclamation evinces an utterly unreasonable interpretation of the Section 7412(i)(4) exemption authority by purporting to have authority to reach facilities that already possess the requisite technology and standards that do not require "technology" at all.

### E. The Proclamation improperly construes "not available" to mean that more time is needed for compliance

The Proclamation also unlawfully second-guesses the underlying HON rulemaking by improperly second-guessing the Rule's compliance dates. In addition to the Proclamation's exceedance of authority and misconstruction with respect to "not available" where technology is plainly available, the Proclamation also patently misconstrues "not available" as applying to the purported need for more time to implement the requirements. This renders the Proclamation *ultra vires*. *See Griffith v. Fed. Labor. Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (an "agency construction of a statute" is *ultra vires* if "the disputed [action] defies the plain language of a statute" or "the agency's construction is utterly unreasonable and impermissible").

Specifically, the Proclamation strays outside the narrow confines of determining whether or not a technology is "not available," asserting instead that "the timeline for compliance . . . would require shutdowns or massive capital investments before any proven pathway to compliance exists" and that the HON Rule failed to consider "permitting realities" at the regulated facilities. 90 Fed. Reg. 34587. These are not appropriate considerations in determining if the technology required by the HON Rule is "available."

As discussed above, "available" has a specific meaning, and the President's authority under Section 7412(i)(4) is accordingly limited. While regulated facilities' needed time for implementation is a consideration under the statutory framework, it is a consideration that the statute confers exclusively to EPA, not the President under Section 7412(i)(4). First, at the time when EPA sets and revises standards, it is EPA's role to determine whether a technology is achievable, not the President's. *See supra* Part III.B. Second, if EPA later finds that a specific facility requires a longer compliance schedule, EPA (or a delegated state program) may permit "up to 1 additional year to comply with standards under subsection (d) if such additional period is *necessary for the installation of controls*." 42 U.S.C. § 7412(i)(3)(B) (emphasis added).

In raising "the timeline for compliance" and the consideration of "permitting realities," the Proclamation improperly broadens its determination of whether a technology is "not available" to fold in these considerations of additional time needed to comply. This is a misconstruction of the statutory term and an exceedance of the President's limited authority under Section 7412(i)(4). The Proclamation cannot stand on this basis.

## IV.    EPA AND ADMINISTRATOR ZELDIN ARE PROPER PARTIES.

Defendants argue that the Court should dismiss EPA and Administrator Zeldin, Mot. 13-15, but in fact EPA and its Administrator are proper and necessary parties to this matter.

58

EPA and its Administrator must not be dismissed as parties to this case because implementation of the Proclamation must be enjoined to grant Plaintiffs complete relief.[6] Because courts typically do not have jurisdiction to enjoin the President, "courts can enforce a presidential *ultra vires* holding by enjoining agencies and their officials from implementing the President's unlawful order." *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9 n.6 (Pan, J. concurring) (citing *Newdon v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010)). Case law in this circuit on presidential *ultra vires* claims demonstrates a clear and established practice for granting injunctive relief against subordinate, implementing agencies and officials. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (court has "power under the All Writs Act to issue commands that apply to 'persons who, though not . . . engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice'" (quoting *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977)); *Cook v. Trump*, 804 F. Supp. 3d 14, 45 (D.D.C. 2025) (recognizing that "a court can enjoin subordinate executive officials to reinstate a wrongly terminated official *de facto*" (cleaned up)).

EPA's arguments for dismissal are unavailing. EPA argues that it has taken no final agency action reviewable under the Clean Air Act, 42 U.S.C. § 7607(b). Mot. at 14. But Plaintiffs do not seek review under those statutory pathways. *See* Complaint ¶¶ 8, 10. Instead, Plaintiffs ask the court to find that the President action is *ultra vires*, and to issue appropriate

---

[6] Contrary to EPA's assertion, Plaintiffs did not include EPA and Administrator Zeldin as defendants in attempt to "transmute the claim from unreviewable to justiciable." Mot. at 15. As explained *supra* Part II, Plaintiffs' claims against all defendants, including the President, are justiciable. EPA's invocation of *Trump v. Orr*, 146 S. Ct. 44, 46 (2025) is likewise inapposite. *Orr* did not hold that the State Department was not a proper party to that litigation or that the agency's actions were not subject to judicial review—it merely found that plaintiffs were unlikely to succeed on the merits of their argument that the State Department's action was arbitrary and capricious under the Administrative Procedure Act. *Id.*

relief. *Id.* at 43 (Relief Requested). Such relief would include action by EPA to implement the HON Rule.

Acknowledging that Plaintiffs seek *ultra vires* review, EPA goes on to argue that it is solely the President who issues and implements exemptions under Section 7412(i)(4) of the Act. Specifically, EPA claims that it "has no role in effectuating" the exemptions, and that "[a]ny future EPA action to implement an exemption. . . would be merely ministerial and not subject to review." Mot. at 14-15.

EPA is incorrect in asserting that it has taken no action and plays no role here. From the start, EPA was directly involved in developing the set of standards and facilities eligible for exemptions, issuing press releases and setting up webpages to invite facilities interested in obtaining a Presidential exemption to submit requests and materials to EPA by a deadline the agency set, and then collecting these applications through an EPA email inbox: airaction@epa.gov. SUMF ¶¶ 12-15. In fact, from EPA's official statements at the time, it appears that EPA considered the Section 7412(i)(4) exemptions to play a role in EPA's reconsideration proceedings: "[t]he Trump Administration is considering a 2-year compliance exemption via Section 112(i)(4) of the Clean Air Act for affected facilities *while EPA goes through the rulemaking process*." SUMF ¶ 12 (emphasis added). EPA was the party that received and almost certainly sent the exemption requests to the White House. For all of these actions up until the Proclamation itself, EPA was the primary mover.

With regard to future actions, it is clear that EPA will have an implementing role going forward. First, based on EPA's direct involvement in effectuating the exemptions, it is hard to fathom that EPA would have no future role. Second, under its Clean Air Act authorities and duties, EPA would have a continued obligation to implement and enforce the HON standards for

60

facilities that the Proclamation has now deemed exempted. For example, EPA would collect and publish fenceline monitoring reports and other reports and plans required under the standards. SUMF ¶¶ 115-16 (HON fenceline monitoring provisions), ¶ 122 (providing EPA's Benzene Fenceline Monitoring Dashboard for petroleum refineries). And even if "acting at the behest of the President," the Court can compel EPA "to disobey illegal Presidential commands." *Reich*, 74 F.3d at 1328. EPA is fundamentally intertwined in the implementation and effectuation of the HON Rule and, by extension, the announced exemptions.

For these reasons, EPA and Administrator Zeldin are proper parties to this litigation.

**CONCLUSION**

The Court should declare the Proclamation unlawful and grant injunctive relief as to Administrator Zeldin and EPA to prevent them from relying on the Proclamation to allow exempted facilities to continue noncompliance with the duly issued HON Rule. This relief is no broader than necessary to redress the harms to Plaintiffs' members and supporters and well within this Court's authority to grant.

This Court may enter a declaratory judgment as to the President declaring that the Proclamation is unlawful. *See Clinton v. City of New York*, 524 U.S. 417, 421, 428 (1998) (affirming declaratory judgment that President's actions under Line Item Veto Act were invalid). Such declaratory relief is necessary to "clarif[y] the legal relations at issue" and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (cleaned up). The Court should exercise its "sound discretion," to enter such a judgment here to eliminate "uncertainty" about the lawfulness of the Proclamation for exempted facilities, subordinate officials, and EPA. *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980).

61

Further, this Court should grant injunctive relief against EPA and Administrator Zeldin, as the subordinate officer who enforces the President's directive. *Reich*, 74 F.3d at 1328 ("Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality'" of the action and "'to compel subordinate executive officials to disobey illegal Presidential commands.'"). The injunction should prohibit EPA and Administrator Zeldin from implementing or giving effect to the unlawful Proclamation, including through implementation of the Act's Title V operating permit program, and direct EPA to notify all exempted HON-regulated facilities and relevant permitting authorities that the Proclamation is unlawful and that they may not rely on it.

62

DATED: March 2, 2026                    Respectfully submitted,


*/s/ Adam Kron*                          */s/ Sarah A. Buckley*
Adam Kron (D.C. Bar No. 992135)          Sarah A. Buckley (D.C. Bar No. 90035401)
Sage Lincoln (D.C. Bar No. 90042038)     Natural Resources Defense Council, Inc.
Earthjustice                             1152 15th St. NW, Suite 300
1250 I St. NW, Fourth Floor              Washington, D.C. 20005
Washington, D.C. 20005                   sbuckley@nrdc.org
akron@earthjustice.org                   Tel: (202) 836-9555
slincoln@earthjustice.org
Tel: (202) 794-8039                      *Counsel for Plaintiffs Natural Resources*
                                         *Defense Council and Environmental Justice*
*Counsel for Plaintiffs Texas Environmental*   *Health Alliance for Chemical Policy Reform*
*Justice Advocacy Services, Air Alliance*
*Houston, Concerned Citizens of St. John,*     */s/ Rosalie Winn\**
*Louisiana Environmental Action Network,*      Rosalie Winn (Colorado Bar No. 52662)
*RISE St. James Louisiana, and Sierra Club*    Leah Fattor (Colorado Bar No. 61031)**
                                         Environmental Defense Fund
*/s/ Abel Russ*                          2060 Broadway, Suite 300
Abel Russ (D.D.C. Bar No. 1007020)       Boulder, CO 80302
Environmental Integrity Project          rwinn@edf.org
888 17th St. NW, Suite 810               lfattor@edf.org
Washington, DC 20006                     Tel: (303) 447-7212
aruss@environmentalintegrity.org         *\*Admitted pro hac vice*
Tel: (802) 482-5379                      *\*\*pro hac vice forthcoming*

*Counsel for Plaintiff Environmental*    */s/ Samantha Liskow*
*Integrity Project*                      Samantha Liskow, (D.D.C. Bar No. NY0687)
                                         Environmental Defense Fund
                                         257 Park Avenue South
                                         New York, NY 10010
                                         sliskow@edf.org
                                         Tel: (212) 616-1247

                                         *Counsel for Plaintiff Environmental Defense*
                                         *Fund*


                                    63