**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, et al.,<br><br>Defendants. | Civil No. 1:25-cv-03745-CRC |
| GREATER-BIRMINGHAM ALLIANCE TO STOP POLLUTION, et al.,<br><br>Plaintiffs,<br>v.<br><br>DONALD TRUMP, et al.,<br><br>Defendants. | Civil No. 1:25-cv-04469-CRC |
| MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, et al.,<br><br>Plaintiffs,<br>v.<br><br>DONALD TRUMP, et al.,<br><br>Defendants. | Civil No. 1:26-cv-00287-CRC |
| CLEANAIRE NC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, et al.,<br><br>Defendants. | Civil No. 1:26-cv-00233-CRC |

**SUPPLEMENTAL BRIEF IN RESPONSE TO SECTIONS 1 AND 2 OF DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

The Environmental Protection Agency put years, thousands of pages of scientific and technical findings, and dozens of stakeholder meetings into developing revised hazardous air pollutant emission standards for coke ovens, commercial sterilizers, and taconite iron ore processing. EPA published the new standards for each of those source categories in 2024. Those standards were long-overdue: the 2024 Taconite Rule is the first time that EPA set mercury standards for the taconite iron ore processing industry as required by the D.C. Circuit's 2005 directive in *Nat'l Wildlife Fed'n v. EPA*, No. 03-1458, 2005 WL 80958, at *1 (D.C. Cir. Jan. 13, 2005). The 2025 Coke Ovens Rule is the result of a court order secured by frontline communities. *Citizens for Pa.'s Future v. Wheeler*, 469 F. Supp. 3d 920 (N.D. Cal. 2020). The 2024 Sterilizers Rule was issued to comply with a consent decree after several environmental groups sued to compel EPA to act after eight years of delay. 91 Fed. Reg. 12706 (Mar. 17, 2026).

With a stroke of a pen and a few paragraphs, the President purports to sweep all that away. In seven proclamations issued in a matter of months, the President has allowed more than 180 facilities to continue emitting toxic and carcinogenic pollutants unconstrained by the underlying rules for an additional two years. Each Proclamation recites conclusory determinations that technology to implement the rules is not available. The Coke Ovens Proclamation, 90 Fed. Reg. 54517 (Nov. 21, 2025), exempts the entire coke ovens industry from the 2024 Coke Ovens Rule, though EPA had recently concluded that "facilities will be able to comply with these limits without the need for any new [or additional] controls." *Greater-Birmingham Alliance to Stop Pollution v. Trump*, 1:25-cv-4469, Compl. ¶ 45., Dkt. 1 (D.D.C.) (*GASP* Compl.). The Sterilizers Proclamation, 90 Fed. Reg. 34747 (July 17, 2025), exempts 45 percent of commercial sterilizers from complying with the 2024 Sterilizers Rule, even though more than half of exempted facilities are already using emissions controls that meet the

standards. *CleanAire NC v. Trump*, 1:26-cv-233, Compl. ¶¶ 1, 4, 83, Dkt. 1 (D.D.C.) (*CleanAire* Compl.). And the Taconite Proclamation, 90 Fed. Reg. 34743 (July 17, 2025), exempts the entire taconite iron ore processing industry from the only federal mercury emission limits for that industry, even when EPA identified feasible methods of reducing mercury and acid gases. *Minn. Ctr. for Ent'l Advocacy v. Trump*, 1:26-cv-287, Compl. ¶¶ 1, 7, Dkt. 1 (D.D.C.) (*MCEA* Compl.).

But for the President's Proclamations, coke ovens and commercial sterilizers would already be required to comply with their respective rules, reducing pollution that harms neighboring communities. Taconite facilities would be preparing to meet the compliance deadline less than a year away—a deadline that EPA already set at the latest date allowed by the Clean Air Act. The Proclamations deny Plaintiffs important hazardous pollutant protections, and they affect operational decisions that facilities are making right now.

This unprecedented, maximalist use of the President's limited statutory authority is reviewable by this Court under the D.C. Circuit's *ultra vires* precedents. In arguing otherwise, Defendants contend that the Court can look no further than the President's recitation of the words "I determine" to decide whether that authority was lawfully exercised. But the President's use of the term "determine" cannot paper over the Proclamations' stark departure from the narrow authority of 42 U.S.C. § 7412(i)(4): that the President may exempt a source from a hazardous air pollutant standard for up to two years only if "the technology to implement" the relevant standard is "not available" *and* if exempting the source "is in the national security interests of the United States." 42 U.S.C. § 7412(i)(4).

Each Proclamation—in its text and application—represents an utterly unreasonable interpretation of this statutory text. Accepting Defendants' invitation to find the Proclamations unreviewable blesses an expansion of the President's authority that both undermines the statutory

text and structure of the Clean Air Act and is also at odds with the D.C. Circuit's framework for *ultra vires* review of executive action. This Court should reject that invitation and meet its "virtually unflagging obligation," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), to review these Presidential Proclamations.

## BACKGROUND

### A. The 2024 rules

In 2024, EPA promulgated rules revising the hazardous air pollutant standards for coke ovens, commercial sterilizers, and taconite iron ore processing, among others.

#### 1. Coke Ovens

Coke is a high-carbon fuel, used to melt metals, that is made by superheating coal in adjacent ovens called batteries to remove impurities. *GASP* Compl. ¶¶ 2-3. EPA estimates coke ovens emit well over 2,000 tons of hazardous air pollution annually. *GASP* Compl. ¶ 26. The hazardous emissions, including benzene, are associated with cancers, blood disorders, respiratory effects, and more. *Id.* ¶ 34–35. EPA has determined coke oven emissions are among the most toxic of all air pollutants. *Id.* ¶ 107.

Historically, EPA has engaged in piecemeal, halting, and deficient regulation of coke ovens, repeatedly ignoring its statutory duties to timely revise and update standards. *See Citizens for Pa.'s Future v. Wheeler*, 469 F. Supp. 3d at 924-25 (summarizing EPA's history of inaction). After a federal court ordered EPA to complete mandatory reviews the Agency had unlawfully delayed, *see id.*, EPA updated the coke ovens standards in 2024 for the first time in nearly two decades.

The 2024 Coke Ovens Rule imposed several different standards that cover different aspects of a coke oven plant. Pursuant to the Rule, operators are required to conduct fenceline monitoring to detect excess benzene emissions from the oven batteries and to take "corrective

action" to remedy the cause of an exceedance. 40 C.F.R. § 63.314 (2025). Operators are also required to use daily visual observations and other work practice standards to reduce pollutant leaks from doors, lids, and offtakes. *Id.* §§ 63.309(a); 63.303(c) (2025). EPA explained that operators of all coke ovens can achieve compliance with leak limits "without the need for any new controls or operating costs." 89 Fed. Reg. at 55696; *see also id*. at 55703 (additionally explaining the Rule simply codified "the current SunCoke practice to observe oven doors to maintain zero leaks").

The Rule also included new standards for hazardous air pollutants that had been unregulated in prior coke ovens rules, including acid gases, hydrogen cyanide, mercury, and other toxic metals. *GASP* Compl. ¶ 41. EPA concluded that all sources could meet those emissions floor standards "and would not have to install controls to meet the limits." 89 Fed. Reg. at 55720; *see also id*. at 55717 (concluding ovens can comply "without the need for additional controls"). EPA determined those limits were already being "achieved" by the best performers in the relevant coke ovens category, and thus were achievable by all plants across the entire industry. 89 Fed. Reg. at 55687 *GASP* Compl. ¶ 45, 99. Some facilities are also required to conduct visual emissions monitoring and to take corrective action if emissions exceeded a specific opacity limit. 40 C.F.R. § 63.7299 (2025).

Sources were required to comply with most of the revised standards by July 7, 2025; the remainder had a compliance deadline of January 5, 2026. 89 Fed. Reg. at 55690, 55743.

EPA attempted to delay those deadlines until 2027 in an interim final rule that EPA published without notice or comment on July 8, 2025. National Emission Standards for Hazardous Air Pollutants for Coke Ovens: Pushing, Quenching, and Battery Stacks, and Coke Oven Batteries; Residual Risk and Technology Review, and Periodic Technology Review, 90

Fed. Reg. 29997 (July 8, 2025) ("Delay Rule"). Several plaintiffs here petitioned for review. Rather than file a brief in response, EPA notified the court on September 18, 2025, that it had reviewed post-publication public comments and concluded that coke ovens were capable of meeting applicable standards, "regardless of whether facilities installed additional controls." Response in Opp'n to Mot. For Summary Vacatur or a Stay at 1, Dkt. No. 2135704; *GASP v. EPA*, No. 25-1166 (D.C. Cir. Sep. 18, 2025). EPA then withdrew the Delay Rule in a notice issued October 2, 2025, reiterating that EPA "[d]oes not believe that the currently available information supports a conclusion that regulated parties would face significant immediate compliance challenges meeting" the Coke Ovens Rule standards. 90 Fed. Reg. at 56011.

A few weeks later, President Trump issued the Coke Ovens Proclamation, which provides effectively the same extension as the rule EPA had just rescinded as unnecessary.

**2. Ethylene oxide commercial sterilizers**

Commercial sterilizers are industrial facilities that use the colorless and highly carcinogenic pollutant ethylene oxide to sterilize goods including medical devices and dried food products. *CleanAire* Compl. ¶ 1. Many commercial sterilizers are in or near residential areas, close to homes, schools, and daycares. *Id.* ¶¶ 1, 119; *see, e.g.*, *id.* ¶ 122 (nearly 100 schools and childcare centers within five miles of one exempted sterilizer, Sterilization Services of Virginia).

In 2016, EPA updated its Integrated Risk Information System ("IRIS") assessment for ethylene oxide, concluding that ethylene oxide is significantly more carcinogenic than previously understood, and that exposure to even low amounts of ethylene oxide increases the risk of lymphoma, leukemia, and breast cancers, as well as respiratory, nervous system, and hormone disruption. *Id.* ¶ 38. Children's cancer risks from ethylene oxide exposure are three- to tenfold

higher than for adults. *Id*. ¶ 39. EPA estimated that four million children live within six miles of a commercial sterilization facility. *Id*. ¶ 43.

As a part of its (overdue) periodic review of technological developments and residual risk from commercial sterilizer emissions, *see* 42 U.S.C. §§ 7412(d)(6), (f)(2), EPA concluded that technological developments and residual risk warranted revising standards. In its final Residual Risk Assessment, EPA estimated that cancer risks at high-emitting facilities reach as high as 6,000-in-1 million, 60 times higher than EPA's own threshold for what constitutes "unacceptable risk." *CleanAire* Compl. ¶¶ 2, 40. EPA also concluded that technological developments would allow facilities to achieve greater emission reductions. *Id*. ¶ 4.

In light of these risks and technological developments, the 2024 Sterilizers Rule strengthened ethylene oxide emission standards in two ways. First, relying on its authority under Section 7412(d)(6), EPA tightened standards for various emission points and promulgated new standards for "room air emissions"—emissions from indoor ethylene oxide storage, dispensing, vacuum pump operations, and handling of sterilized material. *CleanAire* Compl. ¶¶ 44, 53; 89 Fed. Reg. at 24092-93. Second, because high-emitting facilities continued to pose health risks even with those tightened standards, EPA set even more stringent standards for facilities with the highest levels of ethylene oxide usage, relying on its authority under 42 U.S.C. § 7412(f)(2). *CleanAire* Compl. ¶¶ 49-51; 89 Fed. Reg. at 24100. Additionally, EPA required facilities to demonstrate compliance using continuous emissions monitoring (CEMS) and required some facilities to install "permanent total enclosure" (PTE) to capture room air emissions. *CleanAire* Compl. ¶¶ 54-55.

Sources were required to comply with the health-based standards (those promulgated under Section 7412(f)(2)) by April 6, 2026, and with the technology-based standards (those promulgated under Section 7412(d)(6)) by April 6, 2027. *Id.* ¶ 63.

### 3. Taconite iron ore processing

Taconite iron ore processing facilities emit mercury and acid gases when separating iron ore from taconite to produce taconite pellets for the eventual manufacture of steel. *MCEA* Compl. ¶¶ 36-37 (citing National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Residual Risk and Technology Review, 85 Fed. Reg. 45476, 45478 (July 28, 2020)). Mercury is an environmentally persistent neurotoxin that bioaccumulates in humans, leading to IQ loss and motor function and language deficiencies. *Id.* ¶¶ 1, 39. Fetuses and young children are particularly susceptible to these effects of mercury exposure. *Id*. Acid gases cause inflammation of the respiratory tract, asthma, and even premature death. *Id*. ¶¶ 40, 51. The eight total taconite ore processing facilities in the United States are owned by one of two parent companies: U.S. Steel or Cleveland-Cliffs. *Id.* at ¶ 4.

Until EPA issued the 2024 Taconite Rule, there was no federal standard for mercury emissions from taconite processing facilities. Over the past two decades, courts have found again and again that EPA had failed in its duty to establish such mercury standards. In 2005, the court in *Nat'l Wildlife Fed'n v. EPA*, 2005 WL 80958, at *1, expressly acknowledged EPA's intent to correct its (admitted) legal error of failure to set a limit for mercury for the taconite processing source category as the Act requires, noting "respondents' stated intention to 'act with all due speed to propose, take comment on, and issue a final rule' setting a standard for mercury emissions from taconite iron ore processing facilities." Yet for the next twelve years, EPA failed to limit mercury emissions from this industry. In *Blue Ridge Envt'l Def. League v. Pruitt*, 261 F. Supp. 3d 53, 57, 61. (D.D.C. 2017), the court ordered that the agency complete the taconite

ore processing risk and technology review by 2020. Then in *Louisiana Environmental Action Network v. EPA*, 955 F.3d. 1088, 1091 (D.C. Cir. 2020) ("*LEAN*"), the D.C. Circuit confirmed that EPA has an obligation to establish standards for unregulated hazardous pollutants.

EPA finally established standards for mercury emissions from the taconite iron ore source category in the Taconite Rule. *MCEA* Compl. ¶¶ 49, 51, 55. In that same rule, it also revised standards for acid gases, determining that the then-existing particulate matter-based surrogate standards for acid gases no longer accurately reflected current emissions performance or technical developments. *MCEA* Compl. ¶ 63. The agency considered developments in practices and control technologies as well as compliance costs (which amounted to less than one percent of the annual sales revenue per ultimate owner) and concluded that the controls required by the Taconite Rule were achievable. *MCEA* Compl. ¶¶ 4, 66 (citing 89 Fed. Reg. at 16412, 16414, 16417, 16421).

The Taconite Rule would reduce mercury emissions by 247 pounds per year and combined acid gas emissions by 719 tons per year. *MCEA* Compl. ¶ 2 (citing 89 Fed. Reg. at 16420 (Mar. 6, 2024)). Existing facilities were required to comply with the Taconite Rule by March 8, 2027, the maximum timeframe allowed under Section 7412(i)(3) (three years after the effective date). *MCEA* Compl. ¶ 16. Because of the Taconite Exemption, that deadline is effectively extended by two years for the entire industry.

**B. The Exemption Proclamations**

On March 12, 2025, EPA announced that it would "reconsider" the Coke Ovens Rule, the Sterilizers Rule, and the Taconite Rule, along with the HON Rule at issue in *t.e.j.a.s.*. *See CleanAire* Compl. ¶ 64; U.S. EPA, Fact Sheet: Final Amendments to Air Toxics Standards for Taconite Iron Ore Processing, https://perma.cc/WA9S-KS73; U.S. EPA, EPA Launches Biggest Deregulatory Action in U.S. History (Mar. 12, 2025), https://perma.cc/EXL5- FAMQ. EPA also

published a fact sheet on its webpage inviting "[a]ny source interested in a Presidential exemption" from any of those rules to "provide their recommendations to EPA by March 31, 2025." *Id.* ¶ 65. EPA established an electronic mailbox—airaction@epa.gov—to receive industry requests. *Id.* ¶ 66. All coke oven and taconite operators submitted requests, along with dozens of commercial sterilizers and a commercial sterilization industry advocacy group. *Id.* ¶ 68; *GASP* Compl. ¶ 52.

On July 17, 2025, President Trump issued three proclamations exempting the 50 chemical facilities at issue in *t.e.j.a.s v. Trump*, 1:25-cv-03745, 40 commercial sterilizers, and the entire taconite industry from the entirety of their respective 2024 hazardous air pollutant rules. Regulatory Relief for Certain Stationary Sources to Promote American Security with Respect to Sterile Medical Equipment, 90 Fed. Reg. 34747 (July 17, 2025) (Sterilizers Proclamation); Regulatory Relief for Certain Stationary Sources to Promote American Iron Ore Processing Security, 90 Fed. Reg. 34743 (July 17, 2025) (Taconite Proclamation). On November 21, 2025, the President issued a proclamation exempting the entire coke ovens industry from most of the standards in the Coke Ovens Rule. Regulatory Relief for Certain Stationary Sources to Promote American Coke Oven Processing Security, 90 Fed. Reg. 54517 (Nov. 21, 2025) (Coke Ovens Proclamation).

Each proclamation is little more than a page. Each concludes with a recitation that the President "make[s] the following determinations": First, that technology to implement the Rules is "not available" and that "[s]uch technology does not exist in a commercially viable form sufficient to allow implementation of and compliance with the [applicable Rule] by the compliance dates in [that Rule]." 90 Fed. Reg. at 34747-48 (sterilizers); *id.* at 34743-44 (taconite); *id.* at 54518 (coke ovens). Second, that the exemptions are "in the national security

interests of the United States." *Id*. at 34748 (sterilizers); *id*. at 34744 (taconite); *id*. at 54518 (coke ovens). None of the exemptions describes what "technology" is not available to meet which standards, nor includes any facility-specific analysis of those standards or technologies.

## ARGUMENT

### I. THE EXEMPTION PROCLAMATIONS ARE REVIEWABLE FOR THE REASONS IN PART II OF *T.E.J.A.S.* PLAINTIFFS' RESPONSE

The President's unlawful, pretextual invocation of the Section 7412(i)(4) exemption authority is judicially reviewable. Defendants' two main arguments to the contrary, found in Parts 1 and 2 of the memorandum in support of their Motion to Dismiss, are unpersuasive. In Part 1, they argue that Clean Air Act provisions that govern judicial review of actions by the EPA Administrator, 42 U.S.C. §§ 7604, 7607, preclude judicial review of presidential exemptions. Defs.' Mem. in Supp. of Mot. to Dismiss 7-9, Dkt. 34-1 ("Mot."). We adopt the response in Part II.A of the *t.e.j.a.s.* plaintiffs' brief in response, which explains that the Clean Air Act's judicial review provisions for actions of the EPA Administrator do not impliedly bar review of the President's exemption determinations. Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss & Mem. in Supp. of Cross-Mot. for Summ. J. 22-25, Dkt. 41-1 ("Pls.' Mem.").

In Part 2, Defendants argue that Section 7412(i)(4) commits exemption decisions so much to the President's discretion that exemptions proclamations are effectively unreviewable. Mot. 9-13. Pointing to the standard for *ultra vires* review articulated in *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665, 681 (2025), Defendants assert that the judicial role in reviewing the exemption proclamations is circumscribed to "asking (a) whether the statute confers the discretion that the President has exercised; and (b) whether the President exceeded a specific statutory prohibition on his authority." Mot. 10. They then argue that so long as a proclamation purports to make "the determinations required by statute—that the 'technology to

implement the HON Rule is not available' and the exemption is 'in the national security interests of the United States,'" Mot. 12 (quoting 90 Fed. Reg. at 34588), the Court can make no inquiry into whether the President's action fits within the authority conveyed by the statute.

Plaintiffs adopt Part II.B of the *t.e.j.a.s.* plaintiffs' response, which points out that Section 7412(i)(4) conveys bounded authority that is within the court's competence, not unreviewable discretion, and Part II.C, which addresses the scope of review available for *ultra vires* claims and explains that the exemption proclamations are susceptible to review with evidence that demonstrates the President patently misconstrued the statutory conditions on his authority.

Two cases decided since the *t.e.j.a.s.* plaintiffs' brief support those arguments. In *New Mexico v. Musk*, No. 25-cv-429 (TSC), 2026 WL 799635, at *13 (D.D.C. Mar. 23, 2026), the court rejected Defendants' argument that plaintiffs had failed to state an *ultra vires* claim because they "fail[ed] to identify any specific statute" that Defendants had violated. As argued in the *t.e.j.a.s.* brief, the court explained that "conduct in violation of specific statutory limitations is just one example of an *ultra vires* act—not the only example of an *ultra vires* action." *Id.* (cleaned up). And in *National Trust for Historic Preservation v. National Park Service*, the court explained that canons of statutory construction apply to determine whether the government has adopted "an utterly unreasonable reading of a statute that is contrary to the statute's plain language." No. 25-cv-4316 (RJL), 2026 WL 877779, at *8 (D.D.C. Mar. 31, 2026) (cleaned up).

The argument in the next part elaborates on how the allegations in the *GASP*, *CleanAire NC*, and *MCEA* complaints likewise fit the *ultra vires* standard of review.

## II. EACH PROCLAMATION PLAINLY EXCEEDS THE PRESIDENT'S AUTHORITY

Each Proclamation is unlawful on its face, and our allegations in each of these cases are consistent with the *ultra vires* standard of review. A nonstatutory *ultra vires* claim requires the

Court to determine whether defendants "plainly act[ed] in excess of [their] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). "So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022).

In analyzing Defendants' motions to dismiss, "[t]he court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor, but is not required to accept the plaintiff's legal conclusions as correct." *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014) (citation omitted).

Each of the Coke Ovens, Sterilizers, and Taconite proclamations meet that standard, for reasons that are proclamation-specific and others that are common amongst them. First, the text, scope, and application of each of the proclamations demonstrate that the President patently misconstrued Section 7412(i)(4), and thus that the proclamations exceed his statutory authority. Second, context shows that each exemption is being used as an illegal end-run around the statutory limits on EPA's authority to stay the effectiveness of the 2024 rules while the Agency endeavors to rescind and revise those rules, rebutting—along with the factors that illustrate the President's utterly unreasonable interpretation of his authority—any presumption of regularity.

### A. The President's actions are reviewable as *ultra vires* because, as alleged in each case, he plainly exceeded his delegated powers

In each of the three cases consolidated with the *t.e.j.a.s*. case, Plaintiffs have alleged facts that show that the President's construction of his Section 7412(i)(4) authority is "utterly unreasonable and thus impermissible." *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1174 (D.C. Cir. 2003). Defendants argue that reviewing whether the President's action meets that standard would constitute a vast expansion of *ultra vires* review. They suggest that the Court cannot look beyond the President's incantation of the words "the technology to implement the [relevant Rule] is not available." Mot. 12. That is incorrect.

Judicial "review is available to ensure . . . that the President has not exceeded his statutory authority." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002). Nonstatutory *ultra vires* claims are reviewable so long as the statute does not expressly foreclose review, there is no alternative procedure for review of the statutory claim, and the statute provides requirements that cabin the President's discretion and delineate the outer bounds of his authority such that the court can determine whether the action was plainly in excess of that authority. *See, e.g.*, *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025); *Fed. Educ. Ass'n v. Trump*, 2025 WL 2738626, at * 8 (D.C. Cir. 2025) (Pan, J., concurring) (per curiam). Plaintiffs state a viable *ultra vires* claim when the challenged action on its face or its undisputed application establishes that the President has relied on a "patent misconstruction" of statutory authority. *See Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).[1]

The review we seek in each consolidated case is consistent with D.C. Circuit precedent. Plaintiffs have alleged basic facts about the Coke Ovens, Sterilizers, and Taconite proclamations' text and the standards and facilities to which they apply that establish they are premised on a "patent misconstruction" of Section 7412(i)(4). Consequently, Plaintiffs' claims are more than a

dispute over "garden-variety errors of law or fact" and are reviewable as *ultra vires* claims. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up).

### 1. Coke Ovens

*Ultra vires* review of the Coke Ovens Proclamation is appropriate because "in any view of the facts," the President's Coke Ovens Proclamation is premised on multiple "clear mistake[s] of law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109-110 (1902). At least three such clear legal mistakes are apparent from facial review of the Coke Ovens Proclamation: (1) the Proclamation is premised on the President's reconsideration of determinations that the Act assigns exclusively to EPA; (2) it exempts compliance with standards that require no technology to implement; and (3) it fails to engage in the standard-specific determination of technology "availability" that would comport with Section 7412(i)(4)'s grant of authority.

First, the Coke Ovens Proclamation is based on a patent misconstruction of Section 7412(i)(4) because the Proclamation does not address the availability of compliance technology at individual facilities. *See Fed. Educ. Ass'n*, 2025 WL 2738626, at *8 (Presidential Proclamations are reviewable as *ultra vires* when they fail to make specific findings required by law) (Pan, J., concurring). Instead, it questions the validity of the standards established in the

[1] Whether the complaints' allegations show a "patent misconstruction" or "utterly unreasonable" or "palpably illegal" application of statutory authority arguably goes to the merits—that is, to whether the complaints state a claim for relief –rather than to judicial "reviewability" in any jurisdictional sense. *See, e.g., Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 n.3 (D.C. Cir. 1996) ("[I]t does not follow that there is *no* reviewability if we conclude that the President's action was authorized."); *Mountain States Legal Found*., 306 F.3d at 1136 ("It would be 'untenable . . . to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President *claims* that he is acting pursuant to' a statutory directive.") (emphasis in original; quoting *Reich*, 74 F.3d at 1332). Nonetheless, we discuss our ability to establish that each of the Proclamations are premised on a "patent misconstruction" to help the Court understand that review of these Proclamations is consistent with binding precedent and out of an abundance of caution to the extent that the Court views the "patent misconstruction" requirement as a reviewability issue.

Coke Ovens Rule—and, by extension, the required findings EPA made in adopting those standards—arguing that the standards are not achievable at all. *See* 90 Fed. Reg. 54517. That is *ultra vires*: the Act assigns the determination of whether standards are "achievable" exclusively to EPA and limits the President's exemption authority to standards that require technology determined to be "not available" to the exempted facility. *Compare* 42 U.S.C. § 7412(d)(2), *with id.* § 7412(i)(4).

In the underlying rulemaking, EPA set standards that it concluded coke ovens could achieve, considering statutorily specified factors including technologies, practices, processes, and cost where appropriate. *See, e.g.*, 42 U.S.C. § 7412(d)(2) (identifying technology-based and non-technology-based measures that EPA may determine facilities can apply to achieve Section 7412(d) standards); *id.* § 7412(d)(6) (EPA must "tak[e] into account developments" in "control technologies"). Rather than address the availability of technology to meet those standards, the Coke Ovens Proclamation contends that "the Coke Oven[s] Rule requires compliance with standards *premised* on the application of emissions-control technologies that *do not yet exist* in a commercially demonstrated or cost-effective form" and "rel[ies] on technologies that . . . *cannot be implemented* safely or consistently." 90 Fed. Reg. at 54517 (emphasis added). The Proclamation thus directly contests EPA's achievability determination, attacking the "premise[s]" underlying the standards, *id.*, not whether "the technology to implement [the] standard[s] is not *available*," 42 U.S.C. § 7412(i)(4) (emphasis added).

In giving the President authority to exempt a source only when he determines the requisite technology is not available, the statute in turn *prohibits* the President from exempting sources just because the President disagrees with EPA's achievability determinations or thinks that different standards should apply. The Clean Air Act distinguishes between availability and

achievability and assigns to EPA the responsibility to determine whether a standard is achievable. *Compare* 42 U.S.C. §§ 7412(d)(2), (3) (assigning the achievability determination to EPA), *with id.* at § 7412(i)(4) (allowing the President to exempt a facility based on a determination that technology to implement a standard is not "available" to the facility). Those textual differences are dispositive, because they carve out different roles for EPA and the President. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (applying the "usual rule against ascribing to one word a meaning so broad that it assumes the same meaning as another statutory term") (cleaned up).

The statutory structure and context further confirm the President lacks authority to second-guess the validity of a standard and exempt an entire industry, as he has in the Coke Ovens Proclamation. As explained further *infra* Part II.B, the Act provides an express reconsideration mechanism for correcting flawed standards, subject to specific substantive and procedural limitations. If the President were permitted to exempt entire industries based on objections to the standards themselves, then the Section 7412(i)(4) authority would operate as an end-run around those limitations and would make the statutorily-directed process to petition for administrative reconsideration superfluous. *See infra* Section II.C. Congress cannot have intended such an absurd result, wherein the exception swallows the rule. *See EPA v. Calumet Shreveport Refining, LLC*, 145 S. Ct. 1735, 1751 (2025).

Second, the President patently misconstrued his authority under Section 7412(i)(4) because the Coke Ovens Proclamation exempted facilities from having to comply with standards that do not require technology. To grant an exemption, the statute requires a determination that a particular facility cannot timely comply with a given standard at issue because "the technology to implement such standard is not available" to that facility. 42 U.S.C. § 7412(i)(4). Consequently,

standards that do not depend on technology for their implementation are ineligible for Section 7412(i)(4) exemptions as a matter of law. And yet, 20 of the 22 standards for which the Coke Ovens Proclamation grants exemptions do not require any technology at all. *See, e.g.*, 89 Fed. Reg. at 55708, 55720; *GASP* Compl. ¶ 87. Such blatant "disregard[]" for "a specific and unambiguous statutory directive," *Changji*, 40 F.4th at 722, both "negate[s] any inference that an individualized" availability determination was made as to *any* technology, *Fed. Educ. Ass'n. v. Trump*, 795 F. Supp. 3d 74, 97 (D.D.C. 2025), and renders the Proclamation as a whole invalid. *See id.* at 93-97 (holding a Presidential order *ultra vires* as applied to all covered agencies because the President applied an overly broad interpretation of the applicable statutory standards).

EPA can and does set standards that are based on "processes" or "practices," rather than "control technologies." *See, e.g.*, 42 U.S.C. §§ 7412(d)(2), (6). Nearly all of the new Coke Ovens standards exempted by the Coke Ovens Proclamation were determined by EPA to not require technology for their implementation. *See* 89 Fed. Reg. 55720 ("[A]ll sources can meet the [Maximum Achievable Control Technology] floor limits and would not have to install controls to meet the limits."); *see also id.* at 55708 (EPA concluding the "additional workplace standard . . . will not result in any new control costs"); *id.* at 55696 (concluding that "facilities will be able to comply with [leak] limits without the need for any new controls."). In fact, two of the exempted standards simply require visual observation with the naked eye. *See* 40 C.F.R. §§ 63.7299, 63.303(a)(1)(ii). There is no plausible interpretation of Section 7412(i)(4) that allows the President to determine that naked-eye observations are a "technology" that can be unavailable.

Third, the President's determinations in the Coke Ovens Proclamation are irreconcilable with his own EPA's recent reaffirmation that the Coke Ovens standards could be adopted without compliance difficulties and without installing additional technology. Specifically, on December 5, 2025, EPA issued a notice rescinding a July 2025 rule that had granted the coke oven industry a two-year extension of the compliance deadlines for the Coke Ovens standards. In doing so, EPA reviewed the industry's own data, along with other public comments, and concluded that it "does not believe that the currently available information supports a conclusion that regulated parties would face significant immediate compliance challenges meeting" the updated Coke Ovens Rule standards. 90 Fed. Reg. 56010, 56011 (Dec. 5, 2025). EPA also concluded that standards would not be exceeded "regardless of whether facilities installed additional controls." Response to Pet'rs Mot. for Summary Vacatur or a Stay at 1, *GASP v. EPA*, No. 25-1166 (D.C. Cir. Sept. 18, 2025). These conclusions are utterly inconsistent with the President's conclusory determinations, announced shortly thereafter, that the Coke Oven Rule's "onerous implementation and compliance schedule for these standards" would place coke oven facilities in an "impossible position" that could lead to facilities shutting down entirely. 90 Fed. Reg. at 54517. The Coke Ovens Proclamation makes no attempt to reconcile the President's determinations with his own EPA's contrary findings.

The President's invocation of Section 7412(i)(4)'s standards in the Proclamation was pretextual and patently unreasonable. We have alleged facts that establish "clear evidence" that the President's interpretation would lead to an absurd result, and that he "did not discharge his . . . official duties properly" in determining that technology was unavailable to implement Coke Ovens Standards. *Fed. Educ. Ass'n*, 795 F. Supp. 3d at 89 (cleaned up).

**2. Sterilizers**

The Sterilizer Proclamation is judicially reviewable for similar reasons. The Sterilizer Proclamation exempted nearly 45 percent of the ethylene oxide sterilization industry from the entire Sterilizers Rule, without providing any standard- or technology-specific explanation of what "technology" the President determined is "not available." *CleanAire* Compl. ¶¶ 5-6, 9. And beyond the paucity of the President's explanation, basic facts about the commercial sterilizers that received exemptions show that the President necessarily applied an utterly unreasonable interpretation of the exemption criteria in Section 7412(i)(4).

First, it is an utterly unreasonable construction of the statute to conclude that "technology to implement [a] standard is not available," 42 U.S.C. § 7412(i)(4), for a source that has already installed the necessary technology and is already meeting standards. Yet many of the exempted commercial sterilizers reported emissions rates that would already comply with one or more of the standards in the Sterilizers Rule. As of 2024, EPA estimated that seven of 88 commercial sterilizer facilities "already met the emission standards and will not need to install additional emission controls" to comply with the Sterilizers Rule. 89 Fed. Reg. 24138. 66 of 88 facilities appeared to already be in compliance with the new standards for sterilization chamber vents; 26 of 55 facilities with aeration room vent emissions and 20 of 40 facilities with chamber exhaust vents appeared to already be in compliance with the new standards for those emission points. *Id*.

Although EPA did not identify which facilities these numbers referred to, emissions data collected and reported between 2019 and 2021 and available in the administrative record for the Sterilizers Rule indicates that at least 24 facilities that the president exempted reported emissions that would comply with one or more of the EtO Rule standards. *CleanAire* Compl. ¶ 100; *see, e.g.*, *id*. ¶¶ 101 (Trinity Sterile), 102 (Cook Incorporated).

Other exempted facilities have installed technology sufficient to meet the Sterilizers Rule standards after the data collection reflected in the 2024 Rule administrative record. For example, publicly posted permits for two Sterigenics facilities in Los Angeles, California indicate that those facilities installed a new air pollution control system designed to meet the EtO Rule standards in 2024. *CleanAire* Compl. ¶¶ 91-92. Those facilities also received permits and subsequently reported to their local air quality management district that they had completed construction of permanent total enclosures, which would satisfy another requirement of the Sterilizers Rule. *Id*. ¶¶ 93-95. Similarly, the Sterigenics facility in Atlanta, Georgia installed a permanent total enclosure in 2020 and reported emissions testing to state regulators that showed emission control levels that meet or exceed the Sterilizers Rule standards. *Id*. ¶¶ 97, 99.

Second, although the Sterilizers Proclamation is premised on the importance of protecting the supply of sterilized medical equipment, it grants an exemption to the Cosmed Linden facility in Linden, New Jersey, which sterilizes *only* spices and food products. 90 Fed. Reg. at 34747; *CleanAire* Compl. ¶¶ 107-08. Excusing that facility from more stringent standards does nothing to ensure an "adequate[] supply [of] sterilized medical equipment," 90 Fed. Reg. at 34747, but it does subject nearby residents to cancer risks as high as 2,000 in 1 million. *CleanAire* Compl. ¶ 60. The absurdity of the Linden example emphasizes the lack of any facility-specific consideration or analysis: the Sterilizers Proclamation explains neither what makes any technology unavailable for a particular facility, or why a particular facility meets the Proclamation's stated justification.

No plausible interpretation of "technology" being "not available" could apply to these and other facilities that were already complying with the Sterilizers Rule standards. And there is no reasonable explanation for how exempting a spice sterilizer protects the supply of sterilized

medical equipment. Such allegations are sufficient to show that the Sterilizers Exemption represents a patent misconstruction of the statute that is sufficient to warrant *ultra vires* review. *See, e.g.*, *Changji*, 40 F.4th at 722; *Aid Ass'n for Lutherans*, 321 F.3d at 1174-75.

**3. Taconite**

The Taconite Proclamation is similarly reviewable as *ultra vires.* On its face, it demonstrates that the President has gone far beyond Section 7412(i)(4)'s limited authority by exempting the entire taconite processing industry—including an idled facility with no plans to resume operations—from each of the standards in the Taconite Rule. The Proclamation serves the purpose of second-guessing EPA's determination that the Taconite Rule standards are "achievable," which is impermissible, as set forth above, *supra* Part II.A.1. Moreover, the conclusory statements in the Proclamation about the availability of technologies needed to implement the Taconite Rule cannot overcome the fact that EPA found those same technologies were achievable and feasible to meet the standards in the rule. *See MCEA* Compl. ¶¶ 91, 99, 104. The President must do more to avail himself of the narrow set of statutory circumstances under which he may issue such a Proclamation, and this Court has jurisdiction to examine that Proclamation as *ultra vires*.

The Taconite Proclamation's familiar recitation that "[t]he technology to implement the Taconite Rule is not available," as "[s]uch technology does not exist in a commercially viable form sufficient to allow implementation of and compliance with the Taconite Rule by the compliance dates in the Taconite Rule," *Id.* ¶ 78, is not determinative of this Court's authority to review the Proclamation as *ultra vires*. When EPA is setting a Maximum Achievable Control Technology floor, as it did for mercury in the Taconite Rule, it sets that floor to reflect the emissions levels that have already been "achieved" by the best-performing facilities in a

category, which establishes achievability by their peers. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 594 (cleaned up), *on reh'g en banc*, 671 F. App'x 822, and *on reh'g en banc in part*, 671 F. App'x 824 (D.C. Cir. 2016); 42 U.S.C. § 7412(d)(3). As with the Coke Ovens Proclamation, the Taconite Proclamation exceeds the President's authority by impermissibly questioning the validity of a determination committed to EPA and subject to specific substantive and procedural requirements, rather than making an independent determination about the availability of technology to implement the floor standards. *See supra* Part II.A.1.

The Taconite Proclamation also evinces an utterly unreasonable interpretation of "technology" being "unavailable." In the rulemaking docket for the Taconite Rule, EPA found that six of the seven operational facilities would not need to install additional controls to comply with the revised acid gas standards of the Rule. *MCEA* Compl. ¶ 67. Compliance with the acid gas standards of the Taconite Rule can be met without significant retrofits or additional controls, as all existing indurating furnaces would be able to comply with the revised hydrogen fluoride limits without add-on control devices and all but two furnaces would be able to comply with the revised hydrogen chloride limits without additional controls. *Id.* ¶ 93.

Likewise, two of the seven operational facilities would not need to install additional controls to comply with the standard for mercury. *Id.* ¶ 67. Several facilities have already piloted activated carbon injection, the necessary technology to abate mercury emissions, and test results found carbon injection to be a feasible and least costly method of reducing mercury emissions compared to other controls. *Id.* ¶¶ 7, 102. Activated carbon injection is a well-established technology and other industries—such as facilities operating coal-fired boilers—have used activated carbon injection to control mercury emissions for decades. *Id.* ¶¶ 100-01.

These facts—showing that a number of the exempted facilities do not need to install new technology to comply with at least some of the Rule's standards—show that the Taconite Proclamation's determination that the technology to implement all standards in the Taconite Rule "does not exist in a commercially viable form" must be a plain misinterpretation of the authority conveyed in Section 7412(i)(4). This is especially so where rather than making specific determinations as to the availability of technology to implement each standard at a specific facility the President exempted all taconite iron ore processing facilities from all compliance deadlines in the Taconite Proclamation.

The Taconite Proclamation is also a backdoor attempt to achieve what is explicitly forbidden under the Act: for EPA to stay the Taconite Rule's effective date, during reconsideration, by more than three months. *See infra* Part II.B; 42 U.S.C. § 7607(d)(7)(B). This tactic is especially egregious in the context of the Taconite Proclamation, as the taconite industry tried but failed to secure a stay of the Taconite Rule pending reconsideration. In 2024, industry groups moved for a stay of the Rule. *MCEA* Compl. ¶ 69. In their motion, the groups tried to evade the *LEAN* court's unequivocal mandate that EPA must set standards for mercury emissions from taconite iron ore processing facilities. *Id*. The D.C. Circuit rejected this overture and found the groups had failed to make a "strong showing" that they were likely to succeed in arguments that EPA "was not required to regulate mercury emissions from taconite iron ore processing facilities or that it should have considered costs in setting a floor standard." *Id.* Simply put, through the Taconite Proclamation, industry can now avail itself of the same relief that the D.C. Circuit denied them.

The 2024 Taconite Rule was long-overdue. By EPA's own admission, its issuance was in part for the express purpose of complying with court orders requiring the agency to address the

regulatory gap and establish standards for mercury emissions. *MCEA* Compl. ¶ 56 (*citing* 89 Fed. Reg. 16409 (*citing LEAN*, 955 F.3d 1088 at 1095-96)). As far back as 2005, in *National Wildlife Federation*, the D.C. Circuit held the agency must set a standard for mercury emissions from taconite iron ore processing facilities. *Nat'l Wildlife Fed.*, No. 03-1458, 2005 WL 80958, at *1. That court ultimately declined to set a deadline for this required agency action based on EPA's "stated intention to 'act with all due speed to propose, take comment on, and issue a final rule' setting a [mercury standard]." *Id.* But the agency's articulated "due speed" for this mercury standard would end up spanning the next two decades. It would be another D.C. Circuit case—issued fifteen years after the *National Wildlife Federation* case—that would create the legal impetus that EPA found necessary to finally set a federal mercury emissions limit. In *LEAN*, the D.C. Circuit required EPA to set standards for any unregulated hazardous air pollutants emitted by a major source category when conducting its Section 7412(d)(6) technology review under the Clean Air Act. *LEAN*, 955 F.3d at 1095-1096. When EPA conducted that technology review for taconite processing facilities, it had no choice but to finally set emission standards for mercury from the taconite iron ore processing industry. The Taconite Proclamation serves as an unlawful barrier to these long-overdue health protections.

The Taconite Proclamation is an unlawful exercise of the limited Section 7412(i)(4) authority, as the broad-brush determinations about the unavailability of control technology to meet the standards in the Taconite Rule are pretextual. It also functions as an attempt at a stay pending reconsideration that is forbidden under the Clean Air Act and was denied by the D.C. Circuit in *Cleveland-Cliffs Inc. v. U.S. EPA*. *MCEA* Compl. ¶ 69. This Court has the authority to review it as an *ultra vires* action.

### B. The Exemptions are reviewable as pretextual end-runs around statutory limits on EPA's reconsideration and stay authority.

Defendants' argument for shielding the exemptions proclamations from review behind a vague appeal to presidential "discretion," *see* Mot. 9, is unavailing for another reason: context reveals that the exemptions were issued for "unrelated policy goals rather than based on the statutory criteria." *Nat'l Treasury Emp. Union v. Trump*, 780 F. Supp. 3d 237, 254 (D.D.C. 2025). Each exemption is unlawful—and the Court has the power to say so—because the President is unlawfully using exemptions to achieve an end that is barred by the Clean Air Act: an extended stay pending EPA's reconsideration of rules that have already gone into effect.[2]

Courts have the equitable authority to review executive action and intervene when "the government's interpretation of its statutory authority would 'lead[] to an absurd result.'" *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9 (quoting *Aid Ass'n for Lutherans*, 321 F.3d at 1176). That would be the case here: Section 7607(d)(7)(B) limits EPA's ability to stay a rule pending reconsideration to three months. The pretextual exemptions end-run that limitation, relieving polluters from standards without EPA meeting the substantive and procedural requirements of the Act. *See, e.g.*, *CleanAire* Compl. ¶¶ 158-60, 162-63; *GASP* Compl. ¶ 149; *MCEA* Compl. ¶ 140.

It is no secret that the EPA under the Trump Administration intends to rescind or revise the Coke Ovens, Sterilizers, and Taconite Rules, among others. Less than two months into the new administration, EPA announced its intention to do just that. *See CleanAire* Compl. ¶¶ 64-66, 160. But undertaking public notice and comment, putting together the legal and scientific

---

[2] The Coke Ovens, Sterilizers, and Taconite Rules have each gone into effect, *see* 89 Fed. Reg. 55684, 24090, 16408 (Mar. 6, 2024) and, but for the unlawful exemptions, and the Rules' compliance deadlines are now either passed (for Coke Ovens and Sterilizers), or less than a year away (for Taconite).

justification for new rules—even ultimately arbitrary and capricious ones—takes time. And in the meantime, compliance dates for the rules have come and gone or are fast approaching. The Coke Ovens Rule would already be in effect (circa July 7, 2025, and January 5, 2026), but for the illegal interim final rule that EPA withdrew on October 2, 2025, and now, the Coke Ovens Proclamation. The first compliance deadline for the sterilizers rule—April 6, 2026—has now come and gone. And sources must comply with the Taconite Rule by March 8, 2027.

EPA's ability to amend those dates or stay the effectiveness of those rules is limited by statute. Section 7412(i)(3)(A) prohibits EPA from setting compliance dates "later than 3 years after the effective date" of a rule promulgated under Section 7412; Section 7412(f)(4) requires health-based standards issued under that subsection to apply 90 days after a rule's effective date, subject only to a two-year waiver if necessary for the installation of controls. 42 U.S.C. §§ 7412(i)(3)(A), 7412(f)(4). Section 7607(d)(7)(B) allows EPA to reconsider rules, but states that reconsideration "shall not postpone the effectiveness" of the targeted rule, except that EPA or a court can stay its effectiveness "for a period not to exceed three months." 42 U.S.C. § 7607(d)(7)(B). The D.C. Circuit has described that provision as expressing "Congress's clear intent to specifically limit the agency's authority" to reconsider. *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018); *see also id*. at 1063. The D.C. Circuit has further held that EPA has no other authority—express or implied—to stay the effectiveness of rules it intends to reconsider. *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

And so, just as plainly as EPA stated its intention to reconsider rules, EPA broadcast its intention to use a workaround. Concurrently with its announcement on March 12, 2025, that EPA intended to reconsider nine hazardous air pollutant regulations—including the coke ovens, sterilizers, and taconite rules—EPA invited "[a]ny source interested in a Presidential exemption"

to "provide their recommendations to EPA." *See CleanAire* Compl. ¶¶ 64-65. EPA explicitly stated that the exemptions were offered to relieve polluters of compliance obligations "while EPA reconsiders these rules." *Id.* ¶¶ 66, 160; *see Clean Air Section 112 Presidential Exemption Information*, EPA, https://perma.cc/WKL5-4considers4FC.

Plaintiffs have alleged that these facts establish that the President's sweeping exemptions were a pretextual exercise in avoiding the limits on EPA's own reconsideration and stay authority, circumstances well within the Court's equitable jurisdiction to review *ultra vires* executive action. That claim—Claim II in each of the *t.e.j.a.s.*, *GASP*, *CleanAire*, and *MCEA* complaints—does not take deep digging into technical facts, or nit-picking a judgment call left to the President. *Contra* Mot. 13 (arguing, incorrectly, that the *t.e.j.a.s.* plaintiffs' claims would require "mind-boggling discovery and trial proofs" and a "searching inquiry into the persuasiveness of the President's justifications").

Even where review is "deferential," courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. N.Y.*, 588 U.S. 752, 785 (2019). Defendants' attempt to avoid statutory limitations by pretextually invoking Section 7412(i)(4), in conjunction with facts elaborated above, demonstrates that "the government has attempted to enlarge its authority in bad faith" in adopting an "interpretation of its statutory authority [that] would 'lead to an absurd result.'" *Fed. Educ. Ass'n*, 2025 WL 2738626, at *9 (citing *Barwood, Inc. v. District of Columbia*, 202 F.3d 290, 294 (D.C. Cir. 2000) and quoting *Aid Ass'n for Lutherans*, 321 F.3d at 1176). The Court should accordingly reject Defendants' argument that Plaintiffs'

claims fail to meet the *ultra vires* standard of review articulated in *Nuclear Regulatory Commission*, 605 U.S. at 681, and *Global Health Council*, 153 F.4th at 20. *See* Mot. 12.[3]

The pretextual nature of the Proclamations, in addition to the standard- and facility-specific facts demonstrating that the President applied a patently unreasonable construction of his statutory authority, also serves to rebut any presumption of regularity that might shield the President's action from judicial review. Although a court will "presume that public officers act correctly until the contrary be shown," *Ross v. Reed*, 14 U.S. 482, 486 (1816), the presumption of regularity is just that—a presumption; a court in a particular case may always "look behind the presumption to the actual facts." *Bismullah v. Gates*, 501 F.3d 178, 186 (D.C. Cir. 2007); *Fed. Educ. Ass'n*, 795 F. Supp. 3d at 89. The Court should look behind the presumption to look behind the President's unsubstantiated "determinations" here.

Plaintiffs' allegations rebut any presumption of regularity for several reasons. For one, the President's highly unusual and irregular exercise of a never-before-used authority to exempt 180 facilities from seven categories of hazardous air pollutant standards shortly after a press event billed as "the greatest day of deregulation our nation has seen," *see, e.g.*, *GASP* Compl. ¶ 48, supports an inference that the exemptions were pretextual. For another, none of the Proclamations provides any analysis or explanation of which specific standards within each of the Rules cannot be met at any particular facility because any particular technology is "not available." *See GASP* Compl. ¶¶ 8, 62; *CleanAire* Compl. ¶¶ 9, 76; *MCEA* Compl. ¶¶ 7. Instead, the Proclamations make vague, sweeping claims rendered absurd by a cursory review of the

[3] For the reasons given in Part II.A., the heightened standard in *Nuclear Regulatory Commission* and *Global Health Council* should not apply here, where there is no alternative channel for judicial review of the issues raised in Plaintiffs' lawsuits. But as explained in that Part and herein, our claims nevertheless meet that standard.

standards and facilities to which the Proclamations apply. Indeed, in some cases, the Proclamations exempt facilities from standards from which the industry has never requested relief, *see, e.g.*, *GASP* Compl. ¶¶ 5, 91. The paucity of the President's explanation and failure to engage in the facility and standard-specific analysis contemplated in Section 7412(i)(4) also rebuts the presumption of regularity.

Altogether, the record makes clear that it was the President's broad deregulatory agenda that determined his exemption decisions, rather than any determination of technology unavailability. *Cf. Fed. Educ. Ass'n*, 795 F. Supp. 3d at 89-95 (concluding presumption of regularity rebutted when clear evidence on the record "suggests" that non-statutory policy goals were true motivation for a presidential proclamation and "strongly suggests" that the President did not make a required statutory determination because the relevant proclamation was facially inconsistent with such determination); *see also President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 205 (D. Mass. 2025) (declining to apply presumption of regularity to an presidential proclamation's "unusual" and "irregular" use of statutory authority). And the Proclamations are a tool for avoiding statutory limits on EPA's authority to provide similar relief.

These alleged facts are sufficient to rebut any presumption of regularity that may otherwise apply. And to the extent any valid presumption of regularity would operate to shield the President's Proclamations from meaningful judicial review, the rebuttal of that presumption is even more reason to reject Defendants' arguments against judicial review. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727-28 (D.C. Cir. 1989) (acknowledging that review of the President's invocation of statutory authority to make a determination is proper if the presumption of regularity is rebutted); *see also Fed. Educ. Ass'n,* 795 F. Supp. 3d at 95 (*ultra*

*vires* claims regarding Presidential statutory determination are reviewable and viable when presumption of regularity is rebutted).

**CONCLUSION**

Each of the Proclamations challenged in these consolidated suits evinces a patent misconstruction of Section 7412(i)(4)'s narrow statutory authority. Plaintiffs' factual allegations as to each Proclamation, furthermore, rebut the presumption of regularity that may otherwise apply to the President's determinations that technology to implement the underlying rule is unavailable. This Court should reject Defendants' arguments that it may not review the proclamations as irreconcilable with the text of the Clean Air Act, Congressional intent, and the D.C. Circuit's *ultra vires* precedents.

DATED: April 10, 2026

Respectfully submitted,

/s/ Sarah A. Buckley
Sarah A. Buckley (D.C. Bar No. 90035401)
Shampa Panda (D.C. Bar No. 90030605)
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
Tel: (202) 836-9333
Tel: (202) 836-9555
sbuckley@nrdc.org
spanda-bryant@nrdc.org

*Counsel for Natural Resources Defense Council and Minnesota Center for Environmental Advocacy*

/s/ Tosh Sagar
Tosh Sagar (D.C. Bar No. 1562693)
Sage Lincoln (D.C. Bar No. 90042038)
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
Tel: (202) 793-2075
tsagar@earthjustice.org
slincoln@earthjustice.org

*Counsel for Citizens for Pennsylvania's Future, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club*

/s/ Haley Lewis (Pro Hac Vice)
Haley Lewis (AL Bar No. ASB-1008-R66I)
Abel Russ (D.C. Bar No. 1007020)
Environmental Integrity Project
888 17th Street, NW, Suite 810
Washington, DC 20006
Tel: (202) 263-4449 (Lewis)
Tel: (802) 482-5379 (Russ)
hlewis@environmentalintegrity.org
aruss@environmentalintegrity.org

*Counsel for Greater-Birmingham Alliance to Stop Pollution and Clean Air Council*

/s/ Jaclyn Brass (Pro Hac Vice)
Jaclyn Brass (Ala. Bar No. ASB-5340-B19L)
Christina Tidwell (Ala. Bar No ASB-9696-D10R) (Pro Hac Vice)
Southern Environmental Law Center
2829 2nd Avenue S, Suite 282
Birmingham, AL 35233
Tel: (205) 745-3060
Jbrass@selc.org
Ctidwell@selcal.org

*Counsel for Greater-Birmingham Alliance to Stop Pollution*

Keri N. Powell (D.C. Bar No. 477045)
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Tel: (678) 433-6851
Kpowell@selc.org

*Counsel for Greater-Birmingham Alliance to Stop Pollution, CleanAIRE NC, Virginia Interfaith Power and Light, Sustainable Newton, Savannah Riverkeeper*

/s/ Irena Como (Pro Hac Vice)
Irena Como (N.C. Bar No. 51812)
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Tel: (919)867-4404
icomo@selc.org

Marissa Land (GA Bar No. 168442) (Pro Hac Vice)
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
mland@selc.org

*Counsel for CleanAIRE NC, Virginia Interfaith Power and Light, Sustainable Newton, Savannah Riverkeeper*

/s/ Brian H. Lynk
Brian H. Lynk (D.C. Bar No. 459525)
Environmental Law & Policy Center
740 15th St. NW, Suite 700
Washington, D.C. 20005
Tel: (240) 461-4241
blynk@elpc.org

*Counsel for Environmental Law & Policy Center*

**CERTIFICATE OF SERVICE**

I certify that on April 10, 2026, I electronically filed the foregoing with the Clerk of the Court by using the Court's CM/ECF system.

/s/ *Sarah A. Buckley*
Sarah A. Buckley (D.C. Bar. No. 90035401)
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
Tel: (202) 836-9555
sbuckley@nrdc.org