**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) ) Civil Action No. 1:25-cv-03745-PLF |
| v. | ) ) ) |
| DONALD TRUMP, *et al.*, | ) Oral argument requested ) |
| *Defendants*. | ) ) |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I.      THE HON PROCLAMATION IS SUBJECT TO *ULTRA VIRES* REVIEW .....................2

        A.      Congress did not preclude judicial review of Presidential exemption
                proclamations........................................................................................................2

        B.      An action that patently misconstrues limits on the President's statutory
                authority is subject to *ultra vires* review...................................................4

II.     THE HON PROCLAMATION EXCEEDS THE PRESIDENT'S AUTHORITY .............6

III.    EPA IS A PROPER PARTY AND RELIEF IS AVAILABLE........................................15

        A.      EPA and its Administrator are Proper Parties..........................................15

        B.      Declaratory relief is available against the President ...............................18

IV.     PLAINTIFFS HAVE STANDING TO CHALLENGE THE PROCLAMATION...........20

        A.      Plaintiffs Demonstrated Injuries From Exposure to Hazardous Emissions..........21

        B.      Plaintiffs Demonstrated Informational Injuries .......................................24

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
  321 F.3d 1166 (D.C. Cir. 2003) .................................................................4, 15

*Am. Foreign Serv. Ass'n v. Trump*,
  783 F. Supp. 3d 248 (D.D.C. 2025) .................................................................12

*Am. Forest Res. Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023) .................................................................2

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
  901 F. Supp. 2d 19 (D.D.C. 2012) .................................................................22

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) .................................................................2, 5

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003) .................................................................21

*Clinton v. City of New York*,
  524 U.S. 417 (1998) .................................................................18, 19

*Corley v. United States*,
  556 U.S. 303 (2009) .................................................................7

*Crowley Caribbean Transp., Inc. v. Pena*,
  37 F.3d 671 (D.C. Cir. 1994) .................................................................17

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) .................................................................2

*Doe v. Trump*,
  319 F. Supp. 3d 539 (D.D.C. 2018) .................................................................16

*Encino Motorcars, LLC v. Navarro*,
  584 U.S. 79 (2018) .................................................................11

*Fed. Educ. Assoc., v. Trump*,
  795 F. Supp. 3d 74 (D.D.C. 2025) .................................................................5, 7, 14

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) .................................................................3

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)........................................................................2, 3, 5

*Guerrero-Lasprilla v. Barr*,
  589 U.S. 221 (2020)........................................................................................3, 14

*Healthy Gulf v. Dep't of Interior*,
  152 F.4th 180 (D.C. Cir. 2025)..............................................................................22

*Heckler v. Chaney*,
  470 U.S. 821 (1985)...............................................................................................17

*Herrion v. Children's Hosp. Nat. Med. Ctr.*,
  786 F. Supp. 2d 359 (D.D.C. 2011)......................................................................11

*Horne v. Flores*,
  557 U.S. 433 (2009)................................................................................................22

*Hynes v. Grimes Packing Co.*,
  337 U.S. 86 (1949).................................................................................................16

*Jenner v. United States DOJ*,
  784 F. Supp. 3d 76 (D.D.C. 2025).......................................................................18

*Jones Lang LaSalle Americas, Inc. v. NLRB*,
  128 F.4th 1288 (D.C. Cir. 2025).............................................................................6

*Knight First Amend. Inst. v. Trump*,
  302 F. Supp. 3d 541 (S.D.N.Y. 2018)....................................................................20

*Laufer v. Naranda Hotels, LLC*,
  60 F.4th 156 (4th Cir. 2023) ................................................................................24

*Loughrin v. United States*,
  573 U.S. 351 (2014)................................................................................................11

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)................................................................................................21

*Mass. Lobstermen's Ass'n v. Raimondo*,
  141 S. Ct. 979 (2021)...............................................................................................8

*Nat'l Council of Nonprofits v. OMB*,
  775 F. Supp. 3d 100 (D.D.C. 2025)......................................................................18

*Nat'l Mining Ass'n v. EPA*,
  59 F.3d 1351 (D.C. Cir. 1995)...............................................................................20

*Nat'l Treasury Emp. Union v. Trump*,
  780 F. Supp. 3d 237 (D.D.C. 2025) ................................................................................7, 14

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) .............................................................................................20

*Nat'l Trust for Historic Pres. v. NPS*,
  No. 25-4316, 2026 WL 877779 (D.D.C. Mar. 31, 2026) ........................................................5

*New Mexico v. Musk*,
  No. 25-cv-429 (TSC), 2026 WL 799635 (D.D.C. Mar. 23, 2026) ...........................................5

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ......................................................................................19, 20

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ..........................................................................................................17, 18

*NRDC v. EPA*,
  755 F.3d 1010 (D.C. Cir. 2014) ............................................................................................23

*Nuclear Regul. Comm'n v. Texas*,
  605 U.S. 665 (2025) ...............................................................................................................3

*OSG Bulk Ships v. United States*,
  132 F.3d 808 (D.C. Cir. 1998) ..............................................................................................17

*Powell v. McCormack*,
  395 U.S. 486 (1969) ..............................................................................................................19

*Sargeant v. Dixon*,
  130 F.3d 1067 (D.C. Cir. 1997) ............................................................................................24

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ..............................................................................................23

*Sierra Club v. EPA*,
  479 F.3d 875 (D.C. Cir. 2007) .........................................................................................8, 12

*Sierra Club v. EPA*,
  755 F.3d 968 (D.C. Cir. 2014) ..............................................................................................21

*Sierra Club v. EPA*,
  895 F.3d 1 (D.C. Cir. 2018) ..................................................................................................12

*Sierra Club v. EPA*,
  No. 25-1112, 2026 WL 686323 (D.D.C. Mar. 11, 2026) ......................................................25

v

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ................................................................................18

*Territory of Guam v. United States*,
   593 U.S. 310 (2021) ................................................................................................10

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ................................................................................................16

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ................................................................................................23

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ................................................................................................13

*United States v. Otunyo*,
   63 F.4th 948 (D.C. Cir. 2023) ...................................................................................8

*Williams v. Fanning*,
   332 U.S. 490 (1947) ................................................................................................16

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
   784 F. Supp. 3d 127 (D.D.C. 2025) ........................................................................15

*Ysleta Del Sur Pueblo v. Texas*,
   596 U.S. 685 (2022) ................................................................................................12

**Statutes**

28 U.S.C. § 1331 ............................................................................................................20

28 U.S.C. § 2201 .....................................................................................................19, 20

42 U.S.C. § 7412 ................................................1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 13, 15, 25

42 U.S.C. § 7414 ............................................................................................................24

42 U.S.C. § 7604 ............................................................................................................20

42 U.S.C. § 7661 ............................................................................................................17

42 U.S.C. § 7661d ..........................................................................................................17

**Code of Federal Regulations**

40 C.F.R. § 70.2 .............................................................................................................17

40 C.F.R. § 70.6 .............................................................................................................17

40 C.F.R. § 70.7 ..........................................................................................................................17

**Rules**

D.D.C. LCvR 7(h)(1) ...............................................................................................1, 4, 12,14, 11

**Federal Register**

89 Fed. Reg. 42932 (May 16, 2024) ............................................................................................1

90 Fed. Reg. 34587 (July 23, 2025)..........................................................................8, 10, 12, 14

**Other Authorities**

Black's Law Dictionary (6th Ed. 1990) ....................................................................................7, 9

**INTRODUCTION**

President Trump's HON Proclamation exempted fifty chemical manufacturing facilities from the 2024 HON Rule,[1] hazardous air pollutant standards that EPA estimated would eliminate 6,230 tons of toxic air pollution every year and decrease elevated cancer risk in communities near HON facilities by over 96 percent. Defs.' Statement of Material Facts ("Defs.' Material Facts") ¶¶ 50-51, 54 (Dkt. 58-1). The HON Rule accomplishes those reductions through a variety of standards, including standards that do not require the installation of technology or that rely on technologies already in place at many HON facilities. These include work practice standards such as prohibitions on filling tanks when pollution controls are down, *id.* ¶ 75; more frequent leak monitoring, using the same equipment and methods already required, *id.* ¶¶ 90-97, 98-101, 102-05; fenceline monitoring that has already been implemented at many HON facilities and co-located refineries, *id.* ¶¶ 120-22, 128-34; and ethylene oxide control standards that can be met with devices already in use at many exempted facilities, *id.* ¶¶ 64-65 (control devices), 67-73 (flares). Defendants do not dispute and have thus admitted these facts. *See* D.D.C. LCvR 7(h)(1).

Ignoring and avoiding the facts that many standards from which sources have been exempted do not require "technology" to implement and that many sources have already deployed "technology" needed to implement others, Defendants rest their defenses on the theory that Section 7412(i)(4) grants the President unreviewable power to issue exemptions so long as he recites the words, "I determine that technology is not available." Congress could not have intended such *ipse dixit* to upend its detailed statutory scheme for protecting human health from toxic air pollution.

---

[1] The "HON Rule" is EPA's 2024 rulemaking that revised "National Emission Standards for Hazardous Air Pollutants" for manufacturers of synthetic organic chemicals and certain polymers and resins. *See* 89 Fed. Reg. 42932 (May 16, 2024).

The President's "determination" of the factual predicates necessary for the lawful exercise of Section 7412(i)(4)'s exemption power is unexplained in the Proclamation, unexplained in Defendants' response brief, and inexplicable based on the undisputed facts. Indeed, the only explanation that can be derived from the agreed facts is that the President applied an utterly unreasonable interpretation of the key statutory guardrails in granting patently pretextual exemptions. For these reasons, the Court should grant summary judgment to Plaintiffs and enter appropriate relief, and deny Defendants' motion to dismiss and in-the-alternative cross-motion for summary judgment.

## ARGUMENT

**I.    THE HON PROCLAMATION IS SUBJECT TO *ULTRA VIRES* REVIEW**

When the President acts in excess of his statutorily-conferred powers, courts have equitable jurisdiction to review that action "even absent an applicable statutory review provision." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023); *see also Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981). That jurisdiction is available so long as Congress has not barred review, there is no alternative mechanism for review, and the action is "plainly in excess of [] delegated powers and contrary to a specific prohibition in the statute," *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025), including "error that is patently a misconstruction of the [statute]." *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). Plaintiffs have met that standard.

**A.    Congress did not preclude judicial review of Presidential exemption proclamations**

The Clean Air Act provides no express mechanism for judicial review of Section 7412(i)(4) exemptions, nor does it expressly or impliedly preclude such review. These are precisely the circumstances in which *ultra vires* review is available: when "review is not

2

expressly precluded by statute" and "there is no alternative procedure for review of the statutory claim." *Glob. Health Council*, 153 F.4th at 20; *see also Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) ("*NRC*") (explaining that *ultra vires* review is "unavailable if . . . a statutory review scheme provides aggrieved persons with meaningful and adequate opportunity for judicial review," or if it "forecloses all other forms of judicial review"). Only "clear and convincing evidence" that Congress intended to preclude judicial review can override the "well-settled" and "strong" presumption that "executive determinations generally are subject to judicial review." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (cleaned up).

Defendants' argument that the Clean Air Act prohibits review of Section 7412(i)(4) proclamations should be rejected for the reasons set out in Plaintiffs' opening brief. Pls.' Mem. Supp. Cross-Mot. for Summ. J. 22-25 (Dkt. 41-1) ("Pls.' Br."). And Defendants' new arguments are similarly unavailing. For instance, Defendants argue, paradoxically, that because the Clean Air Act does not *expressly* provide review of Section 7412(i)(4), the Court should infer that review is precluded. Defs.' Resp. 5. But the absence of a mechanism for judicial review is in fact a *prerequisite* for an *ultra vires* claim. *See NRC*, 605 U.S. at 681; *Glob. Health Council*, 153 F.4th at 20. In other words, the availability of *ultra vires* review does not turn on whether Congress *intended* there to be review; it turns on whether Congress did *not* intend to *preclude* review. Plaintiffs thoroughly demonstrated this requirement in our opening brief. Pls.' Br. 23-25.

Defendants then erroneously suggest that *Franklin v. Massachusetts*, 505 U.S. 788 (1992), demands a different standard for *ultra vires* review of presidential action, arguing that *Franklin* held that "'textual silence is not enough' to subject the President to judicial review." Defs.' Resp. 6 (quoting *Franklin*, 505 U.S. at 800). But the quotation in its full context rebuts that argument: The Supreme Court concluded that "textual silence is not enough to subject the

3

President *to the provisions of the APA*," and held that it would require "an express statement by Congress" to hold Presidential action is "reviewable for abuse of discretion under the APA." *Id.* at 800-01 (emphasis added). Plaintiffs seek *ultra vires*, not APA review of the President's action.

Finally, Defendants' suggestion that exemptions under Section 7412(i)(4) "represent[] a relatively minor power" is outrageous. Defs.' Resp. 7. As EPA clearly showed in the HON Rule and Defendants concede, D.D.C. LCvR 7(h)(1), emissions from HON facilities create "unacceptable cancer risk" for more than 150,000 people. Defs.' Material Facts ¶¶ 27-28, 51-52. HON Facilities emit dozens of hazardous air pollutants, including many known human carcinogens. *Id.* ¶¶ 29, 47. There is no safe exposure level to those carcinogens, and even two additional years of exposure to such pollutants subjects fenceline communities to heightened cancer risk and myriad non-cancer health effects. *Id.* ¶¶ 47-48. In little more than a page, with no substantial justification and no opportunity for public comment, the HON Proclamation removed communities' protection from those health harms at fifty sources—nearly a quarter of the industry. *Id.* ¶¶ 19-20. That is before considering that the President has asserted the same power seven times in as many months to exempt more than 180 facilities across six industries. *Id.* ¶ 25.

**B.     An action that patently misconstrues limits on the President's statutory authority is subject to *ultra vires* review**

Plaintiffs' claims also meet the *ultra vires* review standard by demonstrating that the President applied a patently unreasonable interpretation of his statutory authority. *See, e.g.*, *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003). Defendants attempt to raise that bar further, isolating language from *NRC* to argue that *ultra vires* claims are only viable if the executive has violated an express statutory prohibition. *See* Defs.' Resp. 13-15. They also raise a new argument that Plaintiffs must establish that a statute "confers rights on the

4

party seeking review." *Id*. at 12. Both arguments should be rejected.

First, as Defendants themselves explain, plaintiffs can show that action is "plainly in excess of delegated powers and contrary to a specific prohibition," *Glob. Health Council*, 153 F.4th at 20, by demonstrating "error that is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, *or* that violates some specific command of a statute will support relief." Defs.' Resp. 14 (quoting *Changji*, 40 F.4th at 722) (emphasis added)). In other words, a President who patently misinterprets a limited delegation of statutory authority *does* act contrary to a specific prohibition for the purposes of *NRC*. *See, e.g.*, *Fed. Educ. Assoc.*, *v. Trump,* 795 F. Supp. 3d 74, 87 (D.D.C. 2025).

Thus, even if *NRC* states the proper *ultra vires* review standard, *but see* Pls.' Br. 34-37, Plaintiffs' claims satisfy the specific prohibition requirement.[2] The concrete boundaries on the President's Section 7412(i)(4) exemption authority create an implied preclusion: the President *does* violate a specific statutory prohibition when he exceeds limited delegated congressional authority. *See Fed. Educ. Ass'n*, 795 F. Supp. 3d at 87-88; *see also, e.g.*, *Nat'l Trust for Historic Pres. v. NPS*, No. 25-4316, 2026 WL 877779, at \*10 (D.D.C. Mar. 31, 2026) (holding that the President's exceedance of a limited delegation of statutory authority is sufficient to meet *ultra vires* standard); *New Mexico v. Musk*, No. 25-cv-429 (TSC), 2026 WL 799635, at \*13 (D.D.C. Mar. 23, 2026) (rejecting argument that plaintiffs failed to state an *ultra vires* claim because they "fail[ed] to identify any specific statute" that was violated).

Second, Defendants incorrectly assert that a statute must "confer rights on the party seeking review" to support an *ultra vires* claim. Defs.' Resp. 12. Defendants have forfeited that

---

[2] Defendants assert that Plaintiffs "concede that the presidential exemptions do not violate any prohibition in the statute." Defs.' Resp. 15. This is incorrect. *See* Pls.' Br. 36.

argument by failing to raise it in their opening brief/motion to dismiss. *See, e.g.*, *Jones Lang LaSalle Americas, Inc. v. NLRB*, 128 F.4th 1288, 1296 (D.C. Cir. 2025) ("It is well established that issues not raised until the reply brief are forfeited."). Even assuming the argument is not forfeited, it finds no support in the case law. Defendants cite a quotation from *American Schools of Magnetic Healing v. McAnnulty*, which explains that courts can grant equitable relief when an action is "unauthorized by any law and . . . in violation of the rights of the individual." 187 U.S. 94, 109-10 (1902). The reference to "rights" is simply to convey that a person who is harmed by lawless executive action is entitled to an equitable remedy. Moreover, the "right" referred to in *McAnnulty* was characterized as the general "property rights" of the claimant, not any special right created by statute. *See id*. The "rights of the individual" language is not part of the *ultra vires* standard in *NRC*. The only other case Defendants cite, *Kialegee Tribal Town v. U.S. Dept. of Interior*, was an implied-right-of-action case, not an *ultra vires* review case. *See* No. 22-5314, 2025 WL 1446027, at *1 (D.C. Cir. May 20, 2025) (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)) (considering whether civil rights statute created a private right of action).

## II.   THE HON PROCLAMATION EXCEEDS THE PRESIDENT'S AUTHORITY

The Proclamation is thus reviewable, and Defendants' argument that the HON Proclamation falls within the President's authority under Section 7412(i)(4) cannot be reconciled with the statute or the Proclamation.

On its face, the HON Proclamation is premised on a "patent misconstruction" of Section 7412(i)(4) and is therefore unlawful: the Proclamation applies to standards that do not require technology, grants exemptions based on factors not in the statute, and facially demonstrates that the President failed to engage in the statutorily required site- and technology-specific review. Second, the exemptions are facially invalid because uncontroverted facts establish that any presumption of regularity that would apply to the President's availability determinations has

6

been rebutted. *See* Pls.' Br. 38-42. When the President's statutory authority is limited by a predicate requirement to make some specific determination, the President's exercise of that authority is reviewable when plaintiffs have established facts sufficient to rebut the presumption of regularity applicable to the predicate determination. *See, e.g., Fed. Educ. Assoc.*, 795 F.Supp.3d at 95; *Nat'l Treasury Emp. Union v. Trump*, 780 F. Supp. 3d 237, 259-63 (D.D.C. 2025) ("*NTEU*"), stayed on separate grounds by No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025). The context and content of the Proclamation establish that such determinations never actually took place, and that the Proclamation is accordingly unlawful.  Defendants' six arguments to the contrary fail to establish otherwise.

**1.**  The HON Proclamation's across-the-board exemption failed to identify which technology is not available, as required by the statute. Pls.' Br. 43-46.

Defendants assert that the statute does not require the President to identify the relevant technology that is not available. Not only does this argument improperly read words out of Section 7412(i)(4), but it wholly removes one of the clear limitations on the President's exemption authority. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (internal citations and quotations omitted). The statute requires that the President "determine[] that *the* technology to implement *such* standard"—a *particular* technology needed to implement the exempted standard—is not available. 42 U.S.C. § 7412(i)(4) (emphasis added). *See, e.g.*, The, *Black's Law Dictionary* (6th Ed. 1990) ("In construing statute, definite article 'the' particularizes the subject which it precedes and is word of limitation as opposed to indefinite or generalizing force 'a' or 'an'.").

Further, the Act's use of "the" technology refers to a technology that EPA has already

7

recognized in its rulemaking as necessary to implement a standard. *See United States v. Otunyo*, 63 F.4th 948, 957 (D.C. Cir. 2023) ("*the* connotes a thing previously noted or recognized."). It is EPA, in setting the standards, that assesses how facilities within the industry will comply, including the various technologies to do so. *Sierra Club v. EPA,* 479 F.3d 875, 878 (D.C. Cir. 2007) (explaining that the Clean Air Act "permits the Agency to look at technological controls to set emission standards"); *see also* Pls.' Br. 47-48.

But rather than identify which technology—among those previously identified by EPA—is "not available" to implement which standard, the Proclamation vaguely asserts that "[m]any of the testing and monitoring requirements outlined in the HON Rule rely on technologies that are not practically available, not demonstrated at the necessary scale, or cannot be implemented safely or consistently under real-world conditions," before summarily concluding that "[t]he technology to implement the HON Rule is not available." 90 Fed. Reg. at 34587-88. The requirement to make a determination about technology presupposes some consideration of relevant factors. Simply stating, "I determine that technology is not available" without identifying a single technology or standard cannot be enough.

As previously detailed, Pls.' Br. 32-33, Defendants' formulation—that the President need not actually make the specific determinations the statute requires—renders Congress's express delineations of the limited statutory authority bestowed on the President a Trojan horse for unlimited Presidential power. No matter what Congress says to guide or limit the President's authority, no matter what determinations he is required to make, any authority conveyed becomes effectively committed to his absolute discretion for want of review to enforce those limits. *Accord Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 981 (2021) (Roberts, C.J., respecting the denial of certiorari) (observing that, in the absence of *ultra vires* review, any

8

"statute permitting the President in his sole discretion to" take a given type of action could "transform[] into a [source of] power without any discernible limit"). Thus, because a sweeping and conclusory determination cannot comply with Section 7412(i)(4), the President improperly acted outside his limited authority in issuing the Proclamation.

**2.** Defendants argue that the statute's use of "any" allows the President to grant exemptions without engaging in facility- or standard-specific determinations. Defs.' Resp. 17-18. That is wrong. The statute authorizes the President to exempt "any stationary source from compliance with any standard or limitation." 42 U.S.C. § 7412(i)(4). The expansive word "any" refers to what standards and facilities are *eligible* for exemptions under Section 7412(i)(4), should the *mandatory conditions* be met: a specific determination that "the technology to implement such standard" at the specified stationary source "is not available." *Id*. It does not work to weaken or eliminate the need for predicate determinations consistent with the statute.

In this respect, Defendants' reliance on *United States v. Gonzales* is misplaced. Defs.' Resp. 17 (citing 520 U.S. 1, 5 (1997)). For one, Congress did add "language limiting the breadth" of the word "any": Section 7412(i)(4)'s subsequent use of "*such*" standard confirms that the actual determination the President makes must be particularized to the actual standard or standards that the exemption covers. *E.g.*, SUCH, Black's Law Dictionary (6th Ed. 1990) ("Such represents the object as already particularized in terms which are not mentioned."). Thus, the President must identify "such" standard from which to exempt a facility, and make the requisite determination that, for "such" standard, the particular technology is not available.

Statutory context further forecloses Defendants' argument. Had Congress intended a more sweeping authority, it could have permitted the President to exempt entire "categories" or "subcategories" of sources from standards, which are the terms Congress used with respect to

9

how the underlying standards and compliance dates are set. *See* 42 U.S.C. § 7412(d)(1)-(3), (f)(3), (i)(3)(A). Instead, Congress used the narrower term "stationary source," demonstrating that the application of the exemption is intended for application to a particular source or sources, not entire source categories. *See Territory of Guam v. United States*, 593 U.S. 310, 316 (2021) ("Statutes must be read as a whole.") (cleaned up).

The distinct purposes and scope of other provisions in the Clean Air Act simply confirm the limits and requirements found within Section 7412(i)(4)'s text: the President must make specific determinations on the factors Congress set forth and cannot issue sweeping exemptions from entire Rules without such determinations. Other considerations—purported flaws in the underlying rules, costs, and feasibility of compliance deadlines—that are unrelated to technological availability are to be addressed through other provisions of the statute, not Section 7412(i)(4). For example, reconsideration under Section 7607(d)(7)(B) authorizes *EPA* to make sweeping, sector-wide revisions. The Proclamation's across-the-board exemptions from all HON Rule requirements to 50 facilities without any specific determinations thus exceed the authority conveyed in Section 7412(i)(4).

**3.** Defendants do not dispute that it is EPA's exclusive role to determine whether a standard is "achievable," but instead assert that the President's determination only addressed availability, not achievability. Defs.' Resp. 19-20. The Proclamation, however, suggests that the President's determination went beyond the availability of technology. The Proclamation asserts that "[m]any"—not all— of the HON Rule requirements rely on technologies that either "are not practically available, not demonstrated at the necessary scale, *or* cannot be implemented safely or consistently under real-world conditions." 90 Fed. Reg. 34587 (emphasis added). The disjunctive "or" shows that the President did not determine that every HON requirement

10

depended on technology that was not practically available. *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87-88 (2018) (parsing the use of "or").

Further, the exemption applies to standards that either do not require technology to implement or require technology already in use at exempted facilities. Pls.' Br. 48-51. Defendants do not dispute that: they fail to dispute Plaintiffs' statement of undisputed material facts,[3] including that many facilities have already implemented the required fenceline monitoring standard, Defs.' Material Facts ¶ 134, that other standards "do not require the use of any new technology," *id*. ¶¶ 76, 82, 138, and that other standards simply require more frequent leak monitoring with the same practices and technologies that facilities already use, *id*. ¶¶ 92, 94-95, 96-97, 100, 105. The President's determination is thus demonstrably not based on permissible considerations or a permissible interpretation of the limits of his authority. Accordingly, the President acted outside his limited Section 7412(i)(4) authority in issuing the Proclamation.

**4.** Defendants attempt to avoid the statutory limitations on the President's authority by arguing that "technology" encompasses non-technological factors. Defs.' Resp. 20. This attempt fails because it is premised on a specific term of art—"best available control technology"— found elsewhere in the Act that does not apply to standards eligible for Section 7412(i)(4) exemptions. *See* 42 U.S.C. § 7412(d)(1)-(6), (f)(2). Rather, for technology reviews under Section 7412(d)(6), the statute clearly distinguishes between "practices, processes, and control technologies." *Id.* § 7412(d)(6). Defendants' formulation thus violates the presumption "that Congress intended a difference in meaning" when it uses different language. *Loughrin v. United*

---

[3] D.D.C. LCvR 7(h)(1); *see Herrion v. Children's Hosp. Nat. Med. Ctr.*, 786 F. Supp. 2d 359, 362 (D.D.C. 2011), *aff'd,* 448 F. App'x 71 (D.C. Cir. 2011) (finding that responding to assertions as "irrelevant and immaterial" is "patently insufficient to controvert the truth of the matters identified," and to "the extent these matters turn out to be material to the resolution of this motion," Defendants have "failed to supply a basis for treating them as controverted.")

11

*States*, 573 U.S. 351, 358 (2014).

Further, the D.C. Circuit has repeatedly recognized that standards under section 7412 can be based on control technologies or other, non-technology controls, recognizing such a distinction. *See, e.g.*, *Nat'l Lime Ass'n*, 233 F.3d 625, 634 (D.C. Cir. 2000) (EPA may not "avoid setting standards for [hazardous air pollutants] not controlled with technology"); *Sierra Club v. EPA*, 895 F.3d 1, 19 (D.C. Cir. 2018) ("Nontechnology factors, such as the source of raw materials, can affect emissions levels and cannot be ignored."); *Sierra Club v. EPA*, 479 F.3d 875, 882-83 (D.C. Cir. 2007) (discussing EPA's consideration of both "air pollution control technology" and "non-technology pollution prevention techniques" such as material type). Broadening the definition of "technology" to cover anything required by any standard ignores this precedent and is so sweeping as to render the word meaningless. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (stating the "usual rule against ascribing to one word a meaning so broad that it assumes the same meaning as another statutory term") (cleaned up).

Defendants' interpretation of "technology" is thus utterly unreasonable, and the Proclamation brazenly exceeds the President's authority. Courts have authority to declare the President's action *ultra vires* if he has "either disregard[ed] or appl[ied] an overly broad interpretation of . . . terms within the statutory text." *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248, 263 (D.D.C. 2025) (cleaned up). Though the HON Proclamation rests on a determination that technology is required to implement the standards, 90 Fed. Reg. 34588 ("The technology to implement the HON Rule is not available."), Plaintiffs have established as a matter of law that many of the exempted standards do not depend on *any* technology. *See* Pls.' Br. 48-51. And Defendants do not dispute that such regulations require no technology. *E.g.*, Defs.' Material Facts ¶¶ 75, 76, 81, 82, 137, 138; D.D.C. LCvR 7(h)(1). Accordingly, the Proclamation

12

patently misconstrued the President's statutory authority and was *ultra vires*.

**5.** Defendants assert that the Court must simply accept the President's bare statement that "technology" writ large is not available, because the Court cannot engage in "searching inquiry into the persuasiveness of the President's justifications." Defs.' Resp. 22 (quoting *Trump v. Hawaii*, 585 U.S. 667, 686 (2018)). That is not what Plaintiffs are asking for. For one, a "searching inquiry" into the President's "justifications" presupposes that he *provided* justifications. He has not. That puts the HON Proclamation in stark contrast with *Hawaii*, where the Supreme Court concluded the President had fulfilled relevant statutory prerequisites to "find" that allowing entry of certain aliens "would be detrimental to the interests of the United States" after a "comprehensive evaluation" of relevant facts and "setting forth extensive findings describing" how the statutory standard was met. 585 U.S. at 685. Here, the Proclamation declines to address basic issues relevant to whether the Section 7412(i)(4) authority was lawfully exercised.

Moreover, it is entirely appropriate to reject the President's asserted—but unsupported—"determination," because any presumption of regularity that may apply is rebutted. Defendants attempt to argue that this rebuttal is irrelevant, Defs.' Resp. 24, but this collapses into their *Dalton* argument: "presidential discretion as to political matters," they contend, is "beyond the competence of the courts to adjudicate," and thus evidence that the President did not "properly" discharge his official duties is irrelevant. *See* Pls.' Br. 34-37. But here, Congress *has* limited the President's discretion, requiring specific, narrowly defined determinations. And whether "technology" is "available" is not a political question beyond the Court's competence. When the President is required to make such a specific, constrained determination, the Court need not blindly accept the President's determination as determinative of whether his action complies with

13

the limits on his statutory authority, but may consider "clear evidence that the President was indifferent to the purposes and requirements of the [statute], or acted deliberately in contravention of them." *NTEU*, 780 F. Supp. 3d at 254.

A court's evaluation of evidence relevant to rebutting the presumption of regularity that applies to a President's determination is *not* a factual review of the determination itself. *See id.* at 259-63. Again, Defendants have not controverted Plaintiffs' factual assertions that many facilities already possess the technology to implement the standards, rendering them admitted. D.D.C. LCvR 7(h)(1); *e.g.*, Defs.' Material Facts ¶¶ 66, 67, 70, 72, 73, 77-79, 134-136. The irregularity of the HON Proclamation itself—from listing facilities that do not exist, *id.* ¶ 20, to EPA's transparent effort to end-run limitations on its own authority to stay the HON Rule during reconsideration, *id.* ¶ 12—set against a tapestry of executive irregularities that have rebutted the presumption of regularity in countless cases over the past year, *see Fed. Educ. Ass'n*, 795 F. Supp. 3d 74, 89-90 (D.D.C. 2025), constitutes "clear evidence" thoroughly rebutting any presumption of regularity. *NTEU*, 780 F. Supp. 3d at 254; *see also* Pls.' Br. 38-42.

In sum, "in any view of the facts," the President has made a "clear mistake of law" by exempting facilities from standards for which the "technology" is already deployed. *McAnnulty*, 187 U.S. at 109, 110; *see also Guerrero-Lasprilla*, 589 U.S. at 227-28 ("questions of law" can "reasonably encompass questions about whether settled facts satisfy a legal standard").

**6.** Finally, Defendants miss the mark on what the President may properly consider. Defs.' Resp. 20-21. Section 7412(i)(4) only permits the President to exempt a stationary source for up to two years if the "technology to implement such standard is not available." 42 U.S.C. § 7412(i)(4). Other considerations, such as "the timeline for compliance" requiring "shutdowns or massive capital investments" or "permitting realities," are impermissible. 90 Fed. Reg. 34587.

14

Context surrounding the Proclamation also makes clear that the exemptions were pretextual and premised on impermissible factors. In a press release and "fact sheet" about its planned reconsideration of the HON Rule, EPA invited "[a]ny source interested in a Presidential exemption" to apply "while EPA goes through the rulemaking process." Defs.' Material Facts ¶¶ 12, 13. The connection is inescapable. Section 7412(i)(4) exemptions were offered to achieve what the Clean Air Act prohibits: a lengthy stay pending reconsideration. The consideration of these additional factors misconstrues "available" and exceeds the President's limited authority under Section 7412(i)(4). *See* Pls.' Br. 43-44 (reviewing and applying definitions of "available").

Defendants' emphasis on the title of Section 7412(i)—"Schedule for Compliance"—does not alter the scope of this authority. Section 7412(i)(4) provides for an exemption from compliance for up to two years, and thus is appropriately situated under this sub-header. However, this sub-header does not allow the President to issue exemptions based on factors beyond what is permitted in 7412(i)(4). Consideration of such factors renders the Proclamation *ultra vires*. *Aid Ass'n for Lutherans*, 321 F.3d at 1174 (an "agency construction of a statute" is *ultra vires* if "the disputed [action] defies the plain language of a statute" or "the agency's construction is utterly unreasonable and thus impermissible").

## III.    EPA IS A PROPER PARTY AND RELIEF IS AVAILABLE

### A.    EPA and its Administrator are Proper Parties

EPA and its Administrator are proper and necessary parties because "when the President issues an unlawful" order, "the proper course is to seek to enjoin a member of the executive branch from carrying out the executive order at issue." *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 171 (D.D.C. 2025), amended sub nom., 2025 WL 2105262 (D.D.C. June 26, 2025) (internal citations omitted).

Defendants' arguments to the contrary are largely premised on limits to statutory relief

15

that do not apply to *ultra vires* review. Defs.' Resp. 8-10. Congress' channeling provisions do not displace traditional judicial authority where the review sought is not statutory. *Cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994) (channeling provisions apply only to claims "of the type Congress intended" to route through the statutory scheme). Because Plaintiffs seek *ultra vires* review and relief based on the Court's equitable powers, there is no circumvention of Congress.

For non-statutory review cases like this, a party can be "indispensable"—and thus a proper defendant—if "the decree granting the relief sought will require him to take action." *Williams v. Fanning*, 332 U.S. 490, 493 (1947). Plaintiffs seek injunctive relief prohibiting EPA and its Administrator from relying on or giving effect to the Proclamation and directing EPA to promptly notify exempted facilities and permitting authorities that the Proclamation is unlawful and invalid. Pls.' Compl. 43, Dkt. 1. The relief Plaintiffs seek requires EPA and its Administrator to take action, rendering them proper parties. *Contra Hynes v. Grimes Packing Co.*, 337 U.S. 86, 96-97, (1949) (finding the Secretary of Interior was not a proper party where "[n]othing [was] required of the Secretary"); *Doe v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. 2018) (dismissing the President where dismissal would "have little or no substantive effect on this litigation" since "Plaintiffs can still obtain all of the relief that they seek from the other Defendants").

The Court can properly issue this relief against EPA and its Administrator. Even if the HON Proclamation is in some ways "self-executing," EPA is vital in implementing the Proclamation. To effectuate the Proclamation, EPA must communicate with facilities regarding compliance, update its enforcement posture, and coordinate with permitting authorities. For example, under the Clean Air Act's Title V operating permit program, "major stationary sources," including exempted facilities, must hold operating permits that compile all applicable

16

air quality requirements, including hazardous air pollutant standards. *See* 42 U.S.C. § 7661(2); 40 C.F.R. § 70.2. EPA must review these permits periodically, even if there are no significant changes to a facility's operations or requirements. *See* 42 U.S.C. § 7661d(a); 40 C.F.R. §§ 70.6(a)(2), 70.7(a). The HON Rule's compliance schedules are embedded as binding conditions in those Title V permits. 40 C.F.R. § 70.6(a). The Proclamation does not directly amend the terms of a Title V permit; state and local permitting authorities must effectuate any changes, subject to EPA's oversight authority. 42 U.S.C. § 7661d(a), (b). For the Proclamation to alter facility obligations in existing and future permits, EPA must communicate the requirements, oversee the process to ensure correct implementation, and object as necessary. It is certainly within the Court's power to compel EPA to "disobey illegal Presidential commands" to prevent EPA from administering the unlawful Proclamation. *Reich*, 74 F.3d at 1328.[4]

Plaintiffs' other form of requested relief—an order directing EPA to notify the operators of the facilities identified in Annex I and permitting authorities that the HON Proclamation is null—is proper. Defendants' reliance on *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004), is misplaced. *Norton* held that APA claims must address "discrete," rather than "programmatic" agency action. *Id.* at 61-64. In contrast, Plaintiffs' request to inform facilities and permitting authorities that the Proclamation is unlawful falls within the Court's inherent equitable authority.

---

[4] Defendants' reliance on *Heckler* is misplaced. Defs.' Resp. 9. While an agency's specific enforcement decisions are generally not reviewable, *see Heckler v. Chaney*, 470 U.S. 821 (1985), "an agency's adoption of a general enforcement policy is subject to review." *OSG Bulk Ships v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998). Implementation of the HON Rule is far closer to a general enforcement policy subject to judicial review than to the kind of individual enforcement decision shielded by *Heckler. Cf. Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994) (distinguishing between "an agency's statement of a general enforcement policy" and a "single-shot nonenforcement decision," with the former being reviewable even though the latter may not be). Moreover, EPA's obligations under the HON Rule extend well beyond enforcement discretion.

*See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130-31 (D.D.C. 2025) (ordering OMB to notify all affected agencies of the court's injunction and instruct them not to implement the challenged memorandum). Such relief is also consistent with the role EPA has taken in facilitating the exemption: EPA invited sources en masse to apply for exemptions, provided substantive guidance to applicants, and collected applications. Defs.' Material Facts ¶¶ 12-15.

Relief against EPA is also consistent with the usual relief in presidential *ultra vires* cases: an injunction against the subordinate agency that effectuates the *ultra vires* action. *See Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971) ("[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands." (cleaned up)). This is the proper path here. Plaintiffs need not wait until "EPA takes final action relying on those exemptions." Defs.' Resp. 10; *see Jenner v. United States DOJ*, 784 F. Supp. 3d 76, 117 (D.D.C. 2025) (enjoining a "lengthy list" of agencies and agency heads from implementing part of an executive order, rejecting the governments' argument that plaintiffs must wait and challenge later agency decisions implementing the order).

### B.    Declaratory relief is available against the President

Because the Court has jurisdiction to enjoin EPA and its Administrator from implementing or otherwise taking action to further the unlawful HON Proclamation, relief is available and Plaintiffs' claims are redressable. But even if the Court disagrees, Plaintiffs' injuries can be redressed by declaratory relief against the President. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 421, 428 (1998). As an initial matter, Defendants' argument that the Court cannot issue a declaratory judgment against the President is forfeited because they failed to raise that argument in their opening brief. But even so, there are no compelling reasons to refrain from issuing stand-alone declaratory relief against the President in this case.

First, there are no constitutional or equitable limitations on courts issuing stand-alone declaratory relief against the President. A declaratory judgment is a legal remedy made available by the Declaratory Judgment Act, 28 U.S.C. § 2201(a); unlike an injunction, it is not an historic remedy stemming from equity. A declaratory judgment imposes no affirmative command, it is not enforced by contempt, it is not conditional, it is not subject to equitable defenses, and it is not an *in personam* order. Unlike an injunction, a declaratory judgment does not bring the Court's managerial powers to bear upon the President. As such, it does not present the same separation of powers concerns. Indeed, the Supreme Court has explained that a declaratory judgment is not "coercive relief" and "may be considered independently of whether other forms of relief are appropriate." *Powell v. McCormack*, 395 U.S. 486, 517 (1969).

The Supreme Court has previously affirmed a declaratory judgment against the President. *See Clinton v. City of New York*, 524 U.S. at 425 n.9 (noting "[i]n both actions [against the President], the plaintiffs sought a declaratory judgment that the Line Item Veto Act is unconstitutional and that the particular cancellation was invalid; neither set of plaintiffs sought injunctive relief against the President"). The Court's willingness to issue declaratory relief in a case with the President as a defendant demonstrates that such relief is not categorically foreclosed. The cases Defendants cite do not disturb that conclusion. For instance, the D.C. Circuit in *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010), rejected plaintiffs' request for declaratory relief that would bind how future Presidents would conduct the oath of office. The court reached that conclusion not because declaratory relief is not available against the President, but because "[t]he only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against all possible President-elects and the President himself." *Id*. The court explained that "plaintiffs cannot sue all possible President-elects for the

19

same reason they cannot sue all possible inaugural participants": because "*general injunctions*"—*not* declaratory relief against the President—"are outside the judicial power." *Id.*

Second, there are no subject matter jurisdictional limits on courts issuing stand-alone declaratory relief against the President. While the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 (1970), "does not itself provide an independent subject matter jurisdictional basis," because "in this case subject matter jurisdiction is present" under 28 U.S.C. § 1331, "this Court may utilize the tool of declaratory relief." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974).

Third, a declaration that the HON Proclamation is unlawful is appropriate because such a declaration would redress Plaintiffs' injuries. A declaration that the Proclamation is void would establish that the exempted facilities must comply with the HON Rule's standards. EPA would be required to implement the HON Rule in full, restoring the vital pollution protections and monitoring and reporting requirements. *See, e.g.*, *Knight First Amend. Inst. v. Trump*, 302 F. Supp. 3d 541, 579-80 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021) (granting declaratory relief and noting that "all government officials are presumed to follow the law once the judiciary has said what the law is"). The HON Rule standards would also be enforceable by states and by the public through citizen suits. *See* 42 U.S.C. § 7604(a); *Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351, 1363 (D.C. Cir. 1995). That is sufficient to establish redressability.

## IV.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE PROCLAMATION

Plaintiffs have established standing to challenge the action at issue: the HON Proclamation. Plaintiffs' members and supporters have provided evidence of the health harms that they and their families have experienced, which are linked to hazardous air pollutants emitted by exempted facilities, and their concerns that continued exposure to elevated levels of

this pollution will increase their risk of additional harm. Plaintiffs have also provided evidence that they have suffered informational injury because the facilities are now exempt for an additional two years from requirements to submit emissions reports to EPA and conduct fenceline monitoring and reporting, reports which must be made available to the public. Plaintiffs have thus demonstrated that they have suffered an injury-in-fact on a legally protected interest due to the HON Proclamation. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Both the health-based injuries from the exempted facilities' toxic emissions and informational injuries independently constitute injuries-in-fact sufficient to confer standing.[5]

### A.  Plaintiffs Demonstrated Injuries From Exposure to Hazardous Emissions

Defendants concede that Plaintiffs have established injury sufficient for associational standing based on undisputed evidence at 25 exempted facilities.[6] Defs.' Resp. 25-26. Nevertheless, Defendants wrongly contend that Plaintiffs must prove standing as to each exempted facility. That argument fails because Plaintiffs challenge the Proclamation as a whole.

To begin, Defendants would have this Court improperly inject their preferred view of the merits into the standing analysis, contrary to precedent. "[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). Here, Plaintiffs' arguments are that the Proclamation constitutes a single, unlawful action. *E.g.*, Pls.' Br. 41-42. Because Defendants' standing arguments gainsay that merits theory, they cannot be used to defeat Plaintiffs' standing.

---

[5] The court need only find standing for one theory of injury, *see Sierra Club v. EPA*, 755 F.3d 968, 976 n.2 (D.C. Cir. 2014), and need not reach alternative bases for standing.
[6] Defendants also do not dispute evidence that supporting the increased risk of injury arising from living near an exempted facility. *See, e.g.*, Defs.' Material Facts ¶¶ 50, 52 (listing undisputed facts that those living within 50 km of a HON facility face elevated cancer risks).

21

What this Court has before it is a *single* legal action—the HON Proclamation—that has effects at multiple geographical locations. Courts have found that a plaintiff establishing injury from some such sites has standing to challenge the action as a whole. *See Healthy Gulf v. Dep't of Interior*, 152 F.4th 180, 189-90 (D.C. Cir. 2025) (finding standing where Petitioners challenged a single legal action—a five-year lease schedule—with specific, individualized consequences—individual lease blocks—based on overarching findings in the programmatic Environmental Assessment). Because the Proclamation is a single action applicable to multiple exempted facilities, granting an exemption under a single legal authority, and which Plaintiffs are challenging based on legal infirmities infecting the entire Proclamation, the injury that Plaintiffs have undisputedly established as to numerous exempted facilities around the country is sufficient to provide standing to challenge the Proclamation as a whole. *See also Horne v. Flores*, 557 U.S. 433, 446 n.2 (2009) (declining to limit the scope of standing when a "claim implicates the orders in their entirety").

Defendants' attempt to analogize this litigation to challenges of individual National Ambient Air Quality Standards designations ignores fundamental distinctions. It is well established that "[s]tanding is a claim-specific inquiry." *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468 (D.C. Cir. 2014). In *Clean Wisconsin v. EPA*, petitioners did not challenge EPA's designations rule as a whole, but brought distinct challenges to "a subset of the attainment designations." 964 F.3d 1145, 1156 (D.C. Cir. 2020), *judgment entered*, 812 F. App'x 4 (D.C. Cir. 2020). Because petitioners challenged individual designations, they accordingly had to demonstrate standing "for each challenged designation." *Id.* In contrast, where a challenger raises a single claim that an across-the-board exemption in an EPA rule is

illegal, the challenger need not demonstrate standing to challenge each application of that exemption at different facilities. *See NRDC v. EPA*, 755 F.3d 1010, 1016-17 (D.C. Cir. 2014). Such is the case here: Plaintiffs challenge the legality of the Proclamation in its entirety, not piecemeal as applied to specific facilities. *See* Compl. ¶¶ 149-83.

Defendants' reliance on *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021), is inapposite. The Proclamation—unlike the thousands of individual erroneous financial reports at issue in *TransUnion*—is a single action with a single justification granting an across-the-board exemption to all fifty exempted facilities. *See NRDC v. EPA*, 755 F.3d at 1017 (petitioners had standing as to entire challenged rule where members were located near a few of the many relevant facilities).

Defendants' reliance on *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002), is also misplaced. There, the court found that lists comprising 28 street addresses, each purportedly that of a member of the petitioner, were "legally insufficient to demonstrate that at least one member of the organization lived at the time of filing and continues to live in a place affected by the Rule." 292 F.3d at 902 (citation omitted). The petitioner did not submit any other evidence, such as member declarations, "supporting the proposition that there is a substantial probability of actual or imminent injury to its members arising from their residing within five miles of the generating or the disposal facility." *Id.* (citation omitted). But here, Plaintiffs have provided the Court with such evidence of harm through detailed declarations of members living near numerous facilities covered by the Proclamation and undisputed evidence supporting the substantial probability of injury from living near facilities exempted by the Proclamation. The concerns expressed by the *Sierra Club* court are inapplicable in light of this evidence.

23

In sum, Plaintiffs have established injury from increased exposure to toxic emissions sufficient to demonstrate associational standing to challenge the Proclamation.[7]

### B.        Plaintiffs Demonstrated Informational Injuries

In addition, Plaintiffs also have established standing based on their informational standing. *See* Pls.' Br. 17-20. The HON Rule requires exempted facilities to report their emissions, including fenceline monitoring data, that would be published and publicly available. The HON Proclamation deprives Plaintiffs of that information. The denial of information to which plaintiffs have a legal right—including where that legal right originates in a regulation— can be a concrete injury in fact. *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 166 (4th Cir. 2023) (finding a civil rights tester had standing to sue a hotel owner for violations of the Americans with Disabilities Act's Hotel Reservation Regulation based on alleged informational injury); *see Sargeant v. Dixon*, 130 F.3d 1067, 1070 (D.C. Cir. 1997) ("The receipt of information is a tangible benefit the denial of which constitutes an injury."). Moreover, Congress mandates that emissions data EPA receives, like the fenceline monitoring data required to be collected and reported under the HON Rule, be made "available to the public." 42 U.S.C. § 7414(c). By exempting the 50 facilities from the HON Rule, the HON Proclamation deprives Plaintiffs of information that must otherwise be collected and, pursuant to the statute's disclosure requirement, provided to the public. *Contra* Defs.' Resp. 34.

---

[7] Plaintiffs have provided evidence that thousands of Plaintiffs' members live within this zone of harm of all 50 facilities. Barone Decl. ¶¶ 21-23, 25, Dkt. No. 41-3, Ex. 1; Fashho Decl. ¶¶ 2-3, Dkt. No. 41-3, Ex. 3. Should any issue of relief arise as to the 25 facilities Defendants don't concede standing on, Plaintiffs submit that the most appropriate course would be supplemental briefing on remedy. At that point, Plaintiffs would be able to present evidence demonstrating both that thousands of Plaintiffs' members live near the remaining 25 facilities and that those member counts accurately reflect current members of Plaintiff organizations who live in harm's way due to the Proclamation.

24

The order in *Sierra Club v. EPA*, No. 25-1112, 2026 WL 686323 (D.D.C. Mar. 11, 2026), does not compel a contrary conclusion. That case involved a challenge to the removal of "web tools on the agencies' public websites that compiled and presented information concerning the environment." *Id.* at *1. But plaintiffs in that case had no regulatory right to the information: "Defendants published the tools voluntarily, not because any law required them to do so." *Id.* at *6. In contrast, the HON Rule gives Plaintiffs a legal right to fenceline monitoring information.

There is also no merit to Defendants' contention that Article III standing requires monetary harm absent a statutory right to information. Defendants' argument conflates the requirements of informational and organizational standing. *See* Pls.' Br. 19-20. Plaintiffs have presented that the deprivation of fenceline monitoring information harms *both* Plaintiff organizations *and* their members and supporters. The lack of this data prevents Plaintiffs' members and supporters from adequately evaluating and reducing their pollution exposure and health risks in areas affected by emissions from the exempted facilities, and impacts how the Plaintiff organizations engage in advocacy to reduce air pollution. Plaintiffs have thus demonstrated the requisite concrete harms stemming from the failure to receive the information.[8]

### CONCLUSION

Defendants have failed to dispute Plaintiffs' factual assertions that technology for many standards is available and no technology is required at all for other standards, thus rebutting any presumption of regularity that may otherwise apply to the President's determination that technology to implement the HON rule is unavailable. This Court may review the HON Proclamation under the text of the Clean Air Act and the D.C. Circuit's precedents and should find it *ultra vires* as a patent misconstruction of Section 7412(i)(4)'s narrow statutory authority.

---

[8] Plaintiffs' claims are also redressable. *Supra* Section III; Pls.' Br. 15, 20.

DATED: May 22, 2026

Abel Russ (D.D.C. Bar No. 1007020)
Environmental Integrity Project
888 17th Street NW, Suite 810
Washington, DC 20006
aruss@environmentalintegrity.org
Tel: (802) 482-5379

*Counsel for Plaintiff Environmental
Integrity Project*

Rosalie Winn (Colorado Bar No. 52662)*
Leah Fattor (Colorado Bar No. 61031)*
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
rwinn@edf.org
lfattor@edf.org
Tel: (303) 447-7212
*Admitted pro hac vice*

Samantha Liskow, (D.D.C. Bar No. NY0687)
Environmental Defense Fund
257 Park Avenue South
New York, NY 10010
sliskow@edf.org
Tel: (212) 616-1247

*Counsel for Plaintiff Environmental
Defense Fund*

Respectfully submitted,

*/s/ Adam Kron*
Adam Kron (D.C. Bar No. 992135)
Sage Lincoln (D.C. Bar No. 90042038)
Earthjustice
1250 I Street NW, Fourth Floor
Washington, D.C. 20005
akron@earthjustice.org
slincoln@earthjustice.org
Tel: (202) 794-8039

*Counsel for Plaintiffs Texas Environmental
Justice Advocacy Services, Air Alliance
Houston, Concerned Citizens of St. John,
Louisiana Environmental Action Network,
RISE St. James Louisiana, and Sierra Club*

Sarah A. Buckley (D.C. Bar No. 90035401)
Natural Resources Defense Council, Inc.
1152 15th Street NW, Suite 300
Washington, D.C. 20005
sbuckley@nrdc.org
Tel: (202) 836-9555

*Counsel for Plaintiffs Natural Resources
Defense Council and Environmental Justice
Health Alliance for Chemical Policy Reform*