## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES, et al., | |
| Plaintiffs, | |
| v. | Civil No. 1:25-cv-03745 |
| DONALD TRUMP, et al., | |
| Defendants. | |
| GREATER-BIRMINGHAM ALLIANCE TO STOP POLLUTION, et al., | |
| Plaintiffs, | |
| v. | Civil No. 1:25-cv-04469 |
| DONALD TRUMP, et al., | |
| Defendants. | |
| MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, et al., | |
| Plaintiffs, | |
| v. | Civil No. 1:26-cv-00287 |
| DONALD TRUMP, et al., | |
| Defendants. | |
| CLEANAIRE NC, et al., | |
| Plaintiffs, | |
| v. | Civil No. 1:26-cv-00233 |
| DONALD TRUMP, et al., | |
| Defendants. | |

## CONSOLIDATED PLAINTIFFS' SUR-REPLY BRIEF

**INTRODUCTION**

The President's unprecedented use of the narrow exemptions authority in the Clean Air Act to excuse more than 180 facilities from hazardous air pollutant standards is the exercise of far more than a "relatively minor power" that results in "modest extension[s] of time." The President wielded this power to exempt the entire coke oven industry from standards, including basic work practices designed to protect nearby communities from benzene leaks, based on a determination directly contrary to that made by his own EPA just weeks prior. He exempted the entire taconite industry from the only federal mercury emissions standard for that industry—a long-overdue standard the EPA took decades to enact. He exempted 40 commercial sterilizers from standards expected to reduce cancer risk to nearby communities by more than 90 percent.

With a few paragraphs here and a few paragraphs there, the President brushed aside the important protections these standards provide for communities across the country. Now Defendants would have this Court believe that it lacks authority to review the President's sweeping exemptions simply by talismanic invocation of the words "I determine." They are wrong.

Congress conveyed a mandate in Section 7412(i)(4) of the Clean Air Act: that the President must determine both that "the technology to implement such standard is not available" and "that it is in the national security interests of the United States to do so." The Clean Air Act does not bar *ultra vires* review to ensure that exemptions do not grossly exceed the bounds of Section 7412(i)(4). And where, as here, the President's action is based on an utterly unreasonable interpretation of his authority, the *ultra vires* standard is met.

**ARGUMENT**

## I.    THIS COURT HAS AUTHORITY TO REVIEW THE EXEMPTIONS ON ULTRA VIRES GROUNDS

This Court has authority to enforce the boundaries of the President's limited, conditional power that Congress conveyed in Section 7412(i)(4) to temporarily exempt sources from hazardous air pollutants standards. Our constitutional system presupposes that the President, just as any other executive official, has only the powers conferred on him by statute or the Constitution. *Medellín v. Texas*, 552 U.S. 491, 524 (2008). When the President acts in excess of those powers, courts have equitable jurisdiction to review his action "even absent an applicable statutory review provision." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023); *see also Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981). That courts have the power to review executive action to ensure the President follows the law is so fundamental to our country's constitutional framework that courts demand a "clear and convincing" indication that Congress intended to foreclose review before they will forbear. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140-41 (1967); *see also Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988).

The modern framework for *ultra vires* review reflects that longstanding, fundamental principle: it presumes that courts have equitable jurisdiction to protect against "the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law," by granting relief to anyone who is injured by such lawless conduct. *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902). Courts have that jurisdiction so long as Congress has not barred review, there is no alternative mechanism for review, and the action is "plainly in excess of [] delegated powers and contrary to a specific prohibition in the statute," *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (cleaned up), which encompasses "error that is patently a misconstruction of the [statute], that

2

disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute," *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

Plaintiffs have met that standard here. Defendants do not assert that Plaintiffs could obtain review of the exemption proclamations through any other mechanism. *See* Defs. Reply Br. at 13-15 (Dkt. 59). And Defendants have not shown, nor can they show—much less by clear and convincing evidence—that the Clean Air Act forecloses *ultra vires* review. Finally, Plaintiffs have alleged that the President has patently misconstrued or utterly disregarded the limited authority delegated to him under Section 7412(i)(4). While Defendants mischaracterize the caselaw in an attempt to raise the *ultra vires* bar to unprecedented heights (higher, even, than in their opening brief), Plaintiffs meet even that standard because the President's exemption proclamations violate a specific prohibition in a manner that interferes with Plaintiffs' rights.

### A.    Congress did not preclude judicial review of presidential exemption proclamations

The Clean Air Act provides no express mechanism for judicial review of Section 7412(i)(4) exemptions; nor does it expressly or impliedly preclude such review. These are precisely the circumstances in which *ultra vires* review is available: when "review is not expressly precluded by statute" and "there is no alternative procedure for review of the statutory claim." *Glob. Health Council*, 153 F.4th at 20. The Supreme Court has put it similarly, explaining in *Nuclear Regulatory Commission v. Texas* ("*NRC*") that *ultra vires* review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." 605 U.S. 665, 681 (2025) (internal quotation marks omitted).

3

The bar for concluding that a statute forecloses judicial review is high and is not met here. Under the "well-settled" and "strong" presumption of reviewability, courts "adopt the reading [of a statute] that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (internal quotation marks omitted). That includes *ultra vires* review of executive action going beyond limits on his authority. *Dart*, 848 F.2d at 224 ("Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior[.]"). The presumption of reviewability "can only be overcome by *clear and convincing evidence* of congressional intent to preclude judicial review." *Guerrero-Lasprilla*, 589 U.S. at 229 (internal quotations omitted) (emphasis added).

The Clean Air Act provides no such evidence. The Act does not expressly bar review of presidential exemption determinations, and the judicial review provisions that authorize and govern suits over "actions of the Administrator," 42 U.S.C. §§ 7604, 7607, cannot reasonably be construed to do so implicitly. Defendants' statutory fallback, Section 7607(e), is no refuge. *See* Defs. Reply Br. at 5. That provision, titled "Other methods of judicial review not authorized," states: "Nothing in this chapter shall be construed to authorize judicial review of *regulations* or *orders of the Administrator* under this chapter, except as provided in this section." 42 U.S.C. § 7607(e) (emphasis added). The President's exemption proclamations are neither "regulations" nor "orders of the Administrator," so Section 7607(e) has no bearing on the *ultra vires* review sought here. Defendants' efforts to stretch Section 7607(e) to cover *any* action taken, so long as the actor cites Clean Air Act authority, improperly ignores the text.

Nor are there contextual reasons to impute an intent to prohibit review of Section 7412(i)(4) exemptions. Defendants' arguments to the contrary misconstrue the text of the statute

4

and applicable precedent. For instance, pointing to *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), Defendants conflate the existence of a mechanism for judicial review of *some* actions—"actions of the administrator," for instance, 42 U.S.C. §§ 7604, 7607(b)—with an "all-inclusive" scheme governing review of *all* actions, *see* Defs. Reply Br. at 5-6. But in *Block*, the Supreme Court explained that a statute that provides "a detailed mechanism for judicial consideration *of particular issues*" may be read to preclude judicial review "*of those issues*" through other means. *Block*, 467 U.S. at 349 (emphasis added). It did not hold that providing review of *any* issue can preclude all other review. The "particular issue" in this case is the lawfulness (or not) of the exemption proclamations. But Defendants admit—indeed, they vigorously argue—that "there is no statutory basis for review of any aspect of the President's exercise of exemption authority," and that the proclamations are "self-executing," requiring no action by EPA to implement. Defs. Reply Br. at 8-9. In other words, there is no other means of obtaining review of the "particular issue" here, and thus no basis for concluding that Sections 7604 and 7607(b) impliedly bar review.

Defendants attempt to elude the statutory text and the presumption of reviewability by citing certain cases—*Patel v. Garland*, 596 U.S. 328 (2022), and *S. Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444 (1979)—that found that review is precluded, notwithstanding the strong presumption for reviewability, for reasons that do not apply here. *See* Defs. Reply Br. at 7. The provisions at issue in those cases are easily distinguished from the facts here. In *Patel v. Garland*, the Supreme Court considered whether the Immigration and Nationality Act's express prohibition of judicial review of the Attorney General's decisions denying discretionary relief from removal extended to review of factual findings that underlie that denial. 596 U.S. at 331. The Court found that the "text and context" of the applicable provision, including that it was

5

expressly a "jurisdiction-stripping statute," was determinative. *Id*. at 347. That context starkly contrasts with the Clean Air Act's judicial review provisions, which grant rather than strip courts of jurisdiction—with the exception of 42 U.S.C. § 7475(d)(2)(D)(ii), which (revealingly) bars judicial review of a different presidential authority.

The issues in *Seaboard Allied Milling* are similarly distinct from the issues in this case. In that case, the Court concluded that it could not review the Interstate Commerce Commission's decision *not* to investigate the lawfulness of a proposed rate schedule. *See* 442 U.S. at 454-55. First, the Court concluded that while final decisions of the Commission are judicially reviewable, a decision not to investigate did not qualify as "final." *Id.* at 452-53. No such finality issues apply to this case. The Court then concluded that the decision not to order an investigation is not reviewable because the statute merely stated that the Commission "*may*" order such investigation without providing any further guidance or standards. *Id.* at 455 (emphasis in original). This is a plain contrast from Section 7412(i)(4), in which Congress imposed clear and specific limits on the exemption authority it conveyed to the President: it restricts the President from exempting facilities from Section 7412 standards unless the President determines that "the technology to implement such standard is not available." 42 U.S.C. § 7412(i)(4).[1]

Next, Defendants argue that the *absence* of text expressly providing for review of Section 7412(i)(4) determinations supports their interpretation that review is precluded. Defs. Reply Br. at 5-6. But that, to quote Defendants, "get[s] the statutory inference exactly backwards." *Id.* at 6. The absence of a mechanism for judicial review is in fact a prerequisite for an *ultra vires* claim. *See NRC*, 605 U.S. at 681; *Glob. Health Council*, 153 F.4th at 20. In other words, the availability

---

[1] The *Seaboard* Court took pains to emphasize that the ultimate effect of declining judicial review in that case was to change the evidentiary burdens and available relief, not to foreclose relief entirely. 442 U.S. at 454-55. Defendants here seek to foreclose relief entirely.

of *ultra vires* review does not turn on whether Congress *intended* there to be review; it turns on whether Congress did *not* intend to *preclude* review. *Ultra vires* review is available here because there is no "clear and convincing" indication in the statute that Congress intended to preclude review of presidential exemptions. *See Guerrero-Lasprilla*, 589 U.S. at 229.

Trying to jujitsu themselves out from under the weight of statutory text and precedent, Defendants erroneously suggest that *Franklin v. Massachusetts*, 505 U.S. 788 (1992), erects a higher bar for review of presidential action. Defs. Reply Br. at 6. That is, they assert that *Franklin* stands for the proposition that "'textual silence is not enough' to subject the President to judicial review." *Id*. (quoting *Franklin*, 505 U.S. at 800). But that is not what *Franklin* said. The question in *Franklin* was whether "agency" as defined in the Administrative Procedure Act included the President, which would subject the presidential action to APA processes. *Franklin*, 505 U.S. at 800-01. The Supreme Court held that although "[t]he President is not explicitly excluded from the APA's purview, . . . he is not explicitly included, either." *Id*. at 800. The Court concluded that that "textual silence is not enough to subject the President *to the provisions of the APA*," and that it would require "an express statement by Congress" to make presidential action "reviewable for abuse of discretion under the APA." *Id*. at 800-01 (emphasis added). That limited holding does not alter the standard for or availability of *ultra vires* review of presidential action that is "patently a misconstruction" of the statute that limits his authority.

Defendants' remaining arguments are similarly unavailing. First, they contend that the requirement to report "each exemption" to Congress somehow fits with *Block*'s reasoning that judicial review may be foreclosed if there is "'a detailed mechanism for *judicial consideration* of particular issues at the behest of particular persons.'" Defs. Reply Br. at 6 (quoting *Block*, 467 U.S. at 349) (emphasis added). But, to be clear, a requirement to report to Congress does not

7

provide a mechanism for *anyone*—even Congress—to get *judicial* review, which is what *Block* refers to. In any event, a Congressional reporting requirement does not amount to clear and convincing evidence of Congress's intent to bar *ultra vires* review of the President's action. The Supreme Court recently exercised judicial review of the President's use of delegated authority under the International Emergency Economic Powers Act ("IEEPA"), notwithstanding a provision of IEEPA that allows Congress to "terminate" the President's exercise of such authority via "joint resolution." *See Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 640 (2026) (Opinion of Roberts, C.J.). "Congress knows how to bar review when it wants to." *Vassiliades v. Rubio*, 792 F. Supp. 3d 1, 16 (D.D.C. 2025) (judicial review of exercise of IEEPA "emergency authority" available notwithstanding the Congressional reporting provisions).

Last, Defendants' suggestion that exemptions under Section 7412(i)(4) "represent[] a relatively minor power," Defs. Reply Br. at 7, is insulting and minimizes the real harms to the millions of people living, recreating, and breathing in the shadow of the polluting industries at issue here. While no previous President has issued an exemption under Section 7412(i)(4), President Trump did so seven times in a matter of months to exempt more than 180 facilities—including a quarter of the petrochemical facilities subject to the HON Rule, nearly one-third of all coal-fired power plants subject to the Mercury and Air Toxics Standards, nearly half of all commercial sterilizers, and the entire coke ovens and iron-ore processing industries—from hazardous air pollutant standards. Complaint ¶ 6, *Minn. Ctr. for Env't Advocacy v. Trump*, No. 26-cv-287 (D.D.C. Feb. 2, 2026), Dkt. 1 ("*MCEA* Compl."). These exemptions have very significant health consequences for those who live near these facilities. EPA, for example, estimates that 8.5 million people living near medical sterilizers have an elevated cancer risk of one-in-a-million, and that such facilities could pose a lifetime cancer risk as high as 6000-in-one

8

million. Second Am. Compl. ¶ 2, *CleainAire NC v. Trump*, No. 26-cv-233 Dkt. 27-1 (D.D.C. Feb. 27, 2026) ("*CleanAire* Compl."). EPA similarly estimates that over 490,000 people who live within 10 kilometers of a coke oven have an elevated cancer risk of one in one million. 89 Fed. Reg. 55684, 55726. And both coke ovens operations and taconite processing emit mercury—among other toxins—a known neurotoxin linked to IQ loss, deficiencies in attention-span, motor function, language, and visual spatial ability that is especially of concern for developing fetuses and young children. Complaint ¶ 2, *Greater Birmingham Alliance to Stop Pollution v. Trump*, No. 25-cv-4469 (D.D.C. Dec. 22, 2025), Dkt. 1; *MCEA* Compl. ¶ 1.

And Defendants are disingenuous in characterizing the President's exemption authority as merely being limited to "modest" two-year extensions. *See* Defs. Reply Br. at 1. While any one exemption can only last two years, the President may extend such exemption "for 1 or more additional [two-year] periods." *See* 42 U.S.C. § 7412(i)(4). Consequently, under Defendants' extreme view of the law, the President would be able to "unlock" the "extraordinary power" of exempting *all* regulated facilities from *all* Section 7412 standards for an indefinite number of two-year periods by simply baldly asserting that the technology to implement all such standards is not available and that such exemptions are in the national security interest of the United States. *Cf. Learning Resources*, 146 S. Ct. at 640 (casting doubt that Congress would allow the President to "unlock . . . extraordinary power" through an unreviewable declaration of a national security emergency) (Opinion of Roberts, C.J.).

Fortunately, *ultra vires* review of the Section 7412(i)(4) exemptions is available to limit the President to exercising only the narrow authority conferred by Congress, and to foreclose the exercise of such extreme and arbitrary power. *Cf. Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 981 (2021) (Roberts, C.J., respecting the denial of certiorari) (observing that, absent

9

judicial review, any "statute permitting the President in his sole discretion to" take a given type

of action could "transform[] into a [source of] power without any discernible limit").

**B.      Plaintiffs' claims survive even Defendants' misstated *ultra vires* standard**

**1.      A patent misconstruction of statutory authority violates a specific prohibition for purposes of *NRC***

Defendants misstate the *ultra vires* standard by isolating language from *NRC* to advance

a strict, literal, and express statutory "specific prohibition" requirement that is not recognized by

either the Supreme Court or the D.C. Circuit. As this Court—and the Supreme Court itself—

have recently made clear, *NRC* did not wipe away decades of Supreme Court and D.C. Circuit

precedent that allows for *ultra vires* review of the executive branch's interpretation of its

congressionally delegated authority, even when such interpretation does not implicate the

possible violation of a literal "thou-shalt-not" style statutory prohibition.

A President that patently misinterprets or grossly exceeds a limited delegation of

statutory authority *does* act contrary to a specific prohibition.[2] As the D.C. Circuit has explained,

the "specific prohibition" requirement *encompasses* "error that is patently a misconstruction of

the Act, that disregards a specific and unambiguous statutory directive, *or* that violates some

specific command of a statute." *Changji*, 40 F.4th at 722 (articulating three specific

circumstances in which the "specific prohibition" requirement is met) (emphasis added). *See also*

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 87-88 (D.D.C. 2025) (rejecting the government's

---

[2] The "specific prohibition" requirement it not applicable to this case. That requirement applies only to a subset of *ultra vires* claims—like those in *Leedom* and *NRC*—where an express statutory judicial review structure impliedly precludes judicial review outside of that express structure. *See, e.g., Chamber of Commerce v. Reich*, 74 F.3d 1322, 1330 (1996) (explaining that "*Leedom* has come to stand for the proposition that . . . *even* an implied preclusion of judicial review will not bar judicial intervention" if the executive violates a specific statutory prohibition) (emphasis in original) (internal alterations and quotation marks omitted). The *NRC* Court itself acknowledges this distinction. *See* 605 U.S. at 681-82 (explaining that "a <u>Leedom v. Kyne</u> claim is essentially a Hail Mary pass") (emphasis added).

argument that the President's failure to properly make a predicate determination before exercising delegated authority does not violate a specific prohibition).[3] That is, contravening some express statutory command is merely one of several ways that plaintiffs can establish the kind of extreme error necessary to sustain an *ultra vires* claim.

This Circuit has long rejected—and characterized as uniquely dangerous—the argument that an *ultra vires* claim against the President is viable only if the President is alleged to have violated the kind of express and literal specific statutory prohibition envisioned by Defendants. *See Reich*, 74 F.3d at 1332 (holding that it is "untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President *claims* that he is acting pursuant to" statutory authority) (emphasis in original).

Defendants, however, erroneously assert that nonstatutory *ultra vires* claims are only viable if the executive is alleged to have violated some express statutory prohibition. *See* Defs. Reply Br. at 13-15 (citing *NRC*, 605 U.S. at 680-81). This is a clear mischaracterization of the "specific prohibition" requirement as it has been applied in this Circuit and elsewhere.

This Court has recently expressly rejected this very argument, concluding that the President *does* violate a specific statutory prohibition for purposes of *NRC* when he exceeds limited delegated congressional authority. *See Fed. Educ. Ass'n*, 795 F. Supp. 3d at 87-88. Two other district courts in this Circuit have similarly rejected Defendants' strict view of the "specific prohibition" requirement of *NRC*. *See Nat'l Trust for Historic Preservation v. NPS*, No. 25-4316 (RJL), 2026 WL 877779, at *10 (D.D.C. Mar. 31, 2026) (holding that the President exceeding a

---

[3] Indeed, Defendants themselves quote this language from *Changji*. *See* Defs. Reply Br. at 14.

limited delegation of statutory authority is sufficient to meet the *ultra vires* standard under *NRC*);

*New Mexico v. Musk*, No. 25-cv-429 (TSC), 2026 WL 799635, at *13 (D.D.C. Mar. 23, 2026)

(explaining that "conduct in violation of specific statutory limitations 'is just one example of an

*ultra vires* act.'") (quoting *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024)).

In fact, since *NRC*, the Supreme Court has affirmed the Court of International Trade's

invalidation of the President's global tariffs scheme as *ultra vires* because such tariffs exceeded

the limited authority delegated to the President under the IEEPA. *See Learning Resources*, 146

S. Ct. at 637 (affirming on the merits the invalidation of President Trump's IEEPA tariffs);

*V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1376 (Ct. Int'l Trade 2025)

(holding President Trump's IEEPA tariffs are "*ultra vires* and contrary to law"); *see also Nat'l*

*Trust for Historic Preservation*, 2026 WL 877779, at *6 (explaining that the Supreme Court

affirmed on the merits the Court of International Trade's invalidation of the Trump

Administration's tariffs as *ultra vires*). Just as here, review was available in *Learning Resources*

despite the lack of an express "thou shalt not" statutory prohibition on the form of action taken

by the President. *See* 146 S. Ct. at 637; *id.* at 640-41 (Opinion of Roberts, C.J.).

### 2.    There is no individual statutory right element to *ultra vires* claims

For the first time on reply, Defendants incorrectly assert that a statute must "confer[]

rights on the party seeking review" to support a nonstatutory *ultra vires* claim. Defs. Reply Br. at

12. Although they cite *NRC* for that premise, *see id.* at 12, 13, the only place where that language

appears in that opinion is in a quote from *McAnnulty*, 187 U.S. at 110, which the Court uses to

explain that "courts recognized a right to equitable relief where an agency's action was ultra

vires—that is, 'unauthorized by any law and . . . in violation of the rights of the individual."

*NRC*, 605 U.S. at 680. In Defendants' telling, the *NRC* Court's use of "that is" in the above quote

announces an entirely new element of *ultra vires* claims about which the Supreme Court itself is

12

apparently unaware. *See Learning Resources*, 146 S. Ct. at 637 (affirming on the merits the Court of International Trade's invalidation of President Trump's IEEPA tariffs as *ultra vires* without identifying a specific prohibition that violates a statutory conferral of individual rights).

*NRC* does not announce a new element for *ultra vires* claims.[4] The portion of *McAnnulty* cited by *NRC* merely stands for the proposition that courts must and do have equitable authority to review lawless executive action. *McAnnulty*, 187 U.S. at 109-10. The "right" violated in *McAnnulty* was the general "property rights" of the claimant, not any special right created by statute. *Id*. at 110. The opinion further emphasizes that *ultra vires* relief is available where "an official violates the law *to the injury* of an individual." *Id*. at 108 (emphasis added). In holding that the Court "must have power in a proper proceeding to grant relief" against an action that, "by any construction of [admitted] facts," was not authorized by the cited statute, the Court lamented, "[o]therwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Id*. at 109-110.

Plaintiffs here would be similarly left to the uncontrolled whims of the President absent review, whims which will leave Plaintiffs' members suffering from hazardous air pollutant emissions and attendant health risks. Plaintiffs certainly have a right not to be harmed by toxic air pollution. Indeed, protecting public health from such toxic air emissions is the very purpose of Section 7412, not to mention consonant with the purpose of the Clean Air Act itself. *See* 42 U.S.C. § 7401(b)(1) (stating the first purpose of the Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive

---

[4] The only other authority that Defendants cite for this new element is an unpublished case that is inapposite because it was an implied-right-of-action case, not a nonstatutory *ultra vires* case. *See Town v. U.S. Dept. of Interior*, No. 22-5314, 2025 WL 1446027, at *1 (D.C. Cir. May 20, 2025).

13

capacity of its population"). The Clean Air Act even authorizes citizen suits to enforce standards like those issued under Section 7412. *See* 42 U.S.C. § 7604. So, even if Defendants' new individual statutory right element were valid—it is not—Plaintiffs would satisfy that standard.

## II.  PLAINTIFFS' CLAIMS DO NOT REQUIRE FACTUAL REVIEW OF THE PURPORTED AVAILABILITY DETERMINATIONS

Defendants also mischaracterize Plaintiffs' claims as requiring this Court to engage in an "intensive factual review" of the President's technological availability determinations. Defs. Reply Br. at 2. Not so. Instead, Plaintiffs claim that the orders are *facially* invalid for multiple, independent reasons that do not turn on an evaluation of the President's purported availability determinations. First, the exemption proclamations are facially invalid as they evince a fundamentally unreasonable interpretation of Section 7412(i)(4). In particular, they apply to standards that obviously do not meet the statutory eligibility requirements, are expressly premised on statutorily prohibited considerations, and otherwise fail to adhere to the statute's requirements. *See* Consolidated Resp. Br. at 11-24 (Dkt. 56). Resolving a dispute over the proper interpretation of Section 7412(i)(4) does not require a painstaking review of presidential factfinding.

Second, and independently, the exemptions are facially invalid because Plaintiffs' allegations—taken as true, as they must be in this posture—establish that any presumption of regularity that would apply to the President's availability determinations has been rebutted. *See* Consolidated Resp. Br. at 25-30. As to the presumption of regularity, we are not arguing that the Court must make a finding that the President's technology determinations were merely incorrect; rather, we argue that the context and content of the proclamations establish that such determinations never genuinely took place and evince the President's "utter disregard" for the express statutory limitations that Congress placed on his authority. *Fed. Educ. Ass'n*, 795 F.

Supp. 3d at 97 (holding a presidential order is *ultra vires* because it "reflects an utter disregard" for the President's duty to engage in a Congressionally required predicate determination).

## A.    Facial review of the presidential exemptions evinces a fundamentally unreasonable interpretation of Section 7412(i)(4)

Defendants concede that "error[s] in determining whether the authority [to act] itself exists" are reviewable *ultra vires*. *See* Defs. Reply Br. at 12 (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690 (1949)). That is precisely the review Plaintiffs seek from this Court of the exemption proclamations. In his proclamations, the President claimed authority for himself that does not, in fact, exist to issue exemptions that do not meet the predicate statutory requirements. Congress conferred on the President a narrow authority to issue exemptions *only when* "the technology to implement [the] standard is not available" at a "stationary source." 42 U.S.C. § 7412(i)(4). A facial review of the presidential exemptions establishes that the President did not adhere to this statutory restriction and therefore relied on a "patent misconstruction" of his Section 7412(i)(4) authority. *See Changji*, 40 F.4th at 722.

A facial review of the exemption proclamations will establish that each of them utterly disregards the limitation Congress imposed on the President's authority, and is therefore *ultra vires*, for at least four independent reasons. First, the Proclamations apply to standards that are plainly ineligible under the statute because they require no technology to be implemented. *See* Consolidated Resp. Br. at 16-17, 20-23. Second, and similarly, the Proclamations grant blanket exemptions from all recently promulgated standards in each sector, including some standards that are already being complied with, and standards for which the required technology is plainly available, including technologies that many of the covered facilities have already implemented. *See id.* at 17, 19-20, 22-23. Third, on their face, the Proclamations expressly are premised not on the availability of technology but on second guessing determinations that Congress exclusively

15

assigned to EPA, including whether standards are "achievable" industry-wide and whether standards require any control technologies to be implemented. S*ee id.* at 15-16, 20-21. Finally, the Proclamations utterly fail to engage in any kind of technology- standard-, or facility-specific review as required by the statute. *See* Consolidated Resp. Br. at 14-16, 19, 21-22, 24.[5]

Evaluating these claims does not require this Court to nit-pick the President's factual findings or apply an APA-style review. Under "any view of the facts" the President has made multiple "clear mistake[s] of law" and patently misconstrued his authority by issuing exemptions outside of the confines of his congressionally granted authority. *McAnnulty*, 187 U.S. at 109-110. *Cf. Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1174 (D.C. Cir. 2003) (an "agency construction of a statute" is *ultra vires* if "the disputed [action] defies the plain language of a statute" or "the agency's construction is utterly unreasonable and thus impermissible").

As this Court recently explained, when Congress has predicated the President's exercise of delegated authority on a specific presidential determination, the President's exercise of such authority is reviewable. *See Fed. Educ. Ass'n*, 795 F. Supp. 3d at 95-97 ("[W]hile the President may have authority to exclude" agencies from certain statutory protections, courts can review the President's exercise of such authority to ensure it does not "reflect[] an utter disregard for" the determination the President must make before exercising such authority). Thus, while the underlying factfinding is perhaps shielded from searching review, whether the exercise of authority was properly cabined within the limits prescribed by Congress is not. *Id.*

---

[5] The Coke Ovens Proclamation also states that "*many*"—but tellingly, not all—of the standards being exempted rely on technologies that are "not practically available." *See* Coke Ovens Proclamation, 90 Fed. Reg. 54517 (Nov. 21, 2025). That is, the Coke Ovens Proclamation acknowledges that at least some of the exempted standards do *not* require technologies determined to be unavailable. Such standards are plainly ineligible for an exemption under Section 7412(i)(4).

### B. Plaintiffs have alleged facts that rebut any presumption of regularity that applies to the President's statutorily required availability determinations

Plaintiffs' claims are reviewable and viable for the similar, but independent, reason that their allegations are sufficient to rebut any presumption of regularity that applies to the President's availability determination. *See Am. Fed'n of Gov't Emps., AFL-SIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989) (acknowledging that review of President's invocation of statutory authority is appropriate if presumption of regularity rebutted as to predicate determination). As this Court has repeatedly held, when Congress limits the President's authority with a requirement that the President make some specific determination, the President's exercise of such authority is reviewable when plaintiffs plausibly allege facts sufficient to rebut any presumption of regularity that applies such determination. *See Fed. Educ. Ass'n*, 795 F. Supp. 3d at 95; *Nat'l Treasury Emp. Union v. Trump*, 780 F. Supp. 3d 237, 259-63 (D.D.C. 2025) ("*NTEU*") (stayed on separate grounds by No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025)).

While Defendants shrug away Plaintiffs' allegations as mere factual disagreements with the President, *see* Defs. Reply Br. at 24, this Court recently made it abundantly clear that a court's evaluation of evidence relevant to rebutting the presumption of regularity that applies to a President's determination is *not* a factual review of the determination itself. *See Fed. Educ. Ass'n*, 795 F. Supp. 3d at 95; *NTEU*, 780 F. Supp. 3d at 259-63. We do not ask for a searching review of the President's purported availability determinations. Rather, we ask this Court to assess whether such determinations genuinely took place or whether they were mere pretext for the President and EPA's aggressive deregulatory agenda. Such an assessment is completely consistent with this circuit's *ultra vires* jurisprudence.

Plaintiffs have rebutted any presumption of regularity that applies to the President's technological availability determination for several reasons. First, the President's facially

17

overbroad application of his exemptions authority covered both standards and facilities that are plainly ineligible for exemption under Section 7412(i)(4) because no technology is required to meet the standard, because covered facilities are already meeting the standard, or because covered facilities have already implemented the technology required to meet the standard. *See* Consolidated Resp. Br. at 25-30; *cf. Fed. Educ. Ass'n*, 795 F. Supp. 3d at 95 (presumption of regularity rebutted in part because a presidential proclamation exercised statutory authority over facially ineligible agencies).

Most absurdly, the Coke Ovens Proclamation purports to determine that there is no technology available for an individual at a facility to make observations with their naked eye. *See* Consolidated Resp. Br. at 17. Similarly, while the Sterilizers Proclamation is premised on the need to protect the supply of sterilized medical equipment, it grants an exemption to a facility that sterilizes *only* spices and food products. *Id.* at 20.

Second, circumstances surrounding the proclamations, the proclamations' text, and EPA's statements regarding the exemptions establish that "the President was indifferent to the purposes and requirements" of Section 7412(i)(4) and that the exemptions were instead issued for "unrelated policy goals rather than based on the statutory criteria." *NTEU*, 780 F. Supp. 3d at 254. *See also* Consolidated Resp. Br. at 25-30. Each proclamation's text shows that the President's true concern with the standards is not technological availability, but achievability. *See* Consolidated Resp. Br. at 14-16, 22-23. Furthermore, concurrent with EPA's announcement that it planned to repeal several hazardous air pollutants regulations—including all the regulations at issue in this case—EPA invited regulated entities to apply for exemptions under Section 7412(i)(4) and explicitly stated that the exemptions were offered to relieve polluters of compliance obligations "while EPA reconsiders these rules." *See CleanAire* Compl. ¶¶ 161-65;

18

*Clean Air Section 112 Presidential Exemption Information*, EPA (*available at* https://www.epa.gov/stationary-sources-air-pollution/clean-air-act-section-112-presidential-exemption-information). This indicates that the true purpose of the exemptions is to achieve something that Congress forbade in the statute: a stay of regulations greater than three months, pending their administrative reconsideration. *See* Consolidated Resp. Br. at 25-27.

Finally, the exemption proclamations constitute highly "unusual" and "irregular" exercises of a previously never used authority to exempt 180 facilities from seven categories of hazardous air pollutants standards, including blanket exemptions to whole industries. *See President and Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 205 (D. Mass. 2025) (declining to apply presumption of regularity to an "unusual" and "irregular" use of statutory authority).

While Defendants quibble with Plaintiffs' interpretation of "technology", *see* Defs. Reply Br. at 20,[6] there is no reasonable interpretation of Section 7412(i)(4) that would allow the President to determine—as he purportedly has here—that technology is unavailable to implement a standard requiring only that an individual observe something with their naked eye. *See* Consolidated Resp. Br. at 17. Similarly, there is no reasonable construction of the statute that would allow the President to conclude that technology to implement a standard is "not available" for a source that has already installed the necessary technology and/or is already meeting the

---

[6] Defendants argue that "technology" in Section 7412 encompasses both processes and practices. They base this argument on the definition of a broader term—"best available control technology"—found elsewhere in the statute. *See* Defs. Reply Br. at 20 (citing 42 U.S.C. § 7479(3)). Section 7412, however, draws a distinction between "practices, processes, and control technologies," 42 U.S.C. § 7412(d)(6), and Section 7412(i)(4) only applies to "technology". It therefore contravenes the statute (and common sense) to conclude that exemptions may apply to standards that rely on practices and processes that are purportedly unavailable to an individual facility. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (Courts presume "Congress intend[s] a difference in meaning" when it uses different language.).

standard. *See* Consolidated Resp. Br. at 19. Such obvious deviations from the statutory standard establish that the President did not really base his exemptions decisions on the required availability determination. *See Fed. Educ. Ass'n*, 795 F. Supp. 3d at 95 (presumption of regularity rebutted in part because a presidential proclamation applied exercised statutory authority over facially ineligible agencies); *see also Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *10 (D.C. Cir. Sept. 25, 2025) (Pan, J., concurring) (explaining that an *ultra vires* claim against an executive order is viable in part because the executive order applies to entities that "do not appear" to qualify under the relevant predicate statutory determination).

## CONCLUSION

Defendants advance an alarming view of our system of government in which courts are powerless to stop the executive branch from disregarding congressional limitations on authority, so long as such limitations are predicate determinations left to the executive in a statutory scheme lacking an express grant of jurisdiction. Here, the consequences of Defendants' lawless view are exemptions that facially bear no resemblance to the limited authority Congress conferred, and which would sweep aside standards that protect millions of people from exposure to dangerous toxic air pollution. Respectfully, this Court should reject Defendants' incorrect *ultra vires* standard and permit Plaintiffs' claims to move forward to merits review.

20

DATED: May 22, 2026

/s/ Sarah A. Buckley
Sarah A. Buckley (D.C. Bar No. 90035401)
Shampa Panda (D.C. Bar No. 90030605)
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
Tel: (202) 836-9333
Tel: (202) 836-9555
spanda-bryant@nrdc.org
sbuckley@nrdc.org

*Counsel for Natural Resources Defense Council and Minnesota Center for Environmental Advocacy*

/s/ Tosh Sagar
Tosh Sagar (D.C. Bar No. 1562693)
Sage Lincoln (D.C. Bar No. 90042038)
Earthjustice
1250 I Street NW, 4th Floor
Washington, DC 20005
Tel: (202) 793-2075
tsagar@earthjustice.org
slincoln@earthjustice.org

*Counsel for Citizens for Pennsylvania's Future, Hoosier Environmental Council, Just Transition Northwest Indiana, and Sierra Club*

/s/ Haley Lewis (Pro Hac Vice)
Haley Lewis (AL Bar No. ASB-1008-R66I)
Abel Russ (D.C. Bar No. 1007020)
888 17th Street, NW, Suite 810
Washington, DC 20006
Tel: (202) 263-4449 (Lewis)
Tel: (802) 482-5379 (Russ)
hlewis@environmentalintegrity.org
aruss@environmentalintegrity.org

*Counsel for Greater-Birmingham Alliance to Stop Pollution and Clean Air Council*

Respectfully submitted,

*/s/* Jaclyn Brass (Pro Hac Vice)
Jaclyn Brass (Ala. Bar No. ASB-5340-B19L)
Christina Tidwell (Ala. Bar No ASB-9696-D10R)
Southern Environmental Law Center
2829 2nd Avenue S, Suite 282
Birmingham, AL 35233
Tel: 205-745-3060
Jbrass@selc.org
Ctidwell@selcal.org

*Counsel for Greater-Birmingham Alliance to Stop Pollution*

/s/ Kerri N. Powell
Keri N. Powell (D.C. Bar No. 477045)
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Tel: 678-433-6851
Kpowell@selc.org

*Counsel for Greater-Birmingham Alliance to Stop Pollution, CleanAIRE NC, Virginia Interfaith Power and Light, Sustainable Newton, Savannah Riverkeeper*

*/s/* Irena Como (Pro Hac Vice)
Irena Como (N.C. Bar No. 51812)
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Tel: 919-867-4404
icomo@selc.org

Marissa Land (GA Bar No. 168442) (*phv*)
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
mland@selc.org

*Counsel for CleanAIRE NC, Virginia Interfaith Power and Light, Sustainable Newton, Savannah Riverkeeper*

/s/ Brian H. Lynk

21

Brian H. Lynk (D.C. Bar No. 459525)
Environmental Law & Policy Center
740 15th St. NW, Suite 700
Washington, D.C. 20005
Tel: 240-461-4241
blynk@elpc.org

*Counsel for Environmental Law & Policy Center*

**CERTIFICATE OF SERVICE**

I certify that on May 22, 2026, I electronically filed the foregoing with the Clerk of the

Court by using the Court's CM/ECF system.

<div style="text-align: center; margin-left: 40%;">

/s/ *Sarah A. Buckley*
Sarah A. Buckley (D.C. Bar. No. 90035401)
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
Tel: (202) 836-9555
sbuckley@nrdc.org

</div>